UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WALTER TIMOTHY STOREY,                )
                                      )
          Petitioner,                 )
                                      )
     vs.                              )          Case No. 4:05-CV-2073 (JCH)
                                      )
DONALD P. ROPER,                      )
                                      )
          Respondent.                 )

**MEMORANDUM AND ORDER**

The matter is before the Court on Petition Walter Timothy Storey's Petition for Writ of

Habeas Corpus ("2254 Motion"), filed March 5, 2007. (Doc. No. 17). Respondent Donald Roper

filed his Response on June 8, 2007. (Doc. No. 26). Petitioner filed his Traverse on January 12, 2008.

(Doc. No. 38).

**TABLE OF CONTENTS**

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -
    I.      Procedural History of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -
    II.    Facts of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -
    III.   Procedural Details of the Missouri Death Penalty Statute . . . . . . . . . . . . . . - 11 -

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -
    I.      Non-Cognizable Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -
        A.    Claim Six . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -
        B.    Claim Seven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -
        C.    Claim Forty-Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -
        D.    Claim Forty-Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 15 -
    II.    Exhaustion and Procedural Default Analysis . . . . . . . . . . . . . . . . . . . . . . . - 16 -
        A.    Claim Twenty-Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 17 -
        B.    Claim Twenty-Seven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
    III.   Claims Addressed on the Merits–1991 Guilt-Phase Trial . . . . . . . . . . . . . . - 20 -
        A.    Claim One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 20 -
        B.    Claim Four and Claim Nineteen . . . . . . . . . . . . . . . . . . . . . . . - 21 -

C.     Claim Five and Claim Twenty . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 24 -
D.     Claim Eight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 25 -
      1.     Divine Intervention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 26 -
      2.     The "Inked Fingerprints" . . . . . . . . . . . . . . . . . . . . . . . . . . . - 27 -
      3.     Statements About Police . . . . . . . . . . . . . . . . . . . . . . . . . . . - 27 -
      4.     Perjury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 29 -
      5.     Personalizing the Argument . . . . . . . . . . . . . . . . . . . . . . . . . - 30 -
      6.     Sexual Assault Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 30 -
      7.     Everyone in the Courtroom Remark . . . . . . . . . . . . . . . . . . - 31 -
      8.     Claim Twenty-Eight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 32 -
E.     Claim Sixteen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 32 -
      1.     Smith's Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 33 -
      2.     The FBI Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 35 -
      3.     Highway Patrol Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 35 -
      4.     December 4, 1995 Memorandum . . . . . . . . . . . . . . . . . . . . - 36 -
F.     Claim Eighteen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 37 -
      1.     Venireperson 9, Kathleen Doerrer . . . . . . . . . . . . . . . . . . . - 37 -
      2.     Venireperson 39, Kym Duly . . . . . . . . . . . . . . . . . . . . . . . - 38 -
G.     Claim Twenty-One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 40 -
H.     Claim Twenty-Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 43 -
I.     Claim Twenty-Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 45 -
J.     Claim Twenty-Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 47 -
K.     Claim Twenty-Six . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 48 -
L.     Claim Twenty-Nine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 49 -
IV.     Claims Addressed on the Merits–1999 Penalty-Phase Trial . . . . . . . . . . . . - 50 -
A.     Claim Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 50 -
B.     Claim Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 52 -
C.     Claim Nine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 54 -
      1.     Late Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 56 -
      2.     Victim Impact Evidence violated Payne . . . . . . . . . . . . . . . - 59 -
D.     Claim Ten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 61 -
E.     Claim Eleven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 63 -
F.     Claim Twelve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 65 -
      1.     "Excuses" Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 66 -
      2.     Mercy Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 67 -
      3.     Abuse Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 68 -
G.     Claim Thirteen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 70 -
      1.     Instruction 11 (MAI-CR3d 313.46B) . . . . . . . . . . . . . . . . . - 70 -
      2.     Instruction 12 (MAI-CR3d 313.46B) . . . . . . . . . . . . . . . . . - 71 -
H.     Claim Fourteen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 74 -
I.     Claim Fifteen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 76 -
J.     Claims Thirty to Thirty-Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 77 -
      1.     Claim Thirty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 78 -
      2.     Claim Thirty-One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 79 -
      3.     Claim Thirty-Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 81 -
      4.     Claim Thirty-Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 82 -

| | K. | Claim Thirty-Four and Claim Forty-Six . . . . . . . . . . . . . . . . . . . . . . | - 83 - |
|---|---|---|---|
| | | 1. Victim Impact Evidence violated Ex Post Facto Clause . . . . | - 83 - |
| | | 2. Gladys Frey's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 84 - |
| | | 3. Marshall and Stepson's Testimony . . . . . . . . . . . . . . . . . . . | - 85 - |
| | | 4. Freys and Reidelberger Testimony . . . . . . . . . . . . . . . . . . . | - 86 - |
| | | 5. Religious Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 88 - |
| | | 6. Picture of Ms. Frey at Age Three . . . . . . . . . . . . . . . . . . . . | - 90 - |
| | | 7. Entire Community Closing Argument . . . . . . . . . . . . . . . . | - 91 - |
| | L. | Claim Thirty-Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 92 - |
| | | 1. Non-Family Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 92 - |
| | | 2. Family Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 94 - |
| | | 3. Employment records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 95 - |
| | M. | Claim Thirty-Six . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 96 - |
| | N. | Claim Thirty-Seven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 100 - |
| | O. | Claim Thirty-Eight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 102 - |
| | | 1. Voir Dire Comment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 103 - |
| | | 2. Plummer's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 103 - |
| | | 3. Cross-Examination of James Aiken . . . . . . . . . . . . . . . . . . | - 104 - |
| | | 4. Dr. Givon's Testimony Regarding Personality Disorder . . . | - 105 - |
| | | 5. Dr. Givon's Testimony Regarding Competence . . . . . . . . . | - 106 - |
| | P. | Claim Thirty-Nine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 107 - |
| | | 1. Equating Mercy with Weakness . . . . . . . . . . . . . . . . . . . . . | - 107 - |
| | | 2. Comparing Petitioner's Life to Ms. Frey's Life . . . . . . . . . | - 108 - |
| | Q. | Claim Forty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 110 - |
| | R. | Claim Forty-One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 111 - |
| | S. | Post-Trial Hearing Related to Juror Misconduct . . . . . . . . . . . . . . | - 112 - |
| | | 1. Claim Forty-Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 113 - |
| | | 2. Claim Forty-Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 114 - |
| | T. | Claim Forty-Seven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 115 - |
| | U. | Claim Forty-Eight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 116 - |
| | V. | Claim Forty-Nine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 117 - |
| | W. | Claim Fifty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 118 - |
| V. | | Claim Addressed on the Merits--2001 Motion Court . . . . . . . . . . . . . . . | - 119 - |
| | A. | Claim Seventeen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 119 - |

REQUEST FOR EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 120 -

CERTIFICATE OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 121 -

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 122 -

## <u>STANDARD OF REVIEW</u>

A state prisoner may petition for a writ of habeas corpus "only on the ground that he is in

custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A state prisoner is entitled "'to relief on federal habeas corpus only upon proving that [his] detention violates . . . fundamental liberties . . . safeguarded against state action by the Federal Constitution.'" Wessling v. Bennett, 410 F.2d 205, 209 (8th Cir. 1969), quoting Townsend v. Sain, 372 U.S. 293, 312 (1963). "'[I]t is not the province of a federal habeas court to re-examine state-court determinations [of] state-law questions.'" Gee v. Groose, 110 F.3d 1346, 1349 (8th Cir. 1997), quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Rather, a federal court is limited "'to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.'" Id.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), P.L. 104-132, 110 Stat. 1214, made numerous changes to Title 28, Chapter 153 of the United States Code, 28 U.S.C. §§ 2241-2255, the chapter governing federal habeas petitions. Specifically, in Section 104 of the AEDPA, Congress added new subsection (d) to 28 U.S.C. § 2254. That subsection provides as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of § 2254(d)(1), a petitioner may prevail if the state court's decision is opposite to that reached by the United States Supreme Court on a question of law or if a state court decides a case differently than the United States Supreme Court despite confronting indistinguishable facts. See Copeland v. Washington, 232 F.3d 969, 973 (8th Cir. 2000) (citing

Williams v. Taylor, 529 U.S. 362 (2000) (holding that the "contrary to" clause refers to the Supreme Court's holdings and not its dicta)); see also Ramdass v. Angelone, 530 U.S. 156 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a writ may issue only if the state court identifies that correct governing legal principle from the United State Supreme Court's decisions but unreasonably applies the principle to the facts of the petitioner's case. See Williams, 529 U.S. at 412. Under this clause, a federal habeas court should ask "whether the state court's application of clearly established federal law [as determined by the United States Supreme Court] was objectively unreasonable." Id. at 1521. It is not enough for the federal habeas court to conclude in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. Id. at 1522.

## BACKGROUND

### I.     Procedural History of the Case

On May 14, 1990, Petitioner was charged with first degree murder for the death of Jill Lynn Frey ("Ms. Frey"). (Resp. at Ex. L pp. 18-20). On September 19,1991, a jury in the Circuit Court of St. Charles County, Missouri ("Circuit Court") found Petitioner guilty of First Degree Murder, Armed Criminal Action, Second Degree Burglary, and Tampering with Physical Evidence. (Id. at p. 356). The jury recommended a sentence of death after finding as a statutory aggravating circumstance that the murder was "outrageously and wantonly vile, horrible, and inhuman."[1] (Id. at p. 325). On November 15, 1991, the trial court adopted the jury's recommendation and sentenced Petitioner to death. (Id. at p. 356). For his other crimes, Petitioner received consecutive sentences of life without parole, seven years, and five years. (Id. at p. 358). On November 15, 1991, Petitioner filed his notice of appeal with the Missouri Supreme Court to initiate his direct appeal. (Id. at p. 362).

---

[1]This is known as the "depravity of mind" aggravator. See Mo. Rev. Stat. § 565.032.2(7).

Petitioner then filed a Mo. Ct. R. 29.15 ("Rule 29.15") motion for post-conviction relief on March 25, 1992 in the Circuit Court ("1992 Motion Court"). (Resp. at Ex. M-1 pp. 5-20). The 1992 Motion Court denied his motion on September 14, 1993. (Id. at Ex. M-6 pp. 1415-37). Petitioner appealed this denial to the Missouri Supreme Court, which consolidated it with his direct appeal. State v. Storey, 901 S.W.2d 886, 891 (Mo. 1995) (Storey I). The Missouri Supreme Court affirmed his convictions and his non-capital sentences. Id. It reversed the death sentence due to ineffective assistance of counsel because his counsel failed to object to the prosecutor's inappropriate closing argument during the penalty phase. Id. at 900-03. Specifically, the prosecutor argued facts outside the record, personalized the argument, misstated the law, and used a hypothetical meant to induce the jury to apply its emotions instead of reason. Id. at 900-02.

The case was remanded to the Circuit Court for a new penalty-phase trial. (Resp. at Ex. T-1 p. 12). On June 11, 1997, a jury again recommended a sentence of death after finding as a statutory aggravating circumstance that the murder involved depravity of mind. (Id. at Ex. T-2 p. 223). The court adopted this recommendation on July 10, 1997. (Id. at p. 281-84). Petitioner appealed his sentence, and the Missouri Supreme Court reversed it on February 23, 1999 because the trial court violated his Fifth Amendment rights by denying his request that the jury receive a no-adverse inference instruction. State v. Storey, 986 S.W.2d 462, 463-65 (Mo. 1999) (Storey II).

The case was remanded to the Circuit Court for another penalty-phase trial. Id. at p. 466. On September 17, 1999, a jury recommended a sentence of death, which the court adopted, after finding as statutory aggravating circumstances that Petitioner committed the murder for pecuniary gain and the murder was "outrageously and wantonly vile, horrible, and in humane." (Resp. at Ex. Z-2 pp. 191-94). On March 6, 2001, the Missouri Supreme Court affirmed his sentence. State v. Storey, 40 S.W.3d 898, 916 (Mo.) cert. denied, 534 U.S. 921 (2001) (Storey III).

Petitioner filed a Rule 29.15 motion for post-conviction relief with the Circuit Court on July 19, 2001 ("2001 Motion Court"). (Resp. Ex. II-1 at pp. 7-12). This motion was denied on March 18, 2004. (Id. at Ex. II-6 pp. 836-73). The Missouri Supreme Court affirmed the denial of his Rule 29.15 motion on October 18, 2005. Storey v. State, 175 S.W.3d 116, 160 (Mo. 2005) (Storey IV).

Pursuant to Mo. Ct. R. 91 ("Rule 91"), Petitioner filed a petition for writ of habeas corpus with the Missouri Supreme Court on November 16, 2006. (Mot. to Dismiss, Doc. No. 18 at Ex. C). It was denied on December 19, 2006. (Id. at Ex. D). Petitioner filed a second Rule 91 petition with the Missouri Supreme Court on December 22, 2006, which was denied on January 30, 2007. (Id. at Ex. E-F). On January 19, 2007 Petitioner filed a motion to recall the mandate, which the Missouri Supreme Court denied on February 27, 2007. (Id. at Ex. G-H).

On November 4, 2005, Petitioner filed a motion to appoint counsel, in accordance with McFarland v. Scott, 512 U.S. 849 (1994). (Doc. No. 1). The Court appointed counsel to represent Petitioner on November 7, 2005. (Doc. No. 3). On March 5, 2007, Petitioner filed his § 2254 Motion. (Doc. No. 17). On March 12, 2007, Respondent filed a motion to dismiss alleging that Petitioner's claims were time-barred. (Doc. No. 18). The Court denied Respondent's motion on March 27, 2007. (Doc. No. 23).

## II.    Facts of the Case

The 2001 Motion Court summarized the facts giving rise to Petitioner's conviction as follows:

> Lavon Marshall, whose apartment shared a common wall with that of the victim was awakened in the early morning hours of February 3, 1990, by a woman's scream. She heard a man's voice coming from Ms. Frey's apartment angrily saying "shut up, shut up, shut up." She also heard loud banging on the wall, moaning, furniture being moved, drawers being opened and closed, and the sound of running water. Ms. Marshall started to call the police, but when things got quiet, she did not complete the call; she did not believe anything was seriously wrong. The following morning, when

Ms. Marshall went to brunch, she noticed that the light was on in Ms. Frey's bedroom. When she came back, the light was off.

When Ms. Frey, who taught young children with physical and mental disabilities at United Services for the Handicapped (USH) and was normally very prompt, did not show-up for work the morning of February 5, 1990, Karen Stepson, the program director at USH, became concerned. Ms. Stepson attempted to reach Ms. Frey at home by telephone but received no answer. Ms. Stepson then drove to the Sun Lake apartment complex where Ms. Frey lived. When she did not see Ms. Frey's car in the parking lot, she returned to the school. Next, she telephoned Ms. Frey's mother, to see if Ms. Frey was out of town. Ms. Frey's mother was unaware of any trip.

Still concerned, Ms. Stepson then returned to Ms. Frey's apartment complex with Joesph Ortwerth, the Community Relations Director at USH, and Tom Engle, the Executive Director of USH, to see if the apartment manager would let them into Ms. Frey's apartment. After securing a key from the apartment manager, the trio entered Ms. Frey's locked, second-floor apartment where Ms. Stepson discovered Ms.Frey's body in a bedroom. Ms. Frey was lying face down on the floor with her arms behind her back. She was naked from the waist down and was lying in a large pool of blood. Ms. Frey's pajama top was soaked in blood and had what appeared to be a tennis shoe print on it. Her bed was in disarray, the mattress was soaked through with blood, and the walls several feet away from Ms. Frey's body were splattered with blood.

Ms. Stepson's screams upon discovering Ms. Frey's body drew the attention of movant and his mother, who lived in the apartment across the hall from Ms. Frey's apartment. Movant's mother invited them into her apartment to call the police.

The police arrived at Ms. Frey's apartment at 11:35 a.m. As examination of the scene revealed that there had been no forced entry into the apartment. The police did, however, discover mud on the balcony railing to Ms. Frey's apartment and on the patio fence to the apartment below and mud smears on the side of the building. Inside, the police recovered a bloody palm print from Ms. Frey's dresser that belonged to movant. In addition, they noted that several items on her night stand had been disturbed and the some of her personal papers, her cosmetic bag, and her coin purse were scattered on her bed. Finally, Ms. Frey's blood was found on her bathroom carpet and on a towel recovered from the bathroom.

Outside, the police found a paper bag containing Ms. Frey's briefcase in the apartment complex dumpster, as well as a paper bag containing a bloody t-shirt, tank-top, and pair of white gloves. Ms. Frey's blood was on the gloves and movant's blood was on the t-shirt. The tank-top tested positive for human blood but further tests were inconclusive. Ms. Frey's car was found parked in another area of the apartment complex. Finally, the police recovered Ms. Frey's keys from the lake behind her apartment.

Ms. Frey's body was taken to the morgue where an autopsy was preformed by Dr. Mary Case. The autopsy revealed that Ms. Frey died from blood loss and asphyxiation as the result of two incised wounds to her neck. These cuts were several inches deep, passing through both jugular veins, her airway, and her esophagus, to the front of her spine. She remained conscious after these injuries for as much as one minute.

In addition, Ms. Frey sustained numerous injuries to her face including over a dozen bruises, contusions and abrasions. She suffered injuries to her forehead, nose, cheeks, scalp, upper and lower lips, tongue, and one of her eyelids was torn. All of these injuries were inflicted while she was alive, and none of them caused unconsciousness or death.

In addition, Ms. Frey had defensive injuries to her hands and arms. She had an abrasion on her right knee. She also had a six-inch deep stab wound to her right abdominal area. Bruising around the stab wound was consistent with the impact of movant's hand as he thrust the knife all the way into her body. There were four internal impact injuries to the left side of Ms. Frey's scalp which were not externally visible but were caused by four separate blows to her head. Finally, Ms. Frey had five fractured ribs, one of which would have caused her difficulty breathing. These rib injuries were consistent with movant having stepped on Ms. Frey's back, kicked her or hit her with his fist. Ms. Frey sustained no less than twenty blunt force impacts to her body.

The police sent movant and his mother to the police station to be interviewed the morning Ms. Frey's body was discovered. When interviewed by Lieutenant Zumwalt, movant said that around 6:00 p.m., Friday, February 2, 1990, he went to the apartment complex spa where he stayed until around 7:00 or 8:00 p.m. He then returned to his apartment, changed clothes, and left on foot. According to movant, he was picked up by a woman named "Stacey," who took him to a bar in Wentzville, Missouri. Movant claimed to have spent the night with this woman, not returning to his apartment until late Saturday night. According to movant, he remained in his apartment most of the day Sunday, only returning to the spa again around 6:00 p.m.

Movant was interviewed again the following day by Detectives Plummer and Miller. Movant was advised of his Miranda rights and waived them. He initially repeated the story he told Lt. Zumwalt. He then told the detectives that on Friday, February 2, 1990, he received a letter from his wife's attorney regarding their upcoming divorce proceedings which accused him of being abusive and violent. Movant was upset and walked to the liquor store where he bought a twelve-pack of beer. While he was sitting in his apartment drinking this beer, he heard Ms. Frey come home. Movant then went back to the liquor store where he bought more beer. Movant returned home and continued drinking. Later that night, he got a knife from his kitchen, climbed the balcony to Ms. Frey's apartment, and entered through an unlocked sliding glass door. Movant intended to steal money from Ms. Frey to buy more alcohol. Movant removed Mr. Frey's car keys from her jacket, which was hanging on a chair, with the intent of stealing her car. Movant then noticed a light on in Ms. Frey's bedroom. He

went into the bedroom and found her laying on the bed. In movant's words, he "struggled" with Ms. Frey and then left.

Movant took Ms. Frey's car and her wallet and drove to a bar in Wentzville. He threw the wallet in a dumpster outside the bar. He returned home around 11:30 Saturday night. When his mother asked about the scratches and abrasions on his chin, chest, arms, shoulder, and legs, he claimed to have fallen by a lake, and her told her the "Stacey" story.

Sunday afternoon, after his mother and her boyfriend went to church, movant returned to Ms. Frey's apartment to get rid of evidence that might incriminate him. He wiped down the apartment to remove his fingerprints and he scrubbed under Ms. Frey's fingernails with a tooth brush to remove any trace of his skin that may have been embedded there when she scratched him. He threw her keys out of the sliding glass door into the lake and took her brief case. He then threw the brief case into the dumpster along with the clothing he wore during the murder and the cleanup.

Movant was again advised of his <u>Miranda</u> rights, and he reduced the foregoing statement to writing, and it was read to the jury. In that statement, movant admitted that it was his intent to steal money from Ms. Frey when he entered her apartment.

The police interviewed movant a third time on February 7, 1990. After waiving his <u>Miranda</u> rights, movant gave virtually the same account of the murder as he had the day before.

In addition to the evidence, the State presented testimony from Deputy Leutkenhaus that luminol testing revealed two blood stains on the carpet in movant's bedroom. Moreover, when movant was arrested, the police found several injuries on him, including scratches and abrasions on his right hand, under his right arm, on his upper chest, on his shoulder, at the base of his neck, on his right buttock, on his chin, and on his left knee. The police also seized shoes that had blood on them.

(Resp. at Ex. II-6 pp. 837-43) (internal citations omitted).

In a habeas proceeding, federal law requires that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." <u>Id.</u> After a thorough review of the state record, the Court concludes that the 2001 Motion Court accurately summarized the evidence presented at trial. Petitioner has not attempted to rebut the facts relating to the murder of Ms. Frey. In accordance with 28 U.S.C. § 2254(e)(1), and the Court's independent review of the

record, the Court adopts the motion court's factual findings, which the Missouri Supreme Court found not clearly erroneous.

## III.    Procedural Details of the Missouri Death Penalty Statute

The Missouri death penalty scheme requires a bifurcated trial in which the trier of fact, usually a jury, must first determine whether the defendant is guilty of first degree murder. See Mo. Rev. Stat. § 565.030.2. If the defendant's guilt is established during the guilt phase, a second stage of trial proceeds "at which the only issue shall be the punishment to be assessed and declared." See id. at § 565.030.4. During the second, or "penalty," phase, the parties may present evidence in aggravation and mitigation of punishment, including, but not limited to, evidence supporting any of the statutory aggravating or mitigating circumstances listed in Mo. Rev. Stat. § 565.032.2 and § 565.032.3. Id. at 565.030.4. A sentence of life imprisonment without eligibility for probation, parole or release shall be imposed:

> (1) If the trier finds by a preponderance of the evidence that the defendant is mentally retarded; or
>
> (2) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances set out in subsection 2 of section 565.032; or
>
> (3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or
>
> (4) If the trier decides under all of the circumstances not to assess and declare the punishment at death.

Id. at § 565.030.4(1)-(4).

In addition to a direct appeal of the conviction to the Missouri Supreme Court, the state legislature provided for a mandatory review of the death sentence itself by the Missouri Supreme Court. Id. at § 565.035.1. During the sentence review, the Missouri Supreme Court must determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Id. at § 565.035.3.

## DISCUSSION

### I.    Non-Cognizable Claims

Federal habeas relief is available to a state prisoner only on the ground that he is in custody in violation of a constitutional or federal statutory right. Williams-Bey v. Trickey, 894 F.2d 314, 317 (8th Cir.), cert. denied, 495 U.S. 936 (1990); 28 U.S.C. § 2254(a). Claims that do not reach constitutional magnitude cannot be addressed in a federal petition for writ of habeas corpus. Carter v. Armontrout, 929 F.2d 1294, 1296 (8th Cir. 1991).

### A.    Claim Six

In Claim Six, Petitioner alleges that the 1991 trial court erred by not dismissing the second degree burglary charge and the tampering with physical evidence charge because insufficient evidence existed to support them. (Pet. at pp. 26-28). Petitioner alleges that he could not have committed the crime of tampering with physical evidence, which a person commits if he "[a]lters, destroys, suppresses or conceals any record, document or thing with purpose to impair its verity, legibility or availability in any official proceeding or investigation," because there was no proof that he tampered with evidence after the official investigation began on February 5, 1990. See Mo. Rev. Stat. § 575.100.1(1). If Petitioner's argument is correct, then the second degree burglary charge fails because an element of the crime is entering a structure "for the purpose of committing a crime therein." Mo.

Rev. Stat. § 569.170.1. Petitioner believes that the trial court's failure to dismiss these charges amounted to a denial of due process. (Pet. at p. 26).

The Missouri Supreme Court addressed this claim and held that § 575.100.1 "contains no requirement that an investigation begin before one can impair it." Storey I, 901 S.W.2d at 896. This Court cannot review the Missouri Supreme Court's interpretation of Missouri law.[2] Evenstad v. Carlson, 470 F.3d 777, 782-83 (8th Cir. 2006). Moreover, no federal due process violation occurred because the evidence at trial showed that he entered Ms. Frey's apartment and destroyed evidence. Claim Six is denied.

**B.     Claim Seven**

In this claim, Petitioner alleges that he is actually innocent of first degree murder because new mental health examinations show that he could not deliberate, which is a required element of First Degree Murder in Missouri. See Mo. Rev. Stat. § 565.020.1. After his conviction in 1991, Petitioner received numerous mental examinations to aid his legal defense. (Pet. at p. 29). These examinations found that he has borderline personality disorder and post-traumatic stress disorder. (Resp. Ex. Y-4 pg. 1323-24, 1334-35) Additionally, his global brain function places him in the category of "brain damaged with mild impairment." (Resp. at N-2 p. 250).

Claims of actual innocence based on newly discovered evidence "have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the state criminal proceedings." See Burton v. Dormire, 295 F.3d 839, 848 (8th Cir. 2002) (quoting Herrera

---

[2]Petitioner contends that the Missouri Supreme Court's failure to follow precedent from the Missouri Court of Appeal amounted to a due process denial. (Traverse at pp. 18-20). Petitioner's argument that the Missouri Supreme Court ignored precedent from the Missouri Courts of Appeal is without merit. See State v. Grubb, 120 S.W.3d 737, 741 (Mo. 2003) (holding that Missouri Supreme Court is in "nowise bound by the decisions of the [c]ourt of [a]ppeals.").

v. Collins, 506 U.S. 390, 400 (1993)). The Supreme Court did leave open the possibility that a "truly persuasive demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional." Herrera, 506 U.S. at 417. It cautioned "that the threshold showing for such an assumed right would necessarily be extraordinarily high." Id. Although Petitioner discusses his trial counsel's failure to adequately investigate his capacity to deliberate, he has not framed his claim as an ineffective assistance of counsel claim that relies on actual innocence to show prejudice.[3] Rather, he claims that he is innocent of the crime and that upholding the conviction would violate the Eighth and Fourteenth Amendments. The Supreme Court rejected this argument in Herrera. See 506 U.S. at 399-403. Additionally, this case is not the rare case where a "truly persuasive demonstration" of actual innocence exists. Claim Seven is denied.

### C.     Claim Forty-Four

In this claim, Petitioner alleges that the 2001 Motion Court erred by denying his request to call jurors to testify about possible juror misconduct. (Pet. at p. 196). This Court may only grant a habeas petition of a person who is being held in state custody "in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). The Supreme Court has held that the Constitution does not guarantee the existence of post-convictions proceedings. See Bell-Bey v. Roper, 499 F.3d 752, 756 (8th Cir. 2007) (citing Pennsylvania v. Finley, 481 U.S. 551, 557 (1987)). The Eighth Circuit has held that "an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition." Id. (quoting Williams-Bey, 894 F.2d at 317. Petitioner asserts that the Court should "revisit" this rule because of his case's capital nature. The Court declines to revisit this rule because it must apply Eighth Circuit precedent. Hood v. United

---

[3]Claim Twenty-Seven alleges ineffective assistance of counsel due to his 1991 trial counsel's failure to argue that he lacked the ability to deliberate.

States, 342 F.3d 861, 864 (8th Cir. 2003). As such, Claim Forty-Four is not cognizable in a federal habeas action and is denied.

### D. Claim Forty-Five

In Claim Forty-Five, Petitioner alleges that his death sentence violates his Eighth and Fourteenth Amendment rights because, when compared to similar death penalty cases, it is excessive and disproportionate. (Pet. at pp. 198-202). He alleges that his death sentence violates Mo. Rev. Stat. § 565.035.3(3), which requires the Missouri Supreme Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant." He asserts that no defendant that was abused as a child has ever received the death penalty for a single murder. (Id. at p. 199). He contends that the physical abuse cited to support the depravity of mind statutory aggravator "while awful, were at worst on the low end of the scale comparatively speaking." (Id.). He alleges that his lack of prior violent offenses, his improved mental status, and his behavior in prison suggests that anything more than a life sentence is excessive and disproportionate. (Id. at pp. 201-02). Missouri conducted a proportionality review and held that "the penalty in this case was neither excessive nor disproportionate." Storey III, 40 S.W.3d at 916.

The Constitution does not require proportionality review by a state court, but once in place it must be conducted consistently with the Due Process Clause. Kilgore v. Bowersox, 124 F.3d 985, 996 (8th Cir. 1997). The requirements of due process are met by Missouri's statutory notice that proportionality review of death sentences will be performed on direct appeal, Mo. Rev. Stat. § 565.035.1, and by a performance of that review by the Missouri Supreme Court, with a conclusion that the penalty imposed was not disproportionate with similar cases. See Basile v. Bowersox, 125 F. Supp. 2d 930, 976 (E.D. Mo. 1999)(citing LaRette v. Delo, 44 F.3d 681, 688 (8th Cir. 1995)).

Thus, a finding that the Missouri Supreme Court has "addressed and decided the proportionality issue in its opinion" constitutes "the end of our inquiry." Zeitvogel v. Delo, 84 F.3d 276, 283 (8th Cir. 1996). Stated differently, the Constitution does not require this Court "to look behind [the Missouri Supreme Court's] conclusion to consider the manner in which the Missouri Supreme Court conducted its review or whether the court misinterpreted the Missouri statute." Tokar v. Bowersox, 198 F.3d 1039, 1052 (8th Cir. 1999).

Here, the Court finds that the Missouri Supreme Court determined that Petitioner's sentence was not disproportionate and excessive. See Storey III, 40 S.W.3d at 916. This finding ends this Court's inquiry and Claim Forty-Five is denied.

## II.      Exhaustion and Procedural Default Analysis

A petitioner must exhaust his state law remedies before the federal court can address the merits of his claims in a habeas petition. 28 U.S.C. §2254(b). The Court must first look to see whether the federal constitutional dimensions of the petitioner's claims have been fairly presented to the state court. Smittie v. Lockhart, 843 F.2d 295, 296 (8th Cir. 1988). Specifically, the prisoner must "give the state courts one full opportunity to resolve any constitutionals issues by invoking one complete round of the State's established appellate review process." Akins v. Kenney, 410 F.3d 451, 454 (8th Cir. 2005). If not, the petitioner may still meet the exhaustion requirement if there are no currently available non-futile state remedies by which he could present his claims to the state court. Id. When the petitioner's claims are deemed exhausted because he has no available state court remedy, the federal court still cannot reach the merits of the claims unless the petitioner demonstrates adequate cause to excuse his state court default and actual prejudice resulting from the default. Wainwright v. Sykes, 433 U.S. 72, 87 (1977); Keithley v. Hopkins, 43 F.3d 1216, 1217 (8th Cir.), cert. denied, 515 U.S. 1163 (1995); Stokes v. Armontrout, 893 F.2d 152, 155 (8th Cir. 1989). Every

habeas ground advanced by the petitioner must survive this exhaustion analysis, or the petition must be dismissed. Rose v. Lundy, 455 U.S. 509 (1982).

The record demonstrates that Petitioner's claims are exhausted either because they have been properly raised in the state courts, or because Petitioner has no available non-futile state remedies by which he could present his claims.

A claim must be presented at each step of the judicial process in state court to avoid procedural default. Jolly v. Gammon, 28 F.3d 51, 53 (8th Cir. 1994) (citation omitted). An inmate defaults claims that were not properly raised before the state court. Moore-El v. Luebbers, 446 F.3d 890, 897-98 (8th Cir. 2006). If an inmate fails properly to raise a claim in the state court proceedings, the claim is defaulted, and he is procedurally barred from pursuing it here. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Forest v. Delo, 52 F.3d 716, 719 (8th Cir. 1995). When a claim is defaulted, the Court will only consider it where the petitioner can establish either cause for the default and actual prejudice or that the default will result in a fundamental miscarriage of justice. Sawyer v. Whitney, 505 U.S. 333, 338 (1992).

### A.    Claim Twenty-Four

In Claim Twenty-Four, Petitioner alleges that his received ineffective assistance of trial counsel during his 1991 guilt-phase trial when his counsel failed to have pubic hair samples independently tested. Petitioner attempted to raise this claim in his "Second Supplemental Amended Motion under Missouri Supreme Court Rule 29.15." (Resp. at Ex. M-6 pp. 1190-98). The 1992 Motion Court, however, denied this claim because it was untimely filed. (Id. at p. 1419). Petitioner admits that this claim was not raised at the appellate level. (Traverse at p. 78 n. 28). Thus, Petitioner's claim was procedurally defaulted at both levels. See Winfield v. Roper, 460 F.3d 1026,

1038 (8th Cir. 2006) (holding untimely claim filed with motion court is procedurally defaulted); Sweet v. Delo, 125 F.3d 1144, 1150 (8th Cir. 1997) (holding claim must be presented on appeal).

Petitioner asserts that this claim is not procedurally defaulted because independent testing of the hair samples would have shown he is "probably" actually innocent. (Traverse at p. 78). Petitioner can overcome his procedural default by establishing either cause for the default and prejudice or that the default will result in a fundamental miscarriage of justice. Sawyer, 505 U.S. at 338. A positive determination under either standard "is rare and limited." Cox v. Burger, 398 F.3d 1025, 1031 (8th Cir. 2005). Because Petitioner's claims are of a procedural nature, the Court applies the standard set out in  Schlup v. Delo, 513 U.S. 298 (1993). See Cox, 398 F.3d at 1031.Under Schlup, Petitioner must first show that the new, reliable evidence was not available at trial. 513 U.S. at 327-28. Evidence is new "only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." Johnson v. Norris, 170 F.3d 816, 819 (8th Cir. 1999).  Then, he must show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Schlup, 513 U.S. at 327.

Upon consideration, Petitioner's claim of actual innocence does not satisfy Schlup. The evidence, as represented in the § 2254 Motion, does not make it "more like than not" that no reasonable juror would have convicted Petitioner. At most, it shows that the pubic hairs found on Ms. Frey did not come from Petitioner. This fact does not negate the overwhelming evidence of Petitioner's guilt, such as his confession, his bloody palm print, and his bloody clothes. Cf. House v. Bell, 547 U.S. 518, 537-53 (2006) (holding that Schlup standard satisfied when new DNA evidence disproved prime murder motive of sexual assault, significant issues existed with the collection of other forensic evidence, and new evidence existed that victim's husband may have confessed to crime). Thus, Claim Twenty-Four is denied.

## B.    Claim Twenty-Seven

In this claim, Petitioner alleges that he received ineffective assistance of counsel when his 1991 trial counsel failed to investigate the defense that Petitioner was unable to deliberate. (Pet. at p. 108). Petitioner alleges that the testimony of Dr. George Cowan ("Dr. Cowan"), Dr. Gerald Vandenberg ("Dr. Vandenberg"), and Dr. James Straub ("Dr. Straub") would have shown that he was unable to deliberate. (Id.).

Petitioner raised this claim in his 1992 Rule 29.15 Motion. (Resp. at Ex. M-1 pp. 70-81). The 1992 Motion Court rejected this argument after finding the evidence lacked credibility and conflicted with Petitioner's testimony. (Id. at Ex. M-6 pp. 1424-28). Petitioner did not raise this claim on appeal. Petitioner's claim is procedurally defaulted because he failed to raise it at the appellate level. Moore-El, 446 F.3d at 897-98. Petitioner raised this claim in a Rule 91 state habeas motion, but a rule 91 motion cannot rescue any already defaulted claim. See Sweet, 125 F.3d at 1150-51.

Petitioner can avoid procedural default by showing cause and prejudice or by showing a miscarriage of justice. Sawyer, 505 U.S. at 338. Petitioner has not shown cause for his failure to raise this claim at the appellate level, so he must satisfy the miscarriage of justice exception. A miscarriage of justice occurs in the "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent to the crime." McCleskey v. Zant, 499 U.S. 467, 494 (1991). In order to satisfy this exception, Petitioner must show that it is "more likely than not that, in light of new evidence, no reasonable juror would have convicted him." Abdi v. Hatch, 450 F.3d 334, 338 (8th Cir. 2006) (quoting Cassell v. Norris, 103 F.3d 61, 62 (8th Cir. 1996)).

Upon consideration, the Court finds that no miscarriage of justice occurred because Petitioner cannot show that the mental health evidence was newly discovered evidence. Evidence is new "only if it was not available at trial and could not have been discovered earlier through the exercise of due

diligence." Johnson, 170 F.3d at 819. Petitioner has not alleged that he was unable to have mental evaluations done of him. See Nance v. Norris, 392 F.23d 284, 291 (8th Cir. 2004). To the contrary, he admits that the State administered one. This new mental health evidence was presented at his post-conviction hearing. (Resp. at Ex. N-2 pp. 211-85, Ex. N-3 pp. 363-425, Ex. N-4 pp. 606-61). A review of the testimony shows that this testimony would not result in it being more likely than not that no reasonable juror would find that Petitioner could not deliberate because the evidence was not particularly convincing and easily marginalized by the State. (Id.). As such, Claim Twenty-Seven is denied.

### III.  Claims Addressed on the Merits–1991 Guilt-Phase Trial

### A.  Claim One

In Claim One, Petitioner alleges that the 1991 guilt-phase trial court failed to "death qualify" the jury panel because the parties improperly explained Missouri's death penalty process to the potential jurors. Petitioner alleges that his counsel should have objected to the striking of eleven potential jurors that had expressed opposition to the death penalty because it created a jury more likely to find Petitioner guilty of first-degree murder. (Pet. at pp. 8-15). He alleges that this defect led to a "structural error," which robbed him of his right to a jury trial. (Traverse at p. 5).[4]

The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent jurors.'" Morgan v. Illinois, 504 U.S. 719, 727 (1992) (quoting Irvin v. Dowd, 366 U.S. 717, 721-22 (1961)).  The standard for determining when a prospective juror "may be excluded for cause because of his or her views . . . is whether the juror's views would 'prevent or substantially

---

[4]Respondent asserts that this claim is procedurally defaulted. As the Eighth Circuit has noted, sometimes "it might well be easier and more efficient to reach the merits than go through the studied process required by the procedural default doctrine." McKinnon v. Lockhart, 921 F.2d 830, 833 n. 7 (8th Cir. 1990).

impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). Additionally, part of the right to a fair trial is "an adequate *voir dire* to identify unqualified jurors." Morgan, 504 U.S. at 729.

Upon consideration, Claim One is meritless. Petitioner's death sentence was reversed in Storey I. Thus, the Court may only grant habeas relief if Petitioner was denied his right to an impartial jury or adequate voir dire regarding his conviction for first degree murder. The record shows that the jurors knew of their duties regarding the guilt phase of the trial and were questioned about their ability to impartially decide the matter. The judge informed them of the presumption of innocence and the reasonable doubt standard. (Resp. at Ex. K-1 p. 17). The jurors were asked if anyone had knowledge about the case. (Id. at pp. 29-46). They were asked if they, or anyone they knew, had been a victim of violence. (Id. at pp. 87-97). They were asked if they knew the any of the witnesses. (Id. at p. 97). They were asked if they had prior law enforcement experience. (Id. at p. 117). They were questioned about if they understood that the State had the burden of proving Petitioner's guilt. (Id. at pp. 197-203, 212). In sum, nothing in the record shows that the voir dire process affected the jury panel's ability to impartially decide his guilt or innocence. Claim One is denied.

**B.**     **Claim Four and Claim Nineteen**

In Claim Four, Petitioner alleges that the 1991 guilt-phase trial court erred by allowing the prosecutor to commit prosecutorial misconduct during his opening statement. (Pet. at p. 23). Petitioner asserts that the State improperly mentioned that 1) Ms. Frey taught handicapped children; 2) that she had a romantic relationship with Dan Cruz; and 3) that the fingerprints found at the scene matched the "known, inked fingerprints" of Petitioner. (Pet. at pp. 23-24; Resp. at Ex. K-2 pp. 245-

46, 249). In Claim Nineteen, Petitioner alleges that his counsel was ineffective for failing to object to these statements. (Pet. at pp. 84-85).

The Missouri Supreme Court addressed this claim and held:

> Opening statement, previewing the evidence, may refer to admissible evidence. See State v. Debler, 856 S.W.2d 641, 656 (Mo. banc 1993). Frey's occupation was admissible because her co-workers discovered her body. Frey's relationship with Cruz was relevant because he was the last person to talk to her and tried to call repeatedly the day after the murder. The reference to inked prints was permissible because police solved the crime by comparing Storey's inked prints with a bloody palm print in Frey's apartment. The prosecutor could not describe this key point without referring to the inked prints on file. The opening statement did not indicate why the police department had Storey's prints on file, and thus, did not necessarily imply a previous arrest to the jury. Point denied.

Storey I, 901 S.W.2d at 897.

The standard for whether prosecutorial misconduct amounts violates due process is "whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Clemons v. Luebbers, 381 F.3d 744, 757 (8th Cir. 2004) (citing Darden v. Wainwright, 477 U.S. 168, 181 (1986)). As such, relief is only available if "the prosecutor's closing argument was so inflammatory and outrageous that any reasonable trial judge would have sua sponte declared a mistrial." See James v. Bowersox, 187 F.3d 866, 870 (8th Cir. 1999); see also Walls v. Bowersox, 151 F.3d 827, 837 (8th Cir. 1998).

As previously stated, federal courts will only grant a § 2254 petition if the state court decision applied clearly established federal law erroneously, applied federal law unreasonably to the facts of the case, or was based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. 2254(d)(1)-(2). Upon consideration, the Missouri Supreme Court's decision was a reasonable application of federal law to the facts of this case. Each complained about statement referenced facts that were later admitted as evidence. (Resp. at Ex. K-2 pp. 266-67, 277-82, 357-58). None of the

references were made in an inflammatory manner. These comments did not render Petitioner's trial fundamentally unfair, and Claim Four is denied.

In Claim Nineteen, Petitioner alleges that he received ineffective assistance of counsel when his counsel failed to object. In order to demonstrate ineffective assistance of counsel, Petitioner must show (1) his counsel's performance was deficient, in that his representation fell below an objective standard of reasonableness; and (2) that such deficient performance prejudiced Petitioner, in that there is a reasonable probability that but for counsel's errors the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. To overcome this presumption, Petitioner must prove that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id.

Even if Petitioner satisfies the performance component of the analysis, he is not entitled to relief unless he can prove sufficient prejudice. Id. at 691. Petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

Upon consideration, Claim Nineteen fails because Petitioner cannot satisfy the standard for ineffective assistance of counsel set forth in Strickland. Here, Petitioner cannot show that his counsel's performance was deficient because the complained about statements were not improper. See Carter, 92 F.3d at 671 (counsel is not required to make meritless arguments). As such, Petitioner cannot satisfy the first prong of Strickland. Claim Nineteen is denied.

### C.   Claim Five and Claim Twenty

In Claim Five, Petitioner alleges that the 1991 guilt-phase trial court erred by admitting ten "gruesome" photographs[5] of Ms. Frey's corpse because they were so prejudicial that they rendered his trial fundamentally unfair. (Pet. at pp. 25-26). In Claim Twenty, Petitioner alleges that his counsel was ineffective for failing to object to these photographs. (Id. at pp. 85-86)

Petitioner raised this claim before the Missouri Supreme Court, which held:

The trial court has broad discretion to admit or exclude photographs. State v. Isa, 850 S.W.2d 876, 890 (Mo. banc 1993). The gruesome nature of a photograph does not negate its admissibility where it serves a legitimate function, such as showing the nature and character of wounds, depicting the location and condition of the body, or establishing an element of the State's case. Id. at 890-91.

The photos here were admissible to show the nature and character of the wounds and to depict the location of the victim's body. Moreover, the type of wounds suffered and the appearance of the crime scene are relevant to deliberation, an element of first degree murder. See § 565.020 RSMo 1986. The trial court did not abuse discretion in admitting the photographs.

Storey I, 901 S.W.2d at 895.

The admissibility of evidence is an issue of state law that does not fall within the purview of federal habeas review. Garcia v. Mathes, 474 F.3d 1014, 1017 (8th Cir. 2007). The admission of evidence at a state trial can form the basis of federal habeas relief when an "evidentiary ruling infringes upon a specific constitutional right or is so conspicuously prejudicial that it amounts to a denial of due process." Abdi v. Hatch, 450 F.3d 334, 338 (8th Cir. 2006).

No specific constitutional right required the exclusion of this evidence. Therefore, the Court must consider whether the admission of these photographs was so egregiously erroneous that it

---

[5]These photographs showed: Ms. Frey's body before the autopsy; bruising on Ms. Frey's forehead; Ms. Frey's stab wound; bruising on the right hand, wrist, and arm; abrasions and scratches on left hand; right side of face during autopsy showing injuries to right eye and eyelid; left side of face during autopsy showing abrasions and bruises; straight on view of face during autopsy; picture of face during autopsy showing injuries to lip; left forearm, showing scratches; and Ms. Frey's neck wounds. (Resp. at Ex. K-3 pp. 673-80).

rendered Petitioner's trial fundamentally. Upon consideration, the photographs' admission did not violate due process because each picture contained a different view of the injuries sustained by Ms. Frey. (Resp. at Ex K-3 pp. 673-80). Although there were two pictures of Frey's neck wound, the second showed the wound after the blood was cleaned off, meaning it provided a better picture of the neck wound. (Id. at pp. 673-74); see Kuntzelman v. Black, 774 F.2d 291, 292-93 (8th Cir. 1985) (finding no error of constitutional magnitude in the admission of "flagrantly gruesome" photographs where the photographs "were at least arguably relevant and probative in showing the identity and condition of the deceased, the location of the wound, and the intent of [the petitioner] in firing the shot that killed [the victim]."). Thus, Claim Five fails.

Claim Twenty fails because Petitioner cannot satisfy the first prong of Strickland. Counsel was not deficient because the photographs' admission into evidence was not unconstitutional. See Carter, 92 F.3d at 671 (counsel is not required to make meritless arguments). As such, Petitioner cannot satisfy the first prong of Strickland. Claim Twenty is denied.

**D.      Claim Eight**

In Claim Eight, Petitioner alleges that the 1991 guilt-phase court erred by not declaring a mistrial due to prosecutorial misconduct during the closing statement. (Pet. at p. 32). Petitioner claims that the prosecutor made seven inappropriate remarks during his closing statement that rendered his trial fundamentally unfair. (Id. at pp. 32-36).

As previously stated, the standard for whether prosecutorial misconduct amounts to a due process violation is "whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Clemons, 381 F.3d at 757. As such, relief is only available if "the prosecutor's closing argument was so inflammatory and outrageous that any

reasonable trial judge would have sua sponte declared a mistrial." See James, 187 F.3d at 870.

### 1. Divine Intervention

Petitioner claims that the first inappropriate remark occurred when the prosecutor referenced divine imagery by stating:

> First and foremost, although he had taken the meticulous care to wipe down the front of the dresser drawer where the blood splatters had hit while he had been beating Jill Frey, he forgot or didn't see the top of the dresser, and when you looked at the pictures earlier and when you look at them again during deliberations, take a look at the top of the dresser drawer. It's easy to see why Mr. Storey messed up. You really can't see it. You can't see the ridges on this dresser drawer. Was it luck or was it divine intervention?

> Detective Frame said that when he went in, it was like this single ray of light coming through the venetian blinds that just happened – just happened to strike this dresser at such an angle that he could look down and he saw a print in blood. A print left by that man, three free away from the dying body –or, the dead body of Jill Frey. That was the first thing Mr. Storey didn't count on.

(Resp. at Ex. K-4 pp. 878-79). Petitioner alleges that the references led the jury to believe that God "did not want to see Mr. Storey go unpunished." (Pet. at p. 33).

Petitioner raised this issue before the Missouri Supreme Court, which held:

> Storey invokes State v. Debler, 856 S.W.2d 641, 656 (Mo. banc 1993), where this Court cautioned both sides to avoid excessive Biblical references (but did not find plain error). Here, the prosecutor's reference to divine intervention was not excessive, and permissibly highlighted the police's good fortune that Storey missed the key palm print.

Storey I, 901 S.W.2d at 897.

Upon consideration, the Missouri Supreme Court's decision did not result in a decision that was contrary to clearly established federal law and applied federal law reasonably to the facts of the case. The prosecutor's use of the phrase "divine intervention," while unnecessary, was not so inflammatory as to suggest that God wanted Petitioner found guilty of murder. Furthermore, the Eighth Circuit has found other, more inflammatory comments do not warrant habeas relief. See

Kinder v. Bowersox, 272 F.3d 532, 551 (8th Cir. 2001) (holding that prosecutor calling defendant "pure evil" did not warrant habeas relief). Finally, the risk of prejudice caused by this statement is minimal because Petitioner's counsel noted in her closing statement that "God hasn't got any place here." (Resp. at Ex. K-4 p. 895); See Hall v. Luebbers, 341 F.3d 706, 716 (8th Cir. 2003) (statement by defendant's counsel can minimize risk of prejudice from prosecutor's improper statements). Finally, the reference to a "ray of light" merely described the fortuitous circumstance that led the police to discover the key piece of forensic evidence. Petitioner's claim with respect to this remark is denied.

### 2.    The "Inked Fingerprints"

Petitioner alleges that the prosecutor should not have stated that his fingerprint were "on file" because it implied that he had a prior criminal history. (Pet. at p. 33). The Missouri Supreme Court denied this argument, stating that "[t]his argument was identical to that at the guilt-phase opening and was not improper." Storey I, 901 S.W.2d at 897.

In Claim Four, the Court found that the Missouri Supreme Court had not unreasonably applied federal law by holding that the "inked fingerprint" comment in opening statements was not improper. The Court see no reason why this claim warrants a different conclusion. Petitioner's claim with respect to this remark is denied.

### 3.    Statements About Police

Petitioner complains that the prosecutor praised the police for their handling of the investigation into Ms. Frey's death. (Pet. at p. 33). Petitioner believes that the comments amounted to the prosecutor personally vouching for the police witnesses' veracity. (Id. at p. 34). Specifically, the prosecutor stated:

> And I want to tell you something, I know recently here in this country law enforcement has been catching a bad name about some other things and catching a

black eye, but let me tell you this: I hope that you feel, after seeing these officers testify, after seeing the – the professional manner in which they collected all of the evidence for you, I hope you're as proud of these officers as I am to have worked with them on this case, because they did everything, everything, they needed to do.

(Resp. at Ex. K-4. pp. 879-80). The prosecutor later stated that the police "have done their job. An excellent job." (Id. at p. 920).

Petitioner raised this issue before the Missouri Supreme Court, which held as follows:

Third, Storey claims error when the prosecutor said the police were professional, did everything necessary, and he was proud of them. Other than the statement of pride, the references were permissible inferences from the evidence. Clemmons, 753 S.W.2d at 908. The prosecutor's statement of pride in the police, while unduly personal and irrelevant, is not so improper and prejudicial as to be plain error. See Debler, 856 S.W.2d at 656.

Storey I, 901 S.W.2d at 897.

Upon consideration, The Missouri Supreme Court's decision did not result in a decision that was contrary to clearly established federal law, and this decision was a reasonable application of federal law to the facts of this case. A short discussion about pride in the police did not render the trial fundamentally unfair. See Hall, 341 F.3d at 716 (comparing decision to put dog to sleep with decision to impose the death penalty did not render trial fundamentally unfair); Sublett v. Dormire, 217 F.3d 598, 601 (8th Cir. 2000) (stating that jury should convict defendant to send a message and that message should be put on a billboard did not warrant habeas relief). Further, Petitioner's counsel attacked the credibility of the police witnesses in her closing statement. (Resp. at Ex. K-4. p. 896); see id. (defense counsel's discussion of improper remark can minimize prejudice);. Petitioner's claim with respect to this remark is denied.

### 4.      Perjury

Petitioner alleges that the prosecutor improperly stated that Petitioner committed perjury when he testified. (Pet. at p 34). The prosecutor stated that Petitioner had "the gall to get on this

stand, under oath, and to tell the story he told you. Ladies and gentleman, I'm just sorry that we don't have a sixth count for perjury, I'm sorry." (Resp. at Ex. K-4 pp. 882-83). Petitioner alleges that this comment was inflammatory and invaded the providence of the jury. (Pet. at p. 34).

Petitioner raised this claim before the Missouri Supreme Court, which denied the claim by holding:

> Storey testified at guilt phase, putting his credibility into issue. State v. Wren, 643 S.W.2d 800, 802 (Mo. banc 1983). The prosecutor's reference to perjury was a rhetorical means of arguing that Storey's testimony was not believable. While overdone and not condoned, the reference was not plain error. See Clemmons, 753 S.W.2d at 908 (calling defense witnesses "liars" not prejudicial where evidence supported challenge to credibility).

Storey I, 901 S.W.2d at 897.

Upon consideration, The Missouri Supreme Court's decision reasonably applied federal law to the facts of the case. These comments did not make the entire trial fundamentally unfair. See Kellogg v. Skon, 176 F.3d 447, 452 (8th Cir. 1999) (calling defendant a "lair" did not render trial fundamentally unfair because the evidence of guilt was strong and the court instructed the jury that closing arguments were not evidence). These comments were a small part of the closing argument, and the prosecutor then explained why the evidence did not support Petitioner's story. (Resp. at Ex. K-4 pp. 883-84). Furthermore, the jury was instructed that closing statements are not evidence. (Id. at Ex. L p. 294). Finally, the strong evidence of guilt undermines any assertion that the verdict would have been different absent this statement. See King v. Bowersox, 213 F. Supp. 2d 1026, 1034 (E.D. Mo. 2001). Petitioner's claim with respect to this remark is denied.

### 5.    Personalizing the Argument

Petitioner alleges that throughout his closing arguments, the prosecutor repeatedly personalized the argument by stating : (1) "I'm sure he was putting himself in the assailant's shoes;" (2) "I think that those are the missing details;" (3) "I am confident, based on the evidence, that you

won't go any further than the verdict director Instruction No. 5;" (4) "It's probably the most important last few minutes that I've ever had to spend in front of a jury;" (5) "I think the Defendant was the one who had used that knife;" and (6) "I have tried my best to prosecute this case as hard as I could." (Resp. at Ex. K-4 pp. 887, 890, 914, 918, 920). Petitioner alleges that the comments were irrelevant, prejudicial, and undermined the jury's decision by implying special knowledge. (Pet. at p. 35).

Petitioner raised this claim before the Missouri Supreme Court, which held that "[u]sing 'I' does not automatically inject personal beliefs into the argument. Review of the entire argument reveals no personalization rising to the level of plain error." Storey I, 901 S.W.2d at 897-98 (internal citation omitted).

Upon consideration, The Missouri Supreme Court's decision applied federal law reasonably to the facts of the case. Although these some of these comments were improper, they did not, in the context of the trial as a whole, render it fundamentally unfair. See Tokar v. Bowersox, 1 F. Supp. 2d 986, 998-99 (E.D. Mo. 1998). Further, Petitioner has not shown that there was a reasonable probability that these statements affected the trial's outcome because there was strong evidence of Petitioner's guilt. With respect to this remark, the claim is denied.

### 6.      **Sexual Assault Motive**

Petitioner alleges that the prosecutor improperly implied that a sexual assault motive existed, even though the State presented no evidence of a sexual assault. (Pet. at p. 35). The prosecutor made the following statement:

> A couple of things [defense counsel] says, where's the blood and the motive? And it's true, we don't have to prove a motive. The divorce papers were there. Is that the motive? Of course. Think of something else. I think that you can infer from the evidence, did he go in with the intent to sexually assault? Was that the motive? Just because there were no seminal fluids found does not prove anything.

(Resp. at Ex. K-4 pp. 915-16).

The Missouri Supreme Court denied this claim by holding:

> Sixth, Storey claims the prosecutor erred in arguing that, though no semen was found, Storey could still have sexual assault as a motive to enter Frey's apartment. Sexual assault does not require an emission. <u>See</u> §§ 566.010, .040, .050 RSMo 1986. The argument was legally accurate; permitting it was not plain error.

<u>Storey I</u>, 901 S.W.2d at 898.

Upon consideration, The Missouri Supreme Court's decision applied federal law reasonably to the facts of the case. A prosecutor is allowed to draw "reasonable inferences" from the evidence during his closing arguments. <u>United States v. Mullins</u>, 446 F.3d 750, 760 (8th Cir. 2006). So long as the prosecutor is referring to the evidence, he may use colorful language and argue a "personal interpretation" of the evidence. <u>United States v. White</u>, 241 F.3d 1015, 1023 (8th Cir. 2001). Here, the prosecutor was making a reasonable inference from the evidence, namely that Ms. Frey was naked from the waist down, a foreign pubic hair was found on her, and Petitioner had rug burns on his knees and a scratch on his buttock. (Resp. at Ex. II-6 pp. 837-43). The claim with respect to this remark is denied.

### 7. <u>Everyone in the Courtroom Remark</u>

Petitioner alleges that he was deprived of a fair trial when the prosecutor stated that "everyone in this courtroom want you to declare what we all know to be the inevitable, and that being this Defendant . . . is guilty of first degree murder beyond any doubt." (Resp. at Ex. K-4 pp. 920-21). The Missouri Supreme Court denied this claim, finding that "[t]his rhetorical flourish was not plain error." <u>Storey I</u>, 901 S.W.2d at 898.

Upon consideration, The Missouri Supreme Court's decision applied federal law reasonably to the facts of the case. A prosecutor may use colorful language. <u>White</u>, 241 F.3d at 1023. The Court instructed the jury to base its decision on the evidence. (Resp. at Ex. L p. 294). Finally, the strong

evidence of guilt undermines any indicia that the verdict would have been different absent this statement. See King, 213 F. Supp. 2d at 1034. Claim Eight is denied.

### 8.     Claim Twenty-Eight

In Claim Twenty-Eight, Petitioner alleges that his 1991 guilt-phase trial counsel was ineffective for not objecting to the prosecutor's closing arguments. (Pet. at p. 109). Upon consideration, the Court finds that Petitioner cannot satisfy the prejudice prong of Strickland because the Missouri Supreme Court reasonably determined that no plain error occurred when the prosecutor made these statements. The standard for Strickland prejudice and for plain error are "virtually identical," making it highly improbable that Petitioner can show prejudice absent a finding of plain error. See Becht v. United States, 403 F.3d 541, 549 (8th Cir. 2005). The strong evidence of guilt also precludes a finding of prejudice. Claim Twenty-Eight is denied.

### E.     Claim Sixteen

In this claim, Petitioner alleges that the State failed to disclose evidence at both the 1991 and 1999 trials that would have impeached Jenny Smith ("Smith"), a forensic chemist from the Missouri State Highway Patrol crime lab. (Pet. at pp. 62-70). Petitioner believes that the prosecution failed to disclose Smith's notes, an FBI analysis of the public hair sample, a Missouri Highway Patrol document, and a memo in an unrelated case. Petitioner alleges that the failure to disclose this evidence violated Brady v. Maryland, 373 U.S. 83 (1963).

At the 1991 trial, Smith testified about the results of forensic testing done on two pubic hairs found on Ms. Frey's body.   (Resp. at Ex. K-3 p. 641). Smith testified that there were "differences" between Petitioner's pubic hair and the hairs found on Ms. Frey. (Id.). Smith explained that this phrase meant that "they did not have all the characteristics of Walter Storey's public hair sample."

(Id.). Smith later elaborated that the samples had "similarities and differences," meaning her tests did not exclude Petitioner. (Id. at pp. 642-49).

In order to succeed on a Brady claim, Petitioner must demonstrate that: "(1) the prosecution suppressed evidence; (2) the evidence was material and favorable to him; and (3) prejudice ensued." Collier v. Norris, 485 F.3d 415, 421-22 (8th Cir. 2007). The prosecution must disclose both impeachment and exculpatory evidence, even if Defendant has not requested it. Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). Prejudice under Brady ensues "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 433. A reasonable probability "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but is satisfied when the suppression "undermines confidence in the outcome of the trial." Id. at 434.

### 1.    Smith's Notes

Petitioner alleges that the prosecution should have disclosed Smith's notes. He believes that the notes indicated that the State was pressuring Smith to change her answers. At the 2001 Motion Court hearing, Smith testified that she spoke with Phil Groenweghe ("Groenweghe"), an assistant St. Charles County prosecutor, about the case on February 6, 1991. (Resp. at Ex. FF-1 pp. 44-45). Smith explained that Groenweghe was "concerned" that his sexual assault case would "collapse" due to her use of the word "differences," so he asked her to have the FBI test the hair samples. (Id. at pp. 47-48).

The Missouri Supreme Court addressed this claim and held:

Ms. Smith met with the prosecutor, Mr. Groenweghe, to discuss her hair comparison report prior to Storey's 1991 trial. Notes from their meeting on February 6, 1991, indicate, in relevant part:

> [T]he fact is that there are two differences, however my opinion is that the 2Q [pubic hair] could have come from the suspect. . . . . The [prosecuting attorney] thinks his case will collapse on the [pubic hair] report since he cannot establish sexual contact otherwise. . . . My original report of comparisons between the suspect's [pubic hair] and [pubic hair] found in the victim's [pubic hair] combings and on the [victims] hand stated that I found "differences." This report was written using those terms because I am aware that my supervisor does not approve of saying "similarities and differences." Although to have stated my report this way would have more accurately reflected my observation. The two differences I found in this comparison (Length & Medulla) may not be enough to override the many similarities that I found. Although my report may give the impression that I do not believe the questioned hair came from the suspect, this is not my opinion.
>
> I have since learned from the CHR that the [different] medulla characteristics should not be heavily weighed.

Storey has not shown that he was ever entitled to see these notes. These notes indicate that Mr. Groenweghe was worried that the sexual assault case would collapse without linking the hairs to Storey. Storey, however, was never convicted of sexual assault. Regardless, Storey was not prejudiced by not having received them. The memo, taken as a whole, strengthens the State's 1991 position that Storey could not be eliminated as a suspect. It shows that there were similarities and differences between Storey's hair and the hairs left on Ms. Frey's body. This is not exculpatory evidence.

Storey III, 175 S.W.3d at 141-42.

Upon consideration, The Missouri Supreme Court's decision was not contrary to clearly established federal law and reasonably applied it to the facts of the case. The note shows that Smith could neither confirm nor eliminate Petitioner as a suspect based on the hair samples. This conclusion comports with Smith's trial testimony.

## 2.    The FBI Report

Petitioner alleges that the State failed to disclose an FBI analysis of the hairs that could have impeached Smith's testimony. (Traverse at p. 60). The Missouri Supreme Court considered this claim and held:

The FBI did an analysis of the hairs found on Ms. Frey's body in April 1991. The FBI report indicates:

> Light brown caucasian hairs exhibiting pubic region characteristics were found, one each, on the Q1 and Q2 glass microscope slides. These hairs are, however, finer in diameter than typical pubic hairs and are extremely abraided [sic] and debris laden. Similarities and differences were observed between these hairs and the hairs found in the K3 pubic hair sample from STOREY. Accordingly, no conclusion could be reached as to whether or not these hairs originated from STOREY.

This is not exculpatory evidence. Storey did not explain to the motion court how he was prejudiced.

Storey III, 175 S.W.3d at 142.

Upon consideration, The Missouri Supreme Court's decision did not result in a decision that was contrary to clearly established federal law, and it applied federal law reasonably to the facts of the case. This report would not have impeached Smith because she testified that there were differences and never stated that the hairs belonged to Petitioner. As such, the failure to disclose this report was not a Brady violation.

### 3.       Highway Patrol Report

Petitioner alleges that a Brady violation occurred because he could have used an undisclosed Missouri Highway Patrol report to impeach Smith. The Missouri Supreme Court ruled on this claim and held:

> The Missouri Highway Patrol issued a report on March 21, 1990, regarding the hair analysis done by Ms. Smith. The report states: "A pubic hair in the victim's pubic hair combings (# 2) and a pubic hair found in the victim's hand (# 2) were found to be foreign to the victim's pubic hair standards (# 2). These foreign hairs were compared to the suspect's pubic hair standard (# 49) and were found to be different." This report was also disclosed to Storey's trial counsel, as indicated on the acknowledgment sheet dated November 12, 1990.

> Storey claims that another related document was not produced by the State, which is dated July 24, 1990, and entitled "Laboratory Analysis Request." That request indicates that three sexual assault kits were submitted from Mr. Cruz, Storey, and Ms.

Frey. The "Brief Summary of Incident" section of the request states, in its entirety: "MSHP lab analysis of hairs found on victim and that of suspect's hair samples do not provide positive proof linking suspect to victim. Sexual assault kit with hair samples from victim's boyfriend being submitted for comparison with hairs found on victim." The Laboratory Analysis Request indicates the same information as the report disclosed by the State. This is not exculpatory evidence. Storey did not attempt to show, during the 29.15 hearing, how he was prejudiced by not having received this document.

Storey III, 175 S.W.3d at 141.

Upon consideration, The Missouri Supreme Court's decision did not result in a decision that was contrary to clearly established federal law, and it applied federal law reasonably to the facts of the case. The document is consistent with Smith's testimony. As such, the failure to disclose this report was not a Brady violation.

### 4.     **December 4, 1995 Memorandum**

Plaintiff alleges that a memorandum Smith wrote to a prosecuting attorney regarding her work in State v. Chaney, 967 S.W.2d 47 (Mo. 1998) was not disclosed to his 1999 penalty-phase counsel, in violation of Brady.

The Missouri Supreme Court considered this claim and held:

This memo is dated December 4, 1995. It is from correspondence between Smith and the prosecuting attorney regarding State v. Chaney, 967 S.W.2d 47 (Mo. banc 1998). It states:

> After visiting with you last Tuesday it occurred to me that this Winters case has some of the most complicated trace exams that I have ever testified on. There is so much here. I want to help you all I can. The following is a text of mock questions and answers. This is probably very abbreviated, but they cover the main points and you will no doubt expand the questions. I mainly wanted to lead you through the convoluted course of my examinations in hopes I can give you some prior insight. . . . [T]his will help you predict better just how I will answer certain questions.

> I feel confident that your charming ways will inspire a lucid, coherent and utterly convincing testimony out of me. (!!!).

This memo has nothing to do with Storey's trial. It is not <u>Brady</u> material. Storey's conviction trial was in 1991. This memo was not even written until 1995. Ms. Smith did not testify in Storey's 1999 penalty trial. Storey's counsel obtained this memo in an unrelated case. Even if the memo had existed in 1991, the duty to disclose impeachment evidence is not so broad.

<u>Storey III</u>, 175 S.W.3d at 142-43.

Upon consideration, The Missouri Supreme Court's decision did not result in a decision that was contrary to clearly established federal law, and it applied federal law reasonably to the facts of the case The "scripting" of testimony in a 1995 case is not <u>Brady</u> material for a 1991 trial. Moreover, Smith did not testify in 1999, meaning it had no impeachment value. Claim Sixteen is denied.

### F.    Claim Eighteen

In this claim, Petitioner alleges that he received ineffective assistance of counsel during his 1991 guilt-phase trial when his counsel failed to strike venirepersons Kathleen Doerrer ("Doerrer") and Kym Duly ("Duly"), who ultimately served on the jury, because they were "not able to serve as fair and impartial jurors" due to being victims of crime. (Pet. at pp. 79-83).

### 1.    Venireperson 9, Kathleen Doerrer

During voir dire, Doerrer testified that her brother had been murdered four years ago. (Resp. at Ex. K-1 p. 93). She testified that this fact would not "impair my ability," and that she could "set aside" her brother's murder and "give both sides" a "fair shot." (<u>Id.</u>). Petitioner's guilt-phase trial counsel, Ms. Dorothy Hirzy ("Hirzy"), did not ask Doerrer any questions. (Resp. at Ex. N-6 p. 981). At the 1992 Motion Court hearing, Hirzy testified that she did not recall Doerrer, but admitted that she "was probably someone I would like to have stricken since they had a family member murdered. But as I said before, preemptories were exercised." (<u>Id.</u>).

After identifying <u>Strickland</u> as the proper standard, the Missouri Supreme Court held as follows:

Juror Doerrer said her brother was murdered four years earlier, but indicated that the incident would not impair her ability to be fair and impartial and that she could put the incident aside and be fair to both sides. Doerrer thus unequivocally showed she could evaluate the evidence fairly and impartially. There was no basis to move to excuse her, and no ineffective assistance in not doing so. Parker, 886 S.W.2d at 919; Antwine, 791 S.W.2d at 411.

Storey I, 901 S.W.2d at 894.

Upon consideration, Missouri Supreme Court's decision was a reasonable application of Strickland. The Missouri Supreme Court identified that the relevant issue of whether the juror's personal views would "prevent or substantially impair" her performance as a juror. Ramsey v. Bowersox, 149 F.3d 749, 758 (8th Cir. 1998). Doerrer's answers did not suggest that her personal views would impair her performance as a juror. As such, any objection to her would have been without merit, and counsel is not required to make meritless objections. Carter v. Hopkins, 92 F.3d 666, 671 (8th Cir. 1996).

## 2. Venireperson 39, Kym Duly

During voir dire, Duly approached the bench after the prosecutor asked if anyone was a victim of a crime. (Resp. at Ex. K-1 p. 108). Duly then stated:

I was involved in a child molestation case involving me as a young girl, so I feel very prejudiced against any sexual-related things. I just have a lot of past, you know, memories from anything like that, so when rape is involved or any sexual assault, I tend not to be fair.

(Id. at pp. 108-09). After the prosecutor informed the court that there "might be some" sexual assault evidence, the following exchange occurred:

THE COURT: If you think that anything comes out, you think that would prejudice you?

VENIREMAN DULY: I would just tend to — it just depends. It's hard to say, but I just tend to have really bad feelings in that area.

THE COURT: Okay. You understand that each case is on its own–

- 38 -

VENIREMAN DULY: Yes, sir, I do.

THE COURT: --and is guided by its own evidence?

VENIREMAN DULY: Yes, sir

.

THE COURT: And you should be guided by the evidence that's presented in this case from the witness stand and exhibits–

VENIREMAN DULY: Yes, sir, I do understand that.

THE COURT: --and follow the Court's instructions, and you think--you think you could do that?

VENIREMAN DULY: I think I could give a fair--I've accepted it and, yes, I do think that. I just want it to be known.

THE COURT: Fair to the Defendant and fair to the State?

VENIREMAN DULY: Yes, sir.

(Id. at p. 109-10). At the post-conviction hearing, Hirzy testified that she thought she had moved to strike Duly for cause and that she would have wanted Duly removed. (Resp. at Ex. N-6 pp. 959-60). Hirzy, however, did not move to strike Duly.  (Id.  at p. 959).

After identifying Strickland as the proper standard, the Missouri Supreme Court held:

On this record, trial counsel was not ineffective for not moving to excuse Duly. The critical question in a bias challenge is whether the venireperson unequivocally indicated an ability to evaluate the evidence fairly and impartially. State v. Parker, 886 S.W.2d 908, 919 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). Duly did. Since there was no legal basis to excuse Duly for cause, trial counsel was not ineffective for failing to seek removal. See Antwine v. State, 791 S.W.2d 403, 411 (Mo. banc 1990), *cert. denied*, 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991).

Storey I, 901 S.W.2d at 894.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland.  It was reasonable to find that Duly could be a fair juror because she stated that she could be impartial. See Uttech v. Brown, 127 S.Ct. 2218, 2231 (2007) (holding trial judge's determination

whether to strike juror for cause is entitled to great deference). As such, any objection to her would have been without merit, and counsel is not required to make meritless objections. Carter, 92 F.3d at 671. Even if Hirzy's performance was inadequate, Petitioner cannot make a valid showing of prejudice because of the strong evidence of guilt. Thus, Claim Eighteen is denied.

### G.    Claim Twenty-One

In this claim, Petitioner alleges that his 1991 guilt-phase counsel was ineffective when she did not object to testimony about a rape kit and elicited testimony from the States' witnesses that Ms. Frey may have been sexually assaulted. (Pet. at pp. 86-91).

The State questioned officer[6] Vic Muschler ("Muschler") about the collection of forensic evidence from Ms. Frey's body. Muschler noted that a blood sample "was placed into the evidence rape kit." (Id. at Ex. K-3 p. 542). Defense counsel did not object. On cross-examination, defense counsel questioned Muschler about how a rape kit is collected and the collection of pubic hairs from Petitioner. (Id. at pp. 544-48).

Counsel also questioned detective Ron Bextermueller ("Bextermueller") about his involvement in preparing Petitioner's sexual assault kit. (Id. at pp. 575-76). He testified that Petitioner's sexual assault kit was complied by "combing of pubic hairs, pulling of pubic hairs, head hair sample, . . . whole blood stain and also a saliva sample." (Id. at p. 577). Bextermueller testified that he collected the pubic hair samples from Petitioner. (Id. at p. 576-77). Counsel asked what the purpose of a saliva sample was and Bextermueller responded, "[p]rimarily its used in a case where a suspect's alleged to have raped an individual." (Id. at p. 577).

Counsel cross-examined Lori Maloney ("Maloney"), a forensic serologist for the Missouri Highway Patrol Crime Lab. (Id. at p. 585-86). She asked if Maloney had examined any pubic hair

---

[6]Unless otherwise noted, all the police officers are from the St. Charles Police Department.

samples. (Id. at p. 610). Maloney informed defense counsel that she did not work with hair samples. (Id.). Defense counsel then elicited testimony from Maloney that she did not find any sperm cells in Ms. Frey's sexual assault kit. (Id. at p. 611).

Finally, defense counsel cross-examined Smith about her analysis of the pubic hair samples. Smith testified that "there were differences" between the hair samples and that the pubic hair found on Ms. Frey "did not have all the characteristics of Walter Storey's pubic hair sample." (Id. at p. 641). On redirect, Smith testified that the samples contained "similarities and differences" and that the sample given to her was too small to be a truly representative sample. (Id. at pp. 642-44). Finally, she agreed that the Petitioner could be the source of the pubic hairs found on Ms. Frey. (Id. at p. 645).

At the 1992 Motion Court hearing, Hirzy explained that she wanted to introduce evidence about the possible sexual assault "since it was a death penalty case, since there was always a chance that they were going to get there, that would be something I would prefer to develop at the guilt phase so as to try to take the sting out of it for the penalty phase." (Id. at Ex. N-6 p. 1006). She admitted not interviewing Smith before she testified, but was "questioning her on her report." (Id. at p. 1007-08)

The Missouri Supreme Court considered this argument and held:

Storey alleges several errors by trial counsel regarding sexual assault evidence.

First, Storey assigns error because counsel neither objected to testimony that police prepared a rape kit, nor adequately cross-examined the witness who testified about it.

Frey's body was found nude, except for a nightgown bunched up around her waist. In the State's case-in-chief, a police officer testified that a blood sample from Frey "was placed into the evidence rape kit." Storey claims trial counsel should have objected because the prosecutor said in voir dire "I don't, perhaps, see it [evidence of sexual assault] coming out at guilt phase." The prosecutor's statement at voir dire was equivocal, not a promise to omit sexual assault evidence at guilt phase. The brief

reference to a rape kit was neither inflammatory nor prejudicial. Moreover, even if it were, trial counsel's decision not to object-and thus highlight the testimony-was a reasonable trial strategy and not ineffective assistance.

Storey also argues that trial counsel was ineffective in cross-examining this same witness about details of the rape kit and the medical examination of Frey's body. At the 29.15 hearing, trial counsel testified this was a strategic decision because rape was already injected and "she wanted to take the sting out of it." Trial counsel knew that sexual assault would be an issue at penalty phase, and made the strategic decision to inform the jury of it at guilt phase "so it would not be so devastating in the penalty phase." The state of the victim's clothing injected rape as a possibility at both phases. Counsel's strategic choice to deal with it early was not unreasonable.

Second, Storey attacks trial counsel's cross-examination of other witnesses who examined Frey's body. In fact, the challenged cross-examination elicited helpful testimony that Storey did not sexually assault Frey: (1) there was no semen or sperm, and (2) two pubic hairs found on Frey's body "did not have all the characteristics of Walter Storey's pubic hair sample." Storey tries to construct an ineffective-assistance claim because this cross-examination failed to "prove" he did not assault Frey. In fact, the cross-examination drew admissions that the evidence *could not* establish Storey as a rapist. Given the state of the victim's clothing, this cross-examination helped Storey, and was not legally ineffective.

Third, Storey claims that trial counsel was ineffective in failing to interview (before trial) the witness who testified that the pubic hairs on Frey did not have all of Storey's characteristics. Storey fails to demonstrate prejudice because he does not show what an interview would have revealed. Moreover, as noted above, the cross-examination (without the interview) was effective.

Storey I, 901 S.W.2d at 898 (emphasis in original).

Upon consideration, the Court finds that the Missouri Supreme Court reasonably applied Strickland to this case. It was a sound trial strategy to mention a possible sexual assault during the guilt phase because, considering the overwhelming evidence of guilt previously discussed, preparing for the end-game was reasonable. If anything, introducing evidence about the pubic hair helped Petitioner because it was a piece of forensic evidence suggesting that he did not murder Ms. Frey. Moreover, the overwhelming evidence of guilt suggests that even if counsel's handling of the rape kit evidence was deficient, it did not prejudice Petitioner. See Parker, 94 F.3d at 461 (noting that

strong evidence of guilt precluded counsel's failure to object to testimony from being prejudicial under Strickland standard). As such, Count Twenty-One fails.

## H. Claim Twenty-Two

In this claim, Petitioner alleges that he received ineffective assistance of counsel when his trial counsel failed to object to evidence that Petitioner asked for a lawyer during his interviews with the police. (Pet. at p. 92). Petitioner maintains that his counsel should have objected to testimony by detective Richard Plummer ("Plummer") that Petitioner asked for a lawyer during a police interview. (Id., citing Resp. at Ex. K-2 pp. 442-44). He also maintains that counsel should not have questioned detective Michael Miller about where and when Petitioner asked for a lawyer during cross-examination. (Pet. at p. 94, citing Resp. at Ex. K-3 pp. 714-15). He believes that this testimony prejudiced the jury by leading them to believe that he asked for a lawyer because he had something to hide. (Pet. at p. 94). Furthermore, he contends that this information undermined the heart of his defense because he was "the sole witness to give the defense side of what happened the night of the murder." (Id. at p. 95, citing Resp. at Ex. K-4 pp. 754-833).

Petitioner raised this claim in his Rule 29.15 motion for post-conviction relief. (Resp. at Ex. M-1 pp. 54-56). At the 1992 Motion Court hearing, Hirzy testified that she had extensive experience defending first degree murder cases. (Id. at Ex. N-6 p. 931). She knew that the State could not get these statements admitted during direct examination, but made a "judgment call" about whether to let the jury know this information. (Id. at pp. 999-1002). She decided that the statements' benefits outweighed their harm because it "affect[ed] the credibility of the police officers," "degrade[d] them," and showed "how desperate [they] were to get a statement because repeatedly went over to see [Petitioner.]" (Id. at p. 1000-02).

The Missouri Supreme Court denied this claim by holding:

Storey argues that trial counsel was ineffective for eliciting testimony that Storey invoked his right to counsel when questioned by police.

Storey admitted to police that he entered Frey's apartment with a knife, struggled with her, and stole money and her car, then returned the next day to wipe away his fingerprints and to discard evidence. These admissions were introduced in the State's case-in-chief. Later in guilt phase, Storey testified that he was abducted at knife point by a man resembling his uncle-in-law; that they knocked on Frey's door; that she voluntarily admitted them; that the other man then threw Storey against a wall (dazing him); and that when Storey regained consciousness he saw the other man attacking Frey in her bedroom. Storey then testified that he returned to Frey's apartment the next day and removed fingerprints and other evidence, because he was afraid of being implicated, although he had done nothing wrong.

An obvious question about Storey's trial testimony is: Why didn't he tell the police about the man resembling his uncle-in-law? Counsel's decision to elicit early the answer-that the police interview was incomplete because Storey asked for a lawyer-was reasonable, especially since the defense had already told the jury that Storey would testify.

On this record, counsel made a reasonable strategic decision to inform the jury that the police interview was interrupted by Storey's invoking the right to counsel, because it was crucial that the jury know why Storey did not tell the police about the exculpatory evidence. Counsel testified at the 29.15 hearing that she recognized the possible prejudice, but made a "judgment call" that the benefits outweighed the prejudice. A strategic "judgment call" is not ineffective assistance.

Storey I, 901 S.W.2d at 898, 899.

Upon consideration, The Missouri Supreme Court's decision was a reasonable application of Strickland. Absent deficient investigation, which is not alleged here, strategic trial decisions are virtually unchallengeable. Link v. Luebbers, 469 F.3d 1197, 1204 (8th Cir. 2006); Tunstall v. Hopkins, 306 F.3d 601, 606 (8th Cir. 2002). Counsel's explanation, that she thought the testimony would impeach the witnesses more than it would prejudice Petitioner was an acceptable trial strategy. See Flieger v. Delo, 16 F.3d 878, 887 (8th Cir. 1994) (holding it is not ineffective assistance of counsel to elicit on cross-examination that petitioner had violent character and reputation because it impeached the witness by showing bias); see also Basile v. Luebbers, 1 Fed. Appx. 567, 570 (8th Cir. 2001) (holding failure to object to introduction of prior bad acts was not ineffective assistance of

counsel because they were consistent with defendant's theory of the case); <u>Noel v. Norris</u>, 322 F.3d 500, 502 (8th Cir. 2003). As Petitioner has not satisfied the first prong of <u>Strickland</u>, Claim Twenty-Two is denied.

**I.**     **Claim Twenty-Three**

In this claim, Petitioner alleges that his trial counsel was ineffective for failing to interview Thomas Buel ("Buel"), a forensic analyst for the Missouri Highway Patrol,  before calling him as a witness. (Pet. at p. 95). Petitioner alleges that this failure to interview Buel led to the introduction of physical evidence that bolstered the State's case. (<u>Id.</u>).

On direct examination by defense counsel, Buel testified that he did a tool mark examination of Ms. Frey's thyroid cartilage. (Resp. at Ex. K-4 p. 731). After examining the striation marks left on the cartilage, Buel could not find a "direct identifiable relationship to any one of the knives" that the State seized from Petitioner's home. (<u>Id.</u> at p. 732). Buel also testified about a fragmentary, bloody shoe print found on Ms. Frey's nightgown. (<u>Id.</u> at p .733). He stated that the shoe print was from the same "class" of shoes as Petitioner's shoes, but he could not "find sufficient individualizing characteristics to say that this particular pair of shoes made that impression." (<u>Id.</u> at p. 735).

On cross-examination, Buel admitted that it is hard to make conclusive toolmark findings with cartilage, that the knives at issue could have caused the injury, that Petitioner's shoe could have created the print, and that there were no "dissimilarities" between the shoe print and Petitioner's shoes. (<u>Id.</u> at pp. 736-42).  On re-direct, defense counsel again emphasized that Buel could not find any definitive relationship between the shoe print and Petitioner's shoes or the murder weapon and the seized knives. (<u>Id.</u> at p. 743-45).

At the 1992 Motion Court hearing, Hirzy admitted that she did not question Buel before calling him as a witness and characterized his testimony as "surprising" in her motion for a new trial.

(Id. at Ex. N-6 p. 1012-13). She called Buel "because the information that was contained in his report I thought would be helpful. I mean, as I recall, the report that he wrote did not indicate that the white fillet knife could have been the knife that was used." (Id. at p. 1012).

The Missouri Supreme Court considered this claim and held:

This argument fails because it rests on the false assumption that Buel's testimony harmed Storey more than it helped. . . . In fact, Buel's testimony, taken as a whole, was a logical effort to establish reasonable doubt that Storey killed Frey. On this record, reasonable trial counsel might call Buel even after interviewing him and discovering what the State elicited on cross-examination. Moreover, any harm to Storey from the cross-examination of Buel could not have changed the result.

Storey I, 901 S.W.2d at 899.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. The Missouri Supreme Court properly concluded that Buel's testimony was helpful to Petitioner. Faced with strong evidence of guilt, counsel was trying to sow the seeds of reasonable doubt by introducing forensic evidence that did not conclude Petitioner was the murderer. Moreover, the Eighth Circuit has held that a similar failure to investigate did not amount to deficient performance. United States v. Davis, 406 F.3d 505, 510 (8th Cir. 2005) (finding that failure to interview witnesses did not amount to deficient performance when counsel reviewed witnesses' notes and reports). Even if counsel's performance was somehow deficient, it was not prejudicial because there is no reasonable probability that the outcome of the proceedings would have changed. See Payne v. United States, 78 F.3d 343, 348 (8th Cir. 1996) (rejecting ineffective assistance claim where, even if counsel was deficient for failing to interview or investigate witness, defendant failed to establish that interviewing witness would have changed the outcome); United States v. Robinson, 301 F.3d 923, 925-26 (8th Cir. 2002). Thus, Claim Twenty-Three is denied.

J.    **Claim Twenty-Five**

In this claim, Petitioner alleges that his counsel was ineffective by failing to offer evidence that Lonnie Harnage ("Harnage"), his father-in-law, had a history of violent behavior. (Pet. at pp. 101-06). Petitioner testified that someone resembling Tony Harnage ("T. Harnage"), Harange's brother, held him at knife point and forced him to say where he lived. (Resp. at Ex. K-4 pp. 770, 773). Petitioner testified that he lied and told T. Harnage that he lived in Ms. Frey's apartment. (Id. at p. 771). T. Harnage then entered Ms. Frey's apartment and threw Petitioner against the wall, leaving him stunned. (Id. at pp. 772-73). Petitioner saw T. Harnage on top of Ms. Frey in the bedroom before he allegedly slit her throat. (Id. at pp. 773-76). Petitioner believes testimony about Harnage's violent nature and ill-will toward Petitioner and Pat Basler ("Basler"), his mother, would have shown that T. Harnage had motive to commit the crime. (Pet. at pp. 101-06).

The Missouri Supreme Court ruled on this claim and held:

> This argument fails. Storey's testimony at trial was that Tony Harnage (or someone who looked like him) committed the murder. Thus, testimony about Lonnie Harnage could not have helped the guilt-phase defense. Moreover, the motion court correctly concluded that the sheriff's testimony was not admissible at trial because it merely cast suspicion on another person, with no supporting evidence. See State v. Schaal, 806 S.W.2d 659, 669 (Mo. banc 1991), cert. denied, 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992). Choosing not to offer inadmissible testimony is not ineffective assistance. Id.

Storey I, 901 S.W.2d at 900.

Upon consideration, the Misosuri Supreme Court's decision was a reasonable application of Strickland because counsel is not obligated to offer inadmissible evidence. See Henderson v. Norris, 118 F.3d 1283, 1288 (8th Cir. 1997) (holding counsel is not ineffective for failing to offer inadmissible evidence).[7] As such, this claim is denied.

_____

[7]Petitioner also asserts that Missouri's evidentiary rule violated his due process rights. He relies on Holmes v. South Carolina, which examined the constitutionality a rule of evidence prohibiting a defendant from introducing "proof of third-party guilt if the prosecution has introduced forensic evidence, that if believed, strongly supports a guilty verdict."547 U.S. 319, 321 (2006). The

### K.     Claim Twenty-Six

In this claim, Petitioner alleges that he received ineffective assistance of counsel at his 1991 guilt-phase trial because his counsel did not file a motion to dismiss the charges of second degree burglary and tampering with evidence. (Pet. at pp. 106-07). Petitioner also complains that his counsel should not have conceded that he was guilty of these charges in her closing argument. (Id. at p. 107). The Missouri Supreme Court denied this claim, finding that "[s]ince there was no reason to dismiss these counts, nor any basis to object to the instructions, counsel was not ineffective." Storey I, 901 S.W.2d at 896.

Upon consideration, Petitioner's claim does not satisfy Strickland because, as the Missouri Supreme Court properly found, he cannot show that his trial counsel was deficient. Counsel admitted Petitioner was guilty of these charges as part of litigation strategy aimed at reducing the likelihood of a first degree murder conviction by reassuring the jury that Petitioner would receive some punishment. (Resp. at Ex. K-4 pp. 911-12). Decisions related to litigation strategy are virtually unchallengeable. Bowman v. Gammon, 85 F.3d 1339, 1345 (8th Cir. 1996). Furthermore, filing a motion to dismiss would have been meritless due to the evidence of his guilt. See Hopkins, 92 F.3d at 671 (counsel is not required to make meritless arguments). Thus, Claim Twenty-Six is denied.

### L.     Claim Twenty-Nine

In this claim, Petitioner alleges that his 1991 trial counsel was ineffective for failing to object to the voluntary intoxication instruction submitted by the State. (Pet. at pp. 110-11). Petitioner

---

Supreme Court found that this rule violated due process. Id. In a footnote, the Supreme Court noted that the Missouri evidentiary rule at issue here is "widely accepted." Id. at 327 n. 1. Based on this implicit suggestion of constitutionality, the Court finds that Petitioner's argument is without merit.

alleges that this instruction violated State v. Erwin, 848 S.W.2d 476, 484 (Mo. 1993) and Sandstorm v. Montana, 442 U.S. 510 (1979). (Traverse at p. 89).

At trial, Petitioner testified that he drank heavily on the night of the murder. (Resp. at Ex. K-4 pp. 767-68). The jury was instructed that to convict Petitioner, they had to find that the State had proved all elements of the crime, including the requisite mental state, beyond a reasonable doubt. (Resp. at Ex. L p. 279). The State offered an instruction, patterned after MAI-Cr3d 310.50, stating, "[i]n determining the defendant's guilt or innocence, you are instructed that an intoxicated or drugged condition whether from drugs or alcohol will not relive a person of responsibility for his conduct." (Id. at p. 291).

The Missouri Supreme Court considered this claim and held:

Storey invokes State v. Erwin, 848 S.W.2d 476 (Mo. banc), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993), claiming that Instruction 17 (based on MAI-CR3d 310.50) was unconstitutional.

In Erwin, this Court found MAI-CR3d 310.50 unconstitutional, but limited the holding to cases tried in the future and cases subject to direct appeal where the issue had been preserved. Id. at 484. Storey was tried before Erwin was decided, and concedes there was no trial objection nor any error alleged in the new trial motion. Thus, the claim was waived. Rule 28.03.

Storey also claims that trial counsel was ineffective for failing to preserve the issue, even though he was tried before Erwin was decided. This argument is again rejected. See State v. Chambers, 891 S.W.2d 93, 106 (Mo. banc 1994).

Storey I, 901 S.W.2d at 896.

Upon consideration, the Court finds that the Missouri Supreme Court's decision was a reasonable application of Strickland. Counsel is not expected to predict a change in the law. Ruff v. Armontrout, 77 F.3d 265, 268 (8th Cir. 1996) (holding counsel is not expected to predict a change in the law). Additionally, the model instructions are issued by the Missouri Supreme Court, meaning it is objectively reasonable for counsel to assume that they are constitutional. Thus, this claim fails.

## IV.    Claims Addressed on the Merits–1999 Penalty-Phase Trial

### A.    Claim Two

In this claim, Petitioner alleges that the 1999 penalty-phase trial court erred by overruling his proposed strikes of venirepersons Seitrich, Carbtree, Barry, and Hunt because they favored the death penalty. (Pet. at p. 15). He also alleges that the Court erred in overruling his objection to venireperson Griffith because she was unable to consider graphic photographs. (Id.). Petitioner then used his peremptory challenges on these five venirepersons.[8]

Petitioner admits that he used his peremptory strikes on all five of these venirepersons, meaning that none of them served on the jury. (Id. at p. 20). He also admits that Missouri law precludes him from receiving a new trial on this basis. See Mo. Rev. Stat. § 494.480.4. In essence, he claims that § 494.480.4, as applied to him, unconstitutionally denied him due process because he was forced to use most of his peremptory strikes for curative purposes.[9]

The Missouri Supreme Court ruled on this claim and held:

> First, Storey contends that the trial court abused its discretion when it overruled defense counsel's motion to strike two prospective jurors for cause. Storey contends that these jurors were not qualified because the first venireperson testified that a murderer's life had no value and the second venireperson testified that she could not consider graphic photographs of the crime scene and autopsy. In each case, however, the defense struck the venireperson peremptorily. Consequently, section 494.480.4, RSMo 1994, is controlling. The statute states, in relevant part:

---

[8]Petitioner alleges that he was also forced to use four other peremptory challenges to strike venirepersons Montes, Vicars, Donte, and Sachs because they favored the death penalty. (Pet. at p. 20 n. 3). The Court will ignore this allegation for two reasons. First, Petitioner has not formally alleged that they were unqualified. Secondly, after reviewing the 1999 trial transcript, the Court finds that these jurors were qualified. (Resp. at Ex. Y-1 pp. 336-341, 363-366).

[9]Respondent asserts that this claim is procedurally defaulted, however, sometimes "it might well be easier and more efficient to reach the merits than go through the studied process required by the procedural default doctrine." McKinnon, 921 F.2d at 833 n. 7.

> The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant.

Section 494.480.4, RSMo 1994. Because the defense struck the prospective jurors in question, the qualification of the jurors cannot constitute a ground for reversal of conviction or sentence.

Storey further states that section 494.480.4 violates the United States Constitution and the Missouri Constitution. These issues were not raised until his motion for new trial was filed and are not supported here beyond mere abstract and conclusionary statements. They are waived. See State v. Morovitz, 867 S.W.2d 506, 510 (Mo. banc 1993); Rule 30.06(c); Rule 84.04(d)(1) and (4). The point is denied.

Storey III, 40 S.W.3d at 904-05.

The Supreme Court instructs that the right to "peremptory challenges [to prospective jurors] are not of a constitutional dimension, rather they are a means to achieve the constitutionally required end of an impartial jury." United States v. Martinez-Salazar, 528 U.S. 304, 307 (2000) (discussing Ross v. Oklahoma, 487 U.S. 81 (1988)). When no biased juror sits on the jury, the use of a peremptory challenge to strike a juror that the trial judge erroneously refused to strike for cause is not a constitutional violation. Martinez-Salazar, 528 U.S. at 307. This rule does not hinge "on how many peremptory challenges the defendant exercised for curative purposes or how the defendant would have otherwise employed her challenges if she had not use them curatively." United States v. Johnson, 495 F.3d 951, 965 (8th Cir. 2007).

Upon consideration, the Court finds that Petitioner's claim is without merit. The crux of his claim is that he was forced to use so many peremptory challenges. The Eighth Circuit, however, has rejected this kind of claim. Johnson, 495 F.3d at 965. Additionally, Petitioner fails to show that he did not receive a fair trial. Petitioner has not alleged that the Missouri courts failed to apply § 494.480.4 fairly. See Ervin v. Delo, 194 F.3d 908, 914 (8th Cir. 1999) (discussing Sloan v. Delo, 54

F.3d 1371, 1387 (8th Cir. 1995)) (holding that peremptory strikes are created and governed by state law, and that the due process clause guarantees only require that the state must apply its own rules fairly). Additionally, Petitioner has not alleged that the 1999 trial court purposely misapplied the law to force him to use his peremptory strikes. See Ross, 487 U.S. at 91 n. 5. As such, Claim Two is denied.

**B.    Claim Three**

In Claim Three, Petitioner alleges that the trial court erred by striking venireperson Kenneth Drake ("Drake") during the 1999 penalty-phase trial. (Pet. at p. 21). Petitioner alleges that Drake was still capable of serving as a juror because he stated that he could impose the death penalty in an appropriate case. (Id.).[10]

During voir dire, Drake stated that he could not impose the death penalty because a recent visit by Pope John Paul II to St. Louis had prompted him to adopt the religious belief that the death penalty should not be considered. (Resp. at Ex. Y-1 p. 382). Upon further questioning, Drake admitted that he would be "reluctant to" impose the death penalty, that "it was possible, but not likely" that he could impose it, and that he would only impose it "in a very severe case."(Id. at pp. 383-84). The following exchange then occurred:

> THE COURT: I don't think he has given us a firm answer and I would like to know the answer, too. Sir, I am going to give some instructions at the close of this trial. Those instructions will have to do with the range of penalty in this case. The range of penalty, as you know, is life without the possibility of parole or probation, or death. And the people on the jury have to be able to look at and consider the whole range of punishment. Any my question to you, sir, can you consider the whole range of punishment?

---

[10]Petitioner also alleges that the trial court used differing standards to determine eligibility based on if the venireperson favored the death penalty or opposed it. (Pet. at pp. 22-23). Petitioner asserts that venireperson Mike Crabtree's ("Crabtree") treatment illustrates the opposing standards. (Id. at p. 22). Upon consideration, this allegation is without merit.

VENIREPERSON DRAKE: Not without bias. I'm definitely biased.

(Id. at p. 384). Drake later agreed with defense counsel statement that he could impose death penalty if the facts and circumstances "were severe enough." (Id. at p. 455). The Court later struck Drake for cause. (Id. at pp. 464-66).

The Missouri Supreme Court addressed whether Drake was improperly struck by holding as follows:

> "Venirepersons may not be excluded simply because of general objections to the death penalty or conscientious or religious scruples against it. Venirepersons may be excluded only where it appears that their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and their oath." State v. Roberts, 948 S.W.2d 577, 597 (Mo. banc 1997) (citing Gray v. Mississippi, 481 U.S. 648, 657, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) and Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). In this case, the venireperson's equivocal and shifting responses to questions focusing on his ability to impose the death penalty provide a sufficient basis for the trial court to conclude that the venireperson could not consider the full range of punishment as required by the instructions and the juror's oath. See State v. Clemons, 946 S.W.2d 206, 225 (Mo. banc 1997). The point is denied.

Storey III, 40 S.W.3d at 905.

The availability of habeas relief for a claim that the state court improperly struck a potential juror for cause is both a legal and factual question. Kinder, 272 F.3d at 544. Here, the Missouri Supreme Court's opinion was neither contrary to, nor an unreasonable application of, federal law. It applied the correct legal principle, that the ultimate issue is whether the potential juror will follow the instructions of the court rather than his person views on the death penalty. See Rousan v. Roper, 436 F.3d 951, 958 (8th Cir. 2006) (citing Gray v. Mississippi, 481 U.S. 648, 657 (1987)). Moreover, Petitioner has to overcome the presumption that the trial judge's decision was correct, which he has failed to do. See Uttech, 127 S.Ct at 2231; Wainwright, 469 U.S. at 425-26. Finally, it is reasonable to strike a venireperson for cause if his responses to questions about his ability to impose the death penalty are "equivocal and shifting." See Clemons, 381 F.3d at 756; United States v. Purkey, 428

F.3d 738, 751 (8th Cir. 2005) (upholding strike for cause where venireperson had serious reservations about the death penalty); Walls, 151 F.3d at 837 (upholding strike for cause where venireperson had "deep misgivings" about the death penalty). Thus, Claim Three will be denied.

### C.     Claim Nine

In Claim Nine, Petitioner alleges that the trial court improperly admitted victim impact evidence that was disclosed to his counsel on the first day of trial. (Pet. at p. 36). Additionally, Petitioner alleges that testimony of Trinje Reidelberger ("Ms. Reidelberger"), Robert Reidelberger ("Mr. Reidelberger"), and Jody Harrsion ("Harrison"), as well as the exhibits introduced during their testimony, violated Payne v. Tennessee, 501 U.S. 808 (1991). (Pet. at p. 37).

On September 15, 1999, the first day of trial, defense counsel Beverly Biemdiek ("Biemdiek")[11] and the State met with the trial court outside the jury's presence. (Resp. at Ex. Y-2 p. 840). Biemdiek informed the trial court that the State had just given her new discovery, and she objected to its use in the State's opening statement. (Id. at pp. 844-45). The court told counsel that "I'm not going to deal with this until you have had a chance to read it, find out what it is and then we'll talk about it, okay?" (Id. at p. 845). The trial court also warned the State not to refer to this evidence in its opening statement. (Id.).

On September 16, 1999, the trial court again met with counsel and the State outside the jury's presence. (Id. at Ex. Y-3 p. 1124). Counsel again raised the issue of the undisclosed witnesses and exhibits. (Id. at p. 1126). After hearing that the three witnesses were "victim character witnesses" and had "no knowledge of the incident, itself," the trial court allowed the State to call them. (Id. at pp. 1126-27). Petitioner's counsel further protested that she had "no testimony, no statements, no notes"

---

[11]Petitioner had two lawyers at his 1999 penalty-phase trial. These lawyers were Biemdiek and David Kenyon ("Kenyon"). For the sake of clarity, the Court will refer to them as counsel or defense counsel unless more specification is needed.

regarding the witnesses. (Id. at p. 1129). The court told counsel that the three witnesses would be available for questioning before they testified that day. (Id. at p. 1130). It is unclear if Petitioner's counsel interviewed them before they testified.

In all, the State called seven victim impact witnesses, including the three that are the subject of this claim. Harrison testified that she had known Ms. Frey for twenty years and was "one her closest" friends. (Id. at p. 1195). Following Ms. Frey's death, Harrison began carrying a weapon and checked her apartment and car before entering them. (Id. at p. 1199). She stated that Ms. Frey's death "brought her closer to God." (Id. at p. 1198). She gave the eulogy at Ms. Frey's funeral, which she knew "came from God," because she usually avoided speaking in front of large groups. (Id. at p. 1199). Over defense counsel's objection, Harrison then read the eulogy. (Id. at pp. 1201-04).

Ms. Frey was Mr. Reidelberger's preschool teacher. (Id. at p. 1205). Mr. Reidelberger, who has spinal bifida and is largely confined to a wheelchair, testified that Ms. Frey impacted his life by teaching him "that I was no different than nobody else" and by fighting for him to "go into regular schooling." (Id.). Mr. Reidelberger explained that he would not have graduated from high school if Ms. Frey had not gotten him into mainstream schooling. (Id. at p. 1207). She also helped him get to the playground when she was his teacher, which allowed him to play with the other students. (Id. at p. 1208). During this testimony, a photo of Mr. Reidelberger and Ms. Frey sitting with Santa Claus was admitted. (Id.).

Ms. Reidelberger, Mr. Reidelberger's mother, testified that when her son was young, doctors determined that he was very intelligent, but his school wanted to place him in a special class due to his disabilities. (Id. at pp.1210-12). Ms. Frey fought the school on this decision, and Mr. Reidelberger was placed in her class. (Id. at p. 1211). She visited Mr. Reidelberger in the hospital when he was seriously ill. (Id. at p. 1212). Ms. Reidelberger sobbed on the stand as she recounted hearing about

Ms. Frey's death. (Id. at p. 1213). Ms. Reidelberger wrote a poem about Ms. Frey, which she read to the jury. (Id. at pp. 1214-19).

Defense counsel also objected to the admission of the following exhibits: a picture of Ms. Frey with her co-workers on at the school playground; a photo of a memorial garden built in her memory; a photo of a sign saying this garden is dedicated to Jill; a photo of children and staff releasing balloons to say goodbye; a picture of Ms. Frey with her first class of students; a drawing done by one of Ms. Frey's friends that now hangs at the school; a memorial newsletter sent out by the school; a photo of Ms. Frey on Santa Claus' lap when she was a young child; and a photograph of the inscription on her gravestone.[12] (Id. at pp. 1143, 1148-51, 1162, 1166).

1. **Late Disclosure**

Petitioner alleges that the State's untimely disclosure of the three witnesses and exhibits violated his Fifth and Sixth Amendment rights. The Missouri Supreme Court addressed this claim and held that:

> "The basic object of the discovery process is to permit the defendant a decent opportunity to prepare in advance of trial and avoid surprise." State v. Kilgore, 771 S.W.2d 57, 66 (Mo. banc 1989). We recently addressed the issue of late endorsement of witnesses in Moss v. State, 10 S.W.3d 508 (Mo. banc 2000). In Moss, the trial court granted the State leave to endorse two additional witnesses only five days before the trial. In finding no error in the trial court's decision, we considered the following factors:
>
> (1) Whether the defendant waived the objection;
>
> (2) Whether the state intended surprise or acted deceptively or in bad faith, with the intention to disadvantage the defendant;
>
> (3) Whether in fact defendant was surprised and suffered any disadvantage; and

---

[12]The inscription is a copy of Ms. Reidelberger's poem.

(4) Whether the type of testimony given might readily have been contemplated.

Moss v. State, 10 S.W.3d 508, 514 (Mo. banc 2000). . . . .

Storey argues that the trial court's decision prejudiced him (a) in conducting voir dire and (b) in addressing the evidence at trial. When objecting to the evidence, however, defense counsel failed to relay any concerns about the jury selection process. The trial court heard the following objection concerning the evidence at issue . . .

Defense counsel also made no further objection or statement, either at that time or at any time thereafter, that would explain why the relief provided was inadequate.

Before voir dire, the State endorsed witnesses Lavon Marshall, Karen Stepson, Gladys Frey, and Timothy Frey, who all testified as "victim impact" witnesses. Because of these endorsements, the defense should have readily contemplated the admission of evidence related to Jill Frey's character and her work with disabled children. Nevertheless, the defense failed to ask any voir dire questions concerning the jurors' sensitivities to these issues or to the witnesses identified prior to that time. To each venireperson, the defense simply asked the following three questions in substantially the same form:

> (1) Do you think that you could realistically and meaningfully consider anything less than the death penalty?

> (2) Do you believe that it is important for you that you know as much information as you can have about Storey, his background, and his character?

> (3) If you were the foreman of the jury, could you sign a verdict sentencing Storey to life imprisonment even though eleven of the twelve jurors, including yourself, believed that he should receive a sentence of death?

We do not find Storey's argument that he was prejudiced during voir dire by the untimely disclosure of these witnesses credible. There is no indication that the defense would have changed its voir dire strategy due to the endorsement of three additional victim impact witnesses when the defense did not address already identified victim impact witnesses. The mere fact that one of the witnesses was confined to a wheel chair does not alter this conclusion, as the defense was fully notified of the State's intention to introduce testimony related to the victim's work with disabled children. . . .

We also find no indication that the defense suffered a disadvantage during the presentation of evidence or during closing arguments. Due to the timely endorsement of several other victim impact witnesses, the defense should have been prepared for

this particular type of evidence. Moreover, the trial court, in its discretion, ordered a remedy to the late disclosure in accordance with Supreme Court Rule 25.16. The defense made no indication that this remedy was insufficient to prepare for the testimony or for admission of the exhibits. Finally, defense counsel chose not to cross-examine any of the character witnesses in this case, and there is no indication that an earlier disclosure would have prompted a change in this defense strategy. "Where counsel is surprised by opposing evidence at trial, but deals with that evidence in precisely the same manner as if he had been fully prepared, there is no reason to exclude that evidence, however significant, based on a discovery violation." Kilgore, 771 S.W.2d at 66. . . .

Under these facts, Storey did not suffer prejudice. The point is denied. We do not approve, however, the untimely endorsement of witnesses during the penalty phase hearing, without a showing of good cause. Trial courts should take care to protect the integrity of our process from such sloppy or disingenuous tactics. Nonetheless, a new trial is not warranted without some indication that Storey might have done things differently or that a different result might otherwise have occurred.

Storey III, 40 S.W.3d at 905-08.

The Court first addresses Petitioner's Sixth Amendment argument, that the improper introduction of evidence violated Ring v. Arizona, 536 U.S. 584 (2002). He alleges that Ring extended normal discovery principles to the penalty phase of a death penalty trial. He also alleges that this extension allows him to raise an ineffective assistance of counsel claim.

Ring held that a defendant is entitled to have jury decide that he "is guilty of every element of the crime with he is charged beyond a reasonable doubt." Id. at 602 (citing Apprendi v. New Jersey, 530 U.S. 466 477 (2000)). This rule extends to the determination of aggravating factors in a death penalty case. Ring, 536 U.S. at 609. Even if this line of cases extends discovery principles to the late disclosure of victim impact evidence, a new penalty phase is not warranted. Both ineffective assistance of counsel and discovery violation claims require a showing of prejudice, meaning that there is a reasonable probability that the proceeding would have been different. The Court does not think that any reasonable probability exists in this case. The testimony admitted did not advance any

of the aggravating circumstances required under Missouri law. Additionally, the Court agrees with the Missouri Supreme Court that Petitioner should have expected this kind of evidence.

Secondly, Petitioner's alleges that the late disclosure violated his Fifth Amendment due process rights because he was denied adequate notice of the evidence against him. In <u>Gardner v. Florida</u>, 430 U.S. 349, 358 (1977), the Supreme Court held that sentencing process must satisfy the requirements of due process. <u>Gardner</u> found that the defendant was denied due process "when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to explain or deny." <u>Id.</u> at 362. The Supreme Court characterized "fair notice" as the "bedrock of any constitutionally fair procedure." <u>Lankford v. Idaho</u>, 500 U.S. 110, 121 (1991) (failing to notify defendant that the state may pursue the death penalty violates due process).

Upon consideration, Petitioner received adequate notice and had an opportunity to be heard. The trial court made the witnesses available to him. There appears to be little risk of prejudice as petitioner's counsel chose to not cross examine any character witnesses. Finally, Petitioner has failed to cite any precedent supporting his assertion. The precedent cited, which is discussed above, focuses on situations where a defendant is not informed of the possibility that the death penalty will be brought against him. As such, this portion of Petitioner's claim is denied.

### 2. __Victim Impact Evidence violated Payne__

Petitioner alleges that the testimony of Mr. Reidelberger, Ms. Reidelberger, Harrison, and the exhibits introduced with their testimony violated <u>Payne</u>. The Missouri Supreme Court addressed this claim and held:

> Storey next claims that certain victim impact evidence exceeded the boundaries of permissible victim impact evidence as discussed in <u>Payne v. Tennessee</u>, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). He assigns error to the admission of certain testimony and to the admission of certain exhibits. We address each in turn. . . .

Victim impact evidence is admissible under the United States and Missouri Constitutions. State v. Deck, 994 S.W.2d 527, 538 (Mo. banc 1999); see also section 565.030.4, RSMo 1994. "[J]ust as the defendant is entitled to present evidence in mitigation designed to show that the defendant is a 'uniquely individual human being,' the State is also allowed to present evidence showing each victim's 'uniqueness as an individual human being.' " Id. at 538 (quoting Payne v. Tennessee, 501 U.S. 808, 822-23, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). Victim impact evidence violates the Constitution only if it is so "unduly prejudicial that it renders the trial fundamentally unfair." State v. Parker, 886 S.W.2d 908, 927 (Mo. banc 1994) (quoting Payne v. Tennessee, 501 U.S. 808, 824-26, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).

Storey argues that the United States Supreme Court decision in Payne does not authorize the "plethora of exhibits created after Frey's death." Storey has failed, however, to show how the specific evidence admitted in this case prejudiced him in such a way as to render the trial fundamentally unfair.

A number of the exhibits were properly admitted. The photographs of Frey with her class, the balloon release, and the memorial garden serve to illustrate Frey's value to the community and the impact of her death upon her friends and co-workers. In other words, the exhibits help the jury to see the victim as something other than a "faceless stranger." State v. Gray, 887 S.W.2d 369, 389 (Mo. banc 1994). The trial court did not abuse its discretion in admitting these exhibits.

Likewise, the newsletter, poem, and eulogy each describe Frey's unique characteristics and the contributions that she made to society. Though reading a poem or eulogy may not be appropriate in every case, the writings in this case were read into evidence by their respective authors. Clearly, either author could have testified about the victim without the aid of a writing. The prosecutor's choice to use the recorded recollection simply does not result in unfair prejudice under these facts.

Only one exhibit reached beyond the scope of proper victim impact evidence. The photograph of Frey's tombstone was not relevant to show the impact of Frey's death, and it inappropriately drew the jury into the mourning process. Nevertheless, an analysis of improperly admitted victim impact evidence must focus on fundamental fairness. State v. Knese, 985 S.W.2d 759, 771-72 (Mo. banc 1999). Though a photograph of a victim's tombstone will rarely be admissible, there is no reason to treat it any differently than other types of evidence. Id. As with all errors in the admission of evidence, this Court reviews the admission of victim impact evidence "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." State v. Morrow, 968 S.W.2d 100, 106 (Mo. banc 1998). The question, then, is whether the error in this case "so infects the sentencing proceeding as to render it fundamentally unfair." Knese, 985 S.W.2d at 772. In light of the other properly admitted evidence establishing the particularly senseless and brutal nature of the murder of Jill Frey, we simply can not conclude that

the erroneous admission of an irrelevant photograph deprived Storey of a fair trial. The point is denied.

Storey III, 40 S.W.3d at 908-09.

Upon consideration, the Court finds that the Missouri Supreme Court's decision was a reasonable application of Payne. The victim impact evidence at issue is similar to evidence that the Eighth Circuit has previously permitted. See Johnson, 495 F.3d at 977 (reading of poem by victim's childhood friend); United States v. Nelson, 347 F.3d 701, 713 (8th Cir. 2003) (holding that admission of six victim impact witnesses, including victim's family and friends, as well as exhibits consisting of letter and photographs was permissible, especially considering the mitigating evidence put on by defendant). Coping mechanisms, such as the inclusion of poems or eulogies, are allowable under Payne. Simmons v. Bowersox, 235 F.3d 1124, 1135 (8th Cir. 2001) (allowing evidence of victim's coping mechanisms). The testimony about Ms. Frey's impact on the lives of children is allowable because the "[v]ictim's civic activities and involvement in the community are part of their lives, part of what has been lost on account of their death." Gray v. Bowersox, 281 F.3d 749, 756 (8th Cir. 2002). The evidence was not unduly prejudicial because it added little to the uncontested testimony of Gladys Frey, Ms. Frey's mother. Simmons, 235 F.3d at 1135. Finally, the State did not present an undue amount of victim impact evidence because it only called seven witnesses, whose testimony lasted approximately one hundred pages of transcript. See Johnson, 495 F.3d at 977. As such, Claim Nine is denied.

### D. Claim Ten

In Claim Ten, Petitioner alleges that the victim impact testimony of Lavon Marshall ("Marshall") and Karen Stepson ("Stepson") violated Payne. (Pet. at p. 44).

Marshall, Ms. Frey's neighbor, testified that on the night of the murder, she heard a woman screaming, a man saying "shut up, shut up, shut up," some "moaning," and rummaging noises. (Resp.

at Ex. Y-3 pp. 1107-10). Marshall was about to dial 911 when the noises died down. (Id. at p. 1111). The murder "traumatized" Marshall. (Id. at p. 1115). She received four years of counseling to understand that "I was not going to take responsibility" for the murder. (Id. at p. 1114). The trauma caused her to lose her job because she feared being alone. (Id. at p. 1115).

Stepson was a friend and coworker of Ms. Frey. (Id. at pp. 1131, 1138-39). Stepson, along with two other coworkers, initially found Ms. Frey's corpse. (Id. at pp. 1137-38). Stepson had to explain Ms. Frey's death to both her children and Ms. Frey's students. (Id. at pp. 1157-58). She was "fearful" and "confused frequently" after Ms. Frey's death. (Id. at p. 1158). Sometimes, she would be "up all night," "sick in the morning," or "cry in the shower" because of it. (Id. at p. 1158). After "quite a few years," she went into counseling, but it did "not really get rid of the anger." (Id. at p. 1159).

The Missouri Supreme Court addressed this claim and held:

"Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." Payne v. Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). "As a general rule, the trial court 'has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment.' " State v. Winfield, 5 S.W.3d 505, 515 (Mo. banc 1999) (quoting State v. Kinder, 942 S.W.2d 313, 331 (Mo. banc 1996)). Both Marshall and Stepson testified as to the "specific harm caused by the defendant." Payne, 501 U.S. at 825, 111 S.Ct. 2597. The trial court did not abuse its discretion in finding this evidence helpful to the jury in assessing punishment. The point is denied.

Storey III, 40 S.W.3d at 908.

Upon consideration, the Court finds that the Missouri Supreme Court's decision was a reasonable application of Payne. Although Marshall's testimony was at the boundary of acceptable victim impact evidence, it did not render Petitioner's trial fundamentally unfair. It was a very brief discussion of the murder's impact on her. The remainder of the testimony discussed what she

witnessed the night of the murder, specifically the noises she heard. Stepson's testimony was permissible victim impact evidence. See Johnson, 495 F.3d at 977; Nelson, 347 F.3d at 713. As such, Claim Ten is denied.

**E.** **Claim Eleven**

In Claim Eleven, Petitioner alleges that the 1999 trial court improperly excluded part of the testimony of James Aiken ("Aiken"). (Pet. at p. 47). Petitioner alleges that the inability to question Aiken about whether he would remain a maximum security prisoner for the rest of his life violated his right to assert a complete defense. (Id.).

Petitioner called Aiken to testify at the 1999 penalty-phase trial. (Resp. at Ex. Y-3 p. 1220). Aiken, an expert in corrections, testified that Petitioner's prison records show that he is not a dangerous inmate because he had only violated minor rules while in prison. (Id. at pp. 1234-38). Aiken then explained that he would be classified as a maximum security inmate. (Id. at pp. 1240-41). Aiken then commented that this classification would never change. (Id. at p. 1241). The State objected to this comment as being speculative, and the court sustained the objection. (Id.).

The Missouri Supreme Court addressed this claim and held:

> "It is within the trial court's sound discretion to admit or exclude an expert's testimony . . . ." State v. Davis, 814 S.W.2d 593, 603 (Mo. banc 1991). Whether the Department of Corrections' classification system will ever change is a matter of speculation. Moreover, the Governor of Missouri retains the power to grant Storey clemency and reduce his sentence. Mo. Const. art. IV, section 7. The trial court did not abuse its discretion in excluding the speculative testimony. The point is denied.

Storey III, 40 S.W.3d at 910.

On a review of a state court conviction, this Court does not examine whether evidence was properly admitted under state law. Oliver v. Wood, 96 F.3d 1106, 1108 (8th Cir. 1996) (citing Estelle, 502 U.S. at 68). State rulings about the admissibility of evidence "can form the basis for federal habeas relief under the due process clause only when they were so conspicuously prejudicial

or of such magnitude as to fatally infect the trial and deprive the defendant of due process." <u>Bounds v. Delo</u>, 151 F.3d 1116, 1119 (8th Cir. 1998) (citing <u>Parker v. Bowersox</u>, 94 F.3d 458, 460 (8th Cir. 1996)). In making this determination, the Court reviews the totality of the facts of the case and analyzes the fairness of the particular trial under the circumstances. <u>Keyes v. Bowersox</u>, 230 F. Supp. 2d 971, 975 (E.D. Mo. 2002) (citing <u>Turner v. Armontrout</u>, 845 F.2d 165, 169 (8th Cir. 1988)). Additionally, the burden on the Petitioner on this point is "much greater than that required on direct appeal and even greater than the showing of plain error." <u>Owsley v. Bowersox</u>, 47 F. Supp. 2d 1195, 1210 (W.D. Mo. 1999) (quoting <u>Mendoza v. Leapley</u>, 5 F.3d 341, 342 (8th Cir. 1993)).

Petitioner alleges that the 1999 trial court's decision to preclude Aiken's testimony violated his due process rights because it prevented him presenting a complete defense. He asserts that the recent decision of <u>Holmes v. South Carolina</u>, 547 U.S. 319 (2006) supports his position. In <u>Holmes</u>, the Supreme Court recognized both that the states have "broad latitude . . . to establish rules excluding evidence from criminal trials" and that this latitude is limited by a defendant's right to "a meaningful opportunity to present a complete defense." <u>Id.</u> at 325 (citations and quotations omitted). Thus, the right to a complete defense is abridged by evidentiary rules that "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." <u>Id.</u> at 324-25 (citations omitted). <u>Holmes</u> held that a rule excluding certain types of evidence of third party guilt was unconstitutional because it improperly focused on whether the prosecution's case was strong enough. <u>Id.</u> at 329-30.

The Supreme Court also held that juries "must be permitted to 'consider fully' such mitigating evidence and that such consideration 'would be meaningless' unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." <u>Abdul-Kabir v. Quarterman</u>, 127 S. Ct. 1654, 1673 (2007) (quoting

Penry v. Lynaugh, 492 U.S. 302, 321, 323 (1989)). Additionally, consideration of a prisoner's behavior in prison is a relevant mitigating factor in sentencing. Skipper v. South Carolina, 476 U.S. 1, 5 (1986).

Upon consideration, the exclusion of Aiken's testimony did not violate Petitioner's due process rights. The testimony was speculative because Aiken cannot know if Missouri will change its classification system in the future or if the governor will grant Petitioner clemency. The excluded statement did not prevent Petitioner from presenting evidence that he had behaved well in prison and posed little risk of violence towards himself or others. Additionally, the challenged ruling does not resemble the evidentiary rules that have prompted the Supreme Court to reverse convictions on due process grounds. Cf. Crane v. Kentucky, 476 U.S. 683, 691 (1986) (rule prevented defendant from talking about whether circumstances made his confession unreliable); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) (rule prevented parties from impeaching their own witnesses); Washington v. Texas, 388 U.S. 14, 22-23 (1967) (rule barred a person who had been charged as a participant in a crime from testifying in defense of another alleged participant unless the witness had been acquitted). Thus, Claim Eleven is denied.

### F. Claim Twelve

In Claim Twelve, Petitioner alleges that the 1999 penalty-phase trial court erred by overruling his objections to the prosecutor's closing argument. (Pet. at p. 49). Petitioner alleges that allowing the jury to consider these remarks violated his due process and fair trial rights because the remarks prevented the jury from considering the mitigating circumstances. See Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982) (holding a jury "may determine the weight to be given to the relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.").

A prosecutor is given wide latitude in his closing arguments and is free to use "colorful and forceful language." United States v. Robinson, 110 F.3d 1320, 1327 (8th Cir. 1997). A prosecutor's argument, however, violates due process if "the prosecutor's remarks infected the trial with unfairness." Hall, 341 F.3d at 716 (quoting Darden, 477 U.S. at 181). To determine if the remarks infected the trial with unfairness, the Court must (1) measure the type of prejudice that arose from the remarks; (2) examine what defense counsel did in his argument to minimize the prejudice; (3) review the jury instructions to see if the jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome of the sentencing phase would have been different, taking into account all the aggravating and mitigating circumstances. Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir. 1995). This Court will grant "relief only if 'the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have sua sponte declared a mistrial.'" Sublett, 217 F.3d at 600 (quoting James, 187 F.3d at 869).

    1.    **"Excuses" Argument**

Petitioner first complains that the prosecutor improperly equated the mitigating circumstances Petitioner presented to excuses. Specifically, the prosecutor stated:

> Well, I got to tell you folks, you have a laundry list of mitigating circumstances that are presented to you for the purpose of trying to get you to consider those too in this terrible, terrible murder. Well, they don't. They are a list of excuses at best. And they're designed to divert you from what is most important here.

> We are viewing here the type of situation that is really very hard to explain because there is no apparent motive other than the fact that this man was mad, maybe because of the letter from his wife's divorce lawyer, I don't know. And somehow that is supposed to – that is supposed to spark a series of circumstances about how he was brought up so that that excuses his conduct in this case.

(Resp. at Ex. Y-4 pp. 1673-74). The Missouri Supreme Court addressed this claim and held:

> He suggests that the State's argument encouraged the jury to disregard the jury instructions and the law. This point mischaracterizes the State's role in closing arguments. "The prosecutor may comment on the evidence and the credibility of the

defendant's case. . . . Counsel may even belittle and point to the improbability and untruthfulness of specific evidence." State v. Hall, 982 S.W.2d 675, 683 (Mo. banc 1998) (quoting State v. Kreutzer, 928 S.W.2d 854, 872 (Mo. banc 1996)).

In this case, the State did not argue that the jury should disregard the evidence. The prosecutor simply argued that the jury should give the mitigating evidence little or no weight. Clearly, the State is not required to agree with the defendant that the evidence offered during the penalty phase is sufficiently mitigating to preclude imposition of the death sentence. To the contrary, the State is free to argue that the evidence is not mitigating at all, so long as the trial court properly instructs the jury to consider all of the evidence in making its decision. The point is denied.

Storey III, 40 S.W.3d at 910-11.

Upon consideration, the Missouri Supreme Court's decision was not an unreasonable application of federal law. The Eighth Circuit recently held that a prosecutor describing a defendant's arguments against the death penalty as "preposterous" did not violate his due process rights. Clayton v. Roper, 515 F.3d 784, 791-92 (8th Cir. 2008). Similarly, a prosecutor arguing that the jury should give "no weight to the fact that [defendant] had no criminal record" is not improper because it does not suggest that the jury exclude this factor from consideration. Johnson, 495 F.3d at 966. As such, this remark does not amount to prosecutorial misconduct.

### 2. Mercy Argument

Petitioner next complains that the prosecutor improperly equated mercy with weakness. During closing arguments, the follow exchange occurred:

PROSECUTOR: They ask for your mercy and they're praying for weakness.

DEFENSE: Objection, improper argument, your Honor.

THE COURT: Overruled.

PROSECUTOR: Been specifically upheld. Ladies and gentlemen, mercy is a good thing. Weakness is something that we can ill afford. This whole thing is an effort to fool you.

DEFENSE: Objection, improper personalization, your Honor.

THE COURT: I'm going to sustain as to that statement.

DEFENSE: Ask the jury be instructed to disregard.

THE COURT: Ladies and gentlemen, you will be guided by the Court's instructions.

(Resp. at Y-4 p. 1698). The prosecutor also remarked that "[m]ercy is something that the strong give to the weak and to the innocent. You are strong because you have the power here, but that man doesn't qualify for mercy." (Id. at pp. 1699-1700).

The Missouri Supreme Court addressed this claim and held:

> We have cautioned against any suggestion that the jury is weak if it fails to return a certain verdict. State v. Rousan, 961 S.W.2d 831, 851 (Mo. banc 1998). Nevertheless, "[a] prosecutor is allowed to argue that the defendant does not deserve mercy under the facts of a particular case." Id. In Rousan, the defense asked for mercy during closing arguments. The prosecutor then discussed the difference between mercy and weakness. He argued that the defendant did not deserve mercy under the facts of the case. In conclusion, he stated, "The defense has asked you for mercy and what they are hoping for is weakness. I'm sorry. It's a hard choice. Weakness is something we can no longer afford. Do your duty. Thank you folks." Id.
>
> As in Rousan, we find that the State's comment about weakness was isolated and part of a larger and otherwise appropriate argument. We can not say under the facts of this case that the trial court abused its discretion in overruling the defense objection or that there is a reasonable probability that the jury's verdict would have been different had the argument not been made. Deck, 994 S.W.2d at 543. The point is denied.

Storey III, 40 S.W.3d at 911.

Upon consideration, the Missouri Supreme Court applied the proper federal law in a reasonable manner. The Eighth Circuit has rejected this exact argument. Rousan, 436 F.3d at 960.[13] As such, this claim is without merit.

### 3. **Abuse Argument**

_____

[13]Petitioner tries to distinguish Rousan by stating that it did not address whether this sort of language violates the rule that a jury must consider all mitigating evidence. Upon consideration, the Court finds that these comments did not prompt the jury to fail to consider the mitigating evidence.

Finally, Petitioner complains that the prosecutor improperly personalized the argument by stating:

> Folks, a lot of people come up rough, real rough. Chances are from statistics that I read, there is at least two or three of you that were abused some way yourself, as I understand it, it about somewhere around twenty percent. . . . The simple fact of the matter is, that's not good enough reason to kill, to commit murder.

(Resp. at Ex. Y-4 p. 1700).

The Missouri Supreme Court addressed this claim and held:

> A prosecutor may not argue facts outside the record." State v. Storey, 901 S.W.2d 886, 900 (Mo. banc 1995). The record in this case did not contain evidence concerning the statistical probability that the jurors had been abused. Therefore, the prosecutor's reference to this statistical evidence was improper. Nevertheless, the improper reference was an isolated and non-prejudicial piece of closing argument. The prosecutor may ask the jurors to draw upon their common experience and recognize that not all abused people commit murder. Cf. State v. Clay, 975 S.W.2d 121, 139 (Mo. banc 1998) ("a prosecutor may call upon the jurors' common experience in arguments concerning the prevalence of crime in the community and the personal safety of its inhabitants."). Moreover, the prosecutor may argue that the abuse Storey suffered did not outweigh the evidence in aggravation of punishment. See State v. Knese, 985 S.W.2d 759, 774-75 (Mo. banc 1999).
>
> Though referring to statistical data not in evidence is improper during closing arguments, the reference in this case was isolated and not prejudicial. The point is denied.

Storey III, 40 S.W.3d at 911.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of federal law to the facts of this case. A review of the closing arguments shows that this comment did not "fatally infect[] the proceedings and render [Petitioner's] trial fundamentally unfair." Kellogg, 176 F.3d at 452. These comments were less prejudicial than comments that the Eighth Circuit has found do not violate due process. See Preston v. Delo, 100 F.3d 596, 602 (8th Cir. 1996) (comparing defendant to a piece of garbage to be thrown out did not render trial fundamentally unfair).

Moreover, the jury was properly instructed to not treat the lawyer's arguments as evidence. As such, Claim Twelve will be denied.

## G.     Claim Thirteen

In Claim Thirteen, Petitioner alleges that the 1999 penalty-phase trial court erred by overruling the defendant's objection to Instructions 11 and 12 because these erroneous instructions failed to "advise the jury that it could return a verdict of life imprisonment if the facts and circumstances of mitigation outweighed the evidence in aggravation of punishment." (Pet. at p. 53).

### 1.     Instruction 11 (MAI-CR3d 313.46B)

The State submitted this instruction, and the trial court accepted it, despite Petitioner's objection and offer of a different instruction. (Resp. Ex. Y-4 pp. 1656-58). Petitioner asserts that the instruction as given "is manifestly unjust" because it instructs the jury to look at all the circumstances when deciding whether to assess the death penalty, but does not instruct the jury to take the same approach when deciding if life imprisonment is the proper penalty. (Pet. at p. 54). Petitioner alleges that his refused instruction would have corrected this deficiency. (Id.).

The Missouri Supreme Court denied this claim by holding:

> The language of Instruction No. 11 and 12 are patterned exactly after MAI-CR 3d 313.46B and 313.48B. The instructions are presumptively valid. State v. Ervin, 979 S.W.2d 149, 158 (Mo. banc 1998). "Whenever there is an MAI-CR instruction applicable under the law . . . , the MAI-CR instruction is to be given to the exclusion of any other instruction." Id.

> The first modification suggested by the defense concerned MAI-CR 313.46B (Instruction No. 11), commonly referred to as the "life option" instruction. Storey contends that the trial court abused its discretion by refusing to insert the following highlighted phrase into the pattern instruction:

>> You are not compelled to fix death as the punishment even if you do not find the existence of one or more of the mitigating circumstances sufficient to outweigh the aggravating circumstances or circumstances which you find to exist. You must consider all of the circumstances in deciding whether to assess and declare the punishment at

> *imprisonment for life by the Department of Corrections without eligibility for probation or parole or* death. Whether that is to be your final decision rests with you.

Storey argues that the modification was necessary to ensure that the jury gave effect to all of the mitigating evidence. See McKoy v. North Carolina, 494 U.S. 433, 437-38 . . . (1990); Mills v. Maryland, 486 U.S. 367, 375 . . . (1988).

The requested modification, however, is superfluous. The language of MAI-CR 313.46B adequately informs the jury that it must consider all of the circumstances, including the mitigating circumstances, in determining the appropriate punishment. Jury instructions are not to be viewed in isolation, but are to be taken as a whole to determine whether error occurred. Mallett v. State, 769 S.W.2d 77, 82 (Mo. banc 1989). The only choice facing the jurors by the time they reached Instruction No. 11 was whether to sentence Storey to death or life imprisonment. By considering all of the evidence in determining whether to sentence Storey to death, the jury also necessarily considered all of the evidence in determining whether to sentence him to life imprisonment. The trial court did not commit error when it refused to submit the proffered instruction. The point is denied.

Storey III, 40 S.W.3d at 912.

Upon consideration, the Missouri Supreme Court's application of federal law was reasonable. The Missouri Supreme Court correctly determined that the proposed language was superfluous because the instruction already told the jury to consider all the evidence and circumstances. Even if the Court were to find this instruction was erroneous, to grant habeas relief on this claim, the Court must find that "the instruction contains a fundamental defect resulting in a complete miscarriage of justice." Roberts v. Bowersox, 137 F.3d 1062, 1068 (8th Cir. 1998). Such a defect is not present here.

### 2. Instruction 12 (MAI-CR3d 313.46B)

The State offered this instruction, and the court accepted it despite Petitioner's objections and offer of two different instructions. Petitioner alleges that the instruction, as given did not adequately explain the third step of Missouri's penalty phase procedure. (Pet. at p. 56).

The Missouri Supreme Court addressed this claim and held:

The additional modifications offered by the defense concerned pattern instruction MAI-CR3d 313.48B (Instruction No. 12), also known as the "Verdict Mechanics" instruction. In two proposed instructions, the defense inserted the following highlighted sentence into paragraph three:

> If you unanimously decide, after considering all of the evidence and instructions of law given to you, that the defendant must be put to death for the murder of Jill Lynn Frey, your foreperson must write into your verdict all of the statutory aggravating circumstances submitted in Instruction No. 8 which you found beyond a reasonable doubt and sign the verdict form so fixing punishment. ***In addition, your foreperson must write into your verdict all of the other specifically mentioned aggravating circumstances submitted in Instruction No. ___ which you found beyond a reasonable doubt.***

When constructing MAI-CR3d 48B, the drafters of the Missouri Approved Instructions contemplated the exact language offered by the defense in this case. However, the Notes on Use specifically state that the proposed sentence "will be included only if MAI-CR3d 313.41B was given." In this case, MAI-CR3d 313.41B is inapplicable because the prosecution did not submit any non-statutory aggravating circumstances for the jury's consideration. Thus, the proposed modification is not only superfluous, but also contrary to the Notes on Use. A trial court does not commit error when it refuses to submit an incorrect instruction. State v. Parkhurst, 845 S.W.2d 31, 36-37 (Mo. banc 1992).

Despite the superfluous language in paragraph three of the proposed instructions, Storey argues that the trial court should have included the following highlighted language in paragraph five:

> If you are unable to unanimously find the existence of at least one statutory aggravating circumstance beyond a reasonable doubt as submitted in Instruction No. 8 , or if you are unable to unanimously find there are aggravating circumstances which warrant the imposition of a sentence of death, as submitted in Instruction No. 9 , ***or if each juror determines that there are one or more mitigating circumstances sufficient to outweigh the aggravating circumstances found to exist, as submitted in Instruction No. ___***, then your foreperson must sign the verdict form fixing the punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

Storey suggests that this additional phrase is necessary for the instruction to comply with Section 565.030.4, RSMo 1994.

Section 565.030.4 outlines a four-step process that the jury must consider when assessing punishment in a capital case. The jury must assess the punishment at life

imprisonment without the eligibility of parole (1) if the jury does not find beyond a reasonable doubt at least one statutory aggravating circumstance, (2) if the jury does not find that the evidence in aggravation of punishment warrants imposition of the death sentence, (3) if the jury concludes that there is evidence in mitigation of punishment that outweighs the evidence in aggravation of punishment, or (4) if the jury decides under all the circumstances not to assess punishment at death. Section 565.030.4, RSMo 1994.

The trial court instructed the jury concerning this four-step process in Instructions No. 8-11. Thus, the jury only reached Instruction No. 12 after undertaking the process outlined by the statute. Specifically, Instruction No. 10 told the jury that "if each juror finds one or more mitigating circumstances sufficient to outweigh the aggravating circumstances found to exist, then you must return a verdict fixing defendant's punishment at life imprisonment. . . ." In paragraph four of Instruction No. 12, the jury was further admonished, "If you unanimously decide, after considering all of the evidence and instructions of law, that the defendant must be punished . . . by imprisonment for life . . ., your foreperson will sign the verdict form so fixing the punishment." This paragraph adequately informed the jury of the proper verdict form should they choose to assess punishment at life imprisonment after considering steps three or four of the capital sentencing process. Storey's proposed modification added inapplicable language to paragraph five, which instructed the jury concerning the proper verdict form should the defendant be ineligible for the death sentence under steps one or two of the capital sentencing process. These instructions in no way precluded the jury from giving effect to the mitigating evidence. See Buchanan v. Angelone, 522 U.S. 269, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The trial court did not err in rejecting the proposed modifications.

The proposed modifications to Instruction No. 12 included one additional paragraph that the defense chose not to address on appeal. Any objection concerning this modification is waived. See State v. Morovitz, 867 S.W.2d 506, 510 (Mo. banc 1993); Rule 30.06(c); Rule 84.04(d)(1) and (4). The point is denied

Storey III, 40 S.W.3d at 912-14.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of federal law to the facts of this case. When determining whether an instruction prevented the jury from considering all relevant mitigating evidence, the proper standard is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Ayers v. Belmontes, 127 S. Ct. 469, 475 (2006) (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). Here, no reasonable likelihood existed that the jury

was prevented from considering constitutionally relevant evidence. The jury had already been informed that they must consider the mitigating circumstances. (Resp. at Ex. Z-2 p. 183). Additionally, the instruction given was more detailed than the one upheld in Buchanan v. Angelone, 522 U.S. 269, 273 (1998). As such, Claim Thirteen is denied.

### H.    Claim Fourteen

In this claim, Petitioner alleges that the trial court erred by including the pecuniary gain aggravating circumstance in jury instruction number eight. (Pet. at p. 58). Petitioner believes that its inclusion amounted to double jeopardy because the juries in his first two trials had not found it beyond a reasonable doubt. (Id.).

The Missouri Supreme Court considered this claim and held:

The trial court submitted the following "pecuniary gain" aggravating circumstance to the jury:

> In determining the punishment to be assessed against defendant for the murder of Jill Lynn Frey, you must first unanimously determine whether one or more of the following aggravating circumstances exist:
>
> 1. Whether the defendant murdered Jill Lynn Frey for the purpose of the defendant receiving money or any other thing of monetary value from Jill Lynn Frey.

At each of Storey's previous sentencings, the jury failed to find the "pecuniary gain" aggravating circumstance. Storey contends that the submission of this aggravating circumstance to a third jury violates the constitutional prohibition against double jeopardy.

In Poland v. Arizona, the United States Supreme Court squarely addressed and rejected Storey's argument.

> We reject the fundamental premise of petitioner's argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an "acquittal" of that circumstance for double jeopardy purposes . . . . Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the] choice" between the alternative verdicts of death and life imprisonment.

- 74 -

Poland v. Arizona, 476 U.S. 147, 155-56, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) (quoting Bullington v. Missouri, 451 U.S. 430, 438, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981)). In accordance with Poland, this Court further stated,

> The principle that emerges from Bullington and Poland is that the failure to find a particular aggravating circumstance forms the basis for judgment of acquittal on the imposition of the death sentence only when there is a complete failure to find that any aggravating circumstance exists to support the death sentence.

State v. Simmons, 955 S.W.2d 752, 759-60 (Mo. banc 1997).

Storey contends that the recently decided cases of Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), suggest that the Court has begun to reexamine the application of the double jeopardy clause to sentencing. To the contrary, the Apprendi Court specifically rejected the contention that its ruling had any effect on the finding of aggravating factors in capital cases. Apprendi, 120 S.Ct. at 2366; see also Jones, 526 U.S. at 250-51, 119 S.Ct. 1215. The submission of the "pecuniary gain" aggravating circumstance did not violate the Double Jeopardy Clause. The point is denied.

Storey III, 40 S.W.3d at 914-15.

Upon consideration, the Court finds that habeas relief is not warranted. The relevant inquiry for determining whether double jeopardy prevents the imposition of the death penalty on retrial is whether the defendant was "acquitted" at his earlier trial because the court entered "findings sufficient to establish legal entitlement to the life sentence." See Sattazahn v. Pennsylvania, 537 U.S. 101, 110 (2003) (quoting Poland v. Arizona, 476 U.S. 147, 155-57 (1986)). Here, no findings were entered in his two earlier trials that established a legal entitlement to a life sentence because he was sentenced to death at both his 1991 and 1995 penalty-phase trials. His argument that Apprendi warrants a different result also fails. Only four Supreme Court Justices have addressed the issue, and each found that Apprendi does not alter the analysis for capital sentencing double jeopardy claims. Sattazahn, 537 U.S. at 111-13, 117-18. As such, Claim Fourteen is denied.

## I.     Claim Fifteen

In this claim, Petitioner alleges that his death sentence must be overturned because the State presented insufficient evidence to support the jury's finding of the pecuniary gain and depravity of mind aggravators. (Pet. at p. 59).

The Missouri Supreme Court addressed this claim and held:

> Storey also challenges the sufficiency of the evidence to sustain the aggravating circumstances found by the jury. Storey failed to preserve this claim for appeal. Issues that were not preserved may be reviewed for plain error only, which requires the court to find that manifest injustice or miscarriage of justice has resulted from the trial court error. State v. Worthington, 8 S.W.3d 83, 87 (Mo. banc 1999).

> "As to the sufficiency of the evidence to support the aggravating circumstances, the test is whether a reasonable juror could reasonably find from the evidence that the proposition advanced is true beyond a reasonable doubt." State v. Simmons, 955 S.W.2d 752, 768 (Mo. banc 1997). In this case, Storey entered Jill Frey's apartment with a knife. He knew that she was home, and he admitted that his intent was to obtain something of value to purchase more alcohol. After murdering Frey, Storey rummaged through her belongings and took her wallet, keys, and vehicle. This evidence is certainly sufficient to support a finding that Storey murdered Frey for the purpose of receiving money or any other thing of monetary value. Furthermore, the evidence supports a finding that Storey brutally beat Jill Frey to death, inflicting no fewer than twenty blunt force impacts, six broken ribs, a stab wound to the abdomen, and two incise wounds to the neck. The evidence further supports the finding that all of these wounds were inflicted while Frey was alive and conscious. The "depravity of mind" aggravating circumstance is fully supported by the evidence. The point is denied.

Storey III, 40 S.W.3d at 915.

When analyzing a sufficiency of the evidence claim, the Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the aggravating factor "beyond a reasonable doubt." Lewis v. Jeffers, 497 U.S. 764, 781 (1990) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Jackson and its progeny. In a similar circumstance, the Eighth Circuit held that a reasonable fact finder could conclude that the pecuniary gain aggravator applied. See Grubbs v. Delo, 948 F.2d 1459, 1469 (8th Cir. 1991) (holding rational fact finder could

find pecuniary gain aggravator under Missouri law where defendant took money from victim on day of murder and wore gloves while committing the murder). As such, sufficient evidence exists to support the pecuniary gain aggravator.

Similarly, sufficient evidence exists to support the depravity of mind aggravator. The evidence, in the light most favorable to the prosecutor, shows that Ms. Frey received a beating resulting in six broken ribs, a six inch deep stab wound to the abdomen, and twenty blunt force impacts. Additionally, he slashed her throat with enough force to expose her spinal column. (Resp. at Ex. II-6 pp. 837-43). As such, Claim Fifteen is denied.

**J.      Claims Thirty to Thirty-Three**

In these claims, Petitioner alleges that his 1999 trial counsel was ineffective for failing to impeach the testimony of Kim Posey ("Posey"), Petitioner's ex-wife. (Pet. at pp. 112-27). Posey did not testify at the 1999 trial because she was unavailable. Instead, her testimony from the 1997 trial was read into the record. (Resp. at Ex. Y-3 p. 1123).

At the 1997 trial, Posey testified that she was married to Petitioner from 1988 to 1991. (Id. at Ex. S-5 pp. 856-57). She testified that Petitioner would become very violent and would leave for long periods of time. (Id. at p. 858). Petitioner once raped her, but she did not report it because she was scared of him. (Id. at pp. 860-61). While she was pregnant, Petitioner "busted down" a bathroom door and "knocked me down in the tub." (Id. at p. 859). This incident caused her to visit a doctor. (Id.). While she was pregnant, she and Petitioner were having sex in a motel room when he cut her "privates." (Id. at pp. 862, 882). Posey also testified that when Telicia, their daughter, was six to seven months old, Petitioner "put a gun to her head, told me he'd kill us both and that then kill hisself 'cause he didn't have no reason to live." (Id. at p. 860). On cross-examination, she admitted that he had not shot at her or Telicia, but had "shot out the door and shot over the car." (Id. at p. 874).

Petitioner once got angry at Harnage and used a butcher knife to repeatedly stab a pine tree. (Id. at p. 861). He also threatened to kill Harnage. (Id.).

On cross examination, Posey stated that alcohol caused many of Petitioner's violent outbursts. (Id. at p. 867, 873). Posey admitted that while Petitioner was in jail, she sent him love letters and a picture of Telicia. (Id. at pp. 874-8-). She wrote some of these love letters after filing for divorce. (Id. at p. 878). The 1997 trial counsel tried to admit these letters into evidence, but the 1997 penalty-phase court held that they were inadmissible hearsay. (Id. at p. 874-80).

The 1997 trial counsel also pointed out inconsistencies between Posey's deposition testimony and her trial testimony. (Id. at p. 883). Posey refused to provide details about Petitioner cutting her because "I'm now a Christian. I cannot say words like that." (Id. at p. 880). Posey admitted to lying under oath sometime in 1995. (Id. at pp. 884-85). She admitted once smashing Petitioner in the head with a flashlight. (Id. at p. 885). She admitted having a prior conviction for "[b]ad debt." (Id. at p. 886). Finally, she admitted never calling and complaining about Petitioner to the local sheriff. (Id. at p. 885). On redirect, Posey explained that she had been sober for ten months and attended church. (Id. at p. 887).

### 1.     **Claim Thirty**

Defense counsel wanted to read the love letters into evidence in order to impeach Posey's testimony. (Id. at Ex. Y-3 p. 1118). The trial court decided to rule on them as they came up. (Id.). After this conversation, defense counsel decided not to read these letters. At the post-conviction hearing, Biemdiek testified that her failure to ask for the admission of the letters into evidence was an oversight. (Id. at Ex. FF-3 p. 378). She also testified that they would have been "effective tools to use." (Id. at p. 407).

The Missouri Supreme Court addressed this claim and held:

Storey claims that trial counsel was ineffective by failing to introduce, as impeachment evidence, a birthday card and two love letters that Kim wrote to Storey while he was in prison. Although the content of the letters was excluded during the second trial as hearsay, collateral, and sexually explicit, the fact that Kim sent the letters was discussed before the jury. Storey's counsel testified that the failure to offer these letters into evidence, at the third trial, was an oversight. Counsel also thought that the trial court probably would have excluded the letters from the third trial as had been done in the second trial. The motion court held: "Trial counsel used her letters in the 1991 trial, with no success. It is not reasonable to believe the failure to read these letters was prejudicial and would have changed the outcome."

The jury heard Kim's testimony when the transcript was read during the third trial. They knew that she had lied under oath before and continued to change her allegations. The jury knew that Kim wrote love letters to Storey while he was in prison and after the alleged abuse. That was a reasonable item for the jury to consider in evaluating Kim's testimony. Would she send him love letters if he truly treated her so badly? The probative content of the letters beyond this, however, was minimal. The exclusion of the letters did not prejudice Storey because the letters simply showed how Kim expressed her sexual desire and love for Storey. The content of the letters would not have mitigated Storey's offense. Moreover, the value of the testimony would have been devalued by the sexual content included in the letters had they been admitted. It was not error for counsel not to try and introduce the letters. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel tried to introduce the card and letters they would have been admitted, or even had they been admitted, "the result of the proceeding would have been different." Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted).

Storey IV, 175 S.W.3d at 127.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. Petitioner cannot show prejudice because the probative value of the letters was minimal. Additionally, counsel's performance was objectively reasonable. The 1997 trial court ruled that the letters were inadmissible and the jury was already aware that Posey had written to Petitioner after he allegedly assaulted and raped her. Link, 469 F.3d at 1204 (holding that strategic trial decisions are virtually unchallengeable). As such, Claim Thirty is denied.

## 2. Claim Thirty-One

In this claim, Petitioner alleges that he received ineffective assistance of counsel when counsel failed to offer the deposition testimony of Sheriff Jerry Brogden ("Brogden"), a Georgia sheriff who had interacted with Petitioner, Posey, and Posey's family on numerous occasions. (Pet. at p. 118).

Petitioner believes that this testimony would have impeached Posey and shown that Harnage was the cause of their martial problems.(Id.).

Brogden could not testify at the 1999 trial. (Id. at p. 120). At his deposition, he stated that Petitioner was not a violent person and had no significant prior criminal history. (Id.). Posey never complained to him about Petitioner, but did accuse Harnage of abuse. (Id.). Finally, he never observed any discord between Petitioner and Telicia. (Id.).

At the 1999 trial, the prosecutor objected to several portions of the deposition. (Id. at Ex. Y-4 pp. 1529-33). The trial court sustained his objections to Brogden's testimony that Petitioner was not violent and had no significant criminal history. (Id. at p. 1530-33). The trial court stated that it would allow use of his testimony regarding Petitioner stealing a motorcycle to come into evidence because Brogden had investigated this theft. (Id. at p. 1533).

Beimdiek and Kenyon disagreed about the value of Brogden's testimony and ultimately decided not to use it. (Id. at Ex. FF-2 p. 202). Beimdiek noted that most of the helpful portions had been excluded by the trial court. (Id.). She also admitted that they should have moved to exclude the theft evidence because the Georgia conviction relating to the theft had been thrown out. (Id. at pp. 203-04).

The Missouri Supreme Court addressed this claim and held:

The State successfully objected to portions of his deposition as hearsay and irrelevant. The trial court indicated that it would exclude Sheriff Brogden's testimony about Storey's insignificant criminal record and marriage, which in counsel's words, were "some of the best portions of the deposition . . . ." Storey's attorneys disagreed about whether the deposition, without the excluded portions, should be introduced because of the risk of bringing in evidence of a possible motorcycle theft by Storey. Both of Storey's attorneys acknowledge that it may have been beneficial to have had a police officer testify on Storey's behalf even if he had little that could be admitted. One counsel described the disagreement as "a philosophical disagreement about the value of [the deposition]." The head of the public defender's capital litigation division reviewed the decision and opined that the deposition should not be introduced because of its damaging testimony and limited helpfulness. Counsel followed this

advice. Because counsel's decision not to admit Sheriff Brogden's deposition was trial strategy, it "is not a ground for ineffective assistance of counsel." State v. Chambers, 891 S.W.2d 93, 109 (Mo. banc 1994).

Storey IV, 175 S.W.3d at 127-28.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. The decision not to admit the deposition was not deficient because, following the prosecutor's objections, most of the helpful portions of the testimony had been excluded. Even assuming that counsel's performance was deficient, Petitioner cannot show prejudice on these facts because Posey had already been thoroughly impeached. See Hall v. Luebbers, 296 F.3d 685, 694 (8th Cir. 2002). As such, Claim Thirty-One is denied.

### 3. Claim Thirty-Two

In this claim, Petitioner alleges that he received ineffective assistance of trial counsel when his counsel failed to use the testimony of Andy Posey ("Mr. Posey") to impeach Posey. Mr. Posey was Posey's husband until they divorced in 1998. (Pet. at p. 123). Mr. Posey would have testified that Posey was "bossy and argumentative," had a short tempter, and prone to exaggeration. (Id.). He also would have stated that she falsely accused him of physical abuse. (Id.).

At the post-conviction hearing, Beimdiek stated that she did not contact Mr. Posey, but admitted that his statement "would have been worth attempting to introduce." (Resp. at Ex. FF-2 pp. 196-97). Beimdiek, however, seemed skeptical about this evidence's admissibility due to it being impeachment of a collateral matter. (Id. at pp. 197-98). Kenyon echoed these thoughts and also worried that Mr. Posey would not be seen as credible because he was testifying against his ex-spouse. (Id at Ex. HH p. 10).

The Missouri Supreme Court addressed this claim and held:

Trial counsel believed this testimony to be collateral and not very believable. Because counsel's decision not to present testimony from Mr. Posey was trial strategy, it "is not a ground for ineffective assistance of counsel." Chambers, 891 S.W.2d at 109.

Storey IV, 175 S.W.3d at 128.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. When determining prejudice for failing to call a witness, the Court looks at "(1) the credibility of all witnesses; (2) the interplay of the uncalled witnesses with the actual witnesses called; and (3) the strength of the evidence presented by the prosecution." Williams v. United States, 452 F.3d 1009, 1013 (8th Cir. 2006). Here, Posey's credibility had already been impeached thoroughly by her admissions that she sent Petitioner love letters despite his alleged abuse, had struck him with a flashlight, had a prior conviction for bad debt, and had lied under oath within the last year. Where a thorough impeachment of a witness has already occurred, the failure to introduce impeachment evidence on largely collateral matters does not amount to ineffective assistance of counsel. See id. at 1013; accord Hall, 296 F.3d at 694. As such, Claim Thirty-Two is denied.

### 4. Claim Thirty-Three

In this claim, Petitioner alleges his counsel was ineffective by failing to object to Posey's testimony about being a Christian and attending church. (Pet. at p. 125). Beimdiek explained that she did not object to the references because she thought it "diminished [Posey's] credibility on this issue." (Resp. at Ex. FF-3 p. 380). She stated that, "I thought the jury could even, I suppose, take from that that she had previously lied and she wasn't going to further tell that lie now." (Id.). The Missouri Supreme Court addressed this claim and held that the decision to not object was sound trial strategy. Storey IV, 175 S.W.3d at 128.

Upon consideration, the Court finds that the Missouri Supreme Court's decision was a reasonable application of Strickland. Counsel believed that these references actually hurt Posey's

credibility. The decision amounted to trial strategy, which is virtually unchallengeable. See Link, 469 F.3d at 1204. As such, Claim Thirty-Three is denied.

### K.      Claim Thirty-Four and Claim Forty-Six

In Claim Thirty-Four, Petitioner alleges that his trial counsel was ineffective by failing to object to the admission of various victim impact evidence. (Pet. at p. 127). Additionally, Petitioner alleges in Claim Forty-Six that he received ineffective assistance of appellate counsel when his counsel failed to raise the argument that all victim impact evidence should have been excluded due to the Ex Post Facto Clause. (Pet. at p. 202).

### 1.      Victim Impact Evidence violated Ex Post Facto Clause

Petitioner first asserts that the admission of any victim impact evidence at his 1999 penalty-phase trial violated the Ex Post Facto Clause, U.S. Const. art. I, § 9, cl. 3, because the controlling law at the time of Ms. Frey's murder was Booth v. Maryland, 482 U.S. 496 (1987), which prohibited the admission of victim impact evidence.

The Missouri Supreme Court addressed this claim and held:

> When Storey killed Ms. Frey in 1990, the Missouri rules of evidence did not allow for victim impact evidence. In 1993, the Missouri legislature amended section 565.030 to allow it. Counsel testified that she "should have made that objection," that the admission of victim impact evidence violated the ex post facto clause. The motion court held that "[v]ictim impact evidence is admissible and this was proper victim impact evidence. Trial counsel was not ineffective in failing to raise this objection without a sound legal basis for doing so."

> "The ex post facto clause is aimed at laws that are retroactive and that either alter the definition of crime or increase the punishment for criminal acts already committed." State ex rel. Cavallaro v. Groose, 908 S.W.2d 133, 136 (Mo. banc 1995). A "mere disadvantage to an offender is not the standard for judging the ex post facto effect of the law." Id. "[N]o ex post facto violation occurs if the change in the law is merely procedural and does not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt." Miller v. Florida, 482 U.S. 423, 433, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (internal quotations omitted).

> In this case, there was no change in the requirements, burden of proof, or penalty for first-degree murder by allowing victim impact evidence. Storey's "mere disadvantage" of having more evidence admitted in his third trial is insufficient to show an ex post facto violation. <u>Cavallaro</u>, 908 S.W.2d at 136. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." <u>State v. Six</u>, 805 S.W.2d 159, 167 (Mo. banc 1991).

<u>Storey IV</u>, 175 S.W.3d at 131-32.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of <u>Strickland</u>. The Eighth Circuit has addressed this issue and held that the admission of victim impact evidence does not violate the Ex Post Facto Clause. <u>See</u> <u>Nooner v. Norris</u>, 402 F.3d 801, 807 (8th Cir. 2005); <u>see also</u> <u>Neill v.Gibson</u>, 278 F.3d 1044, 1053 (10th Cir. 2001); <u>Washington v. Murray</u>, 952 F.2d 1472, 1481 (4th Cir. 1991). Because counsel is not required to make meritless objections, counsel was not deficient for failing to raise this issue. <u>See</u> <u>Hopkins</u>, 92 F.3d at 671.

The Court also finds that appellate counsel was not ineffective for failing to raise this argument because this argument had no merit. Counsel does not perform deficiently by failing to raise a meritless argument. <u>See id.</u> As such, Claim Forty-Six is denied.

### 2. Gladys Frey's Testimony

Petitioner alleges that his trial counsel was ineffective by failing to object to Gladys Frey's testimony about visiting her dead daughter's grave. (Pet. at p. 129). Gladys Frey testified that the family visited Ms. Frey's grave on her birthday. (Resp. at Ex. Y-3 p. 1187). She stated that seeing the grave "is hard on my husband" and "is the only way" they can see Ms. Frey. (<u>Id.</u>). Petitioner alleges that this testimony was highly prejudicial and inflammatory. He further alleges that had his counsel objected to it, there is a reasonable likelihood that he would have received a life sentence. (Pet. at p. 130).

The Missouri Supreme Court addressed this claim and held:

It is very understandable that Storey's counsel did not want to interrupt the victim's mother while she was testifying. By not objecting, counsel avoided the possibility of alienating the jury. Further, this victim impact evidence was properly admissible, and Storey's proposed objection lacks merit. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." Six, 805 S.W.2d at 167.

Storey IV, 175 S.W.3d at 132.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. The Eighth Circuit has held that counsel is not ineffective for failing to object to a victim's mother testifying, "I believe that he deserves the death penalty," because it represents the sound trial strategy of not interpreting the victim's mother during her victim impact testimony. See Nance, 392 F.3d at 293. Gladys Frey's statement that she can only see her Ms. Frey by visiting her grave is a less inflammatory statement than the one in Nance. As such, this claim is denied.

### 3.    Marshall and Stepson's Testimony

In this claim, Petitioner alleges that he received ineffective assistance of counsel when his trial counsel failed to object to portions of Marshall's and Stepson's testimony. (Pet. at p. 130). When being questioned about why she did not call 911, Marshall stated that "[n]ever in my life in my frame of reference would I have ever believed anything so heinous as that --." (Resp. at Ex. Y-3 p. 1111). Kenyon objected that this answer was nonresponsive. (Id.). During her testimony, Stepson discussed how she told the children at Ms. Frey's school about the murder. (Id. at p. 1158). Stepson testified that "I think we talked about it quite a bit, but it was really almost incomprehensible for children to understand the brutality of something like that." (Id.). Defense counsel did not object. (Id.). Petitioner alleges that these two statements were inadmissible because they were improper opinion testimony. (Pet. at p. 131).

The Missouri Supreme Court addressed this claim and held:

These comments were not given as opinion regarding the classification of the crime, but as an attempt by these witnesses to explain their actions and the impact of the

crime on their lives. The pictures of the crime scene, which the jury saw, portray an act of brutal violence. Having seen those pictures, the jury knew how horrible this crime was, and there can be no doubt that Storey's sentence had little to do with the words these witnesses used. An objection by counsel to the testimony of these friends and neighbors not only would be meritless, it could make the defense look callous and overly technical before the jury. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." <u>Six</u>, 805 S.W.2d at 167.

<u>Storey IV</u>, 175 S.W.3d at 132-33.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of <u>Strickland</u>. Even assuming that the failure to object amounted to deficient representation, Petitioner cannot show prejudice. There is no reasonable probability that the outcome of the 1999 trial would have been different had the jury never heard Marshall and Stepson characterize Ms. Frey's murder as "heinous" and "brutal." The jury had already seen photos of the murder and knew about the acts of violence involved. This claim is denied.

### 4.    **Freys and Reidelberger Testimony**

In this claim, Petitioner alleges that his trial counsel was ineffective by failing to object to certain portions of Gladys Frey's, Tim Frey's, and Ms. Reidelberger's testimony. (Pet. at p. 132). Petitioner alleges that had counsel objected to this testimony, there is a reasonable probability that the jury would have imposed a life sentence.

Petitioner takes issue with two portions of Gladys Frey's testimony. First, Gladys Frey made the following comment after indicating that an exhibit was a picture of Ms. Frey with her students:

> One little girl that she couldn't get the water turned off in the bathroom, she wrote a letter and left it on her grave saying if it wouldn't have been for her making her turn off the faucet, telling her that she could do it, now this little girl is a sophomore in college.

(Resp. at Ex. Y-3 p. 1179). Gladys Frey also explained that her husband had medical problems, which were related to Ms. Frey's death. (<u>Id.</u> at p. 1183). She explained that her husband reacted "very

badly" to Ms. Frey's death. (Id.). After the murder, he had heart trouble, needed bypass surgery, and suffered two strokes. (Id.).

Tim Frey, Ms. Frey's brother, testified about the effect of his sister's murder on both his children and his parents. Tim Frey testified that his older son had a "tough time" with Ms. Frey's death because he was her godchild. (Id. at pp. 1190-91).Tim Frey also attributed his father's health problems to Ms. Frey's murder. Specifically, he testified that his "illnesses" began after the murder and implied that his father lost his "will to live." (Id. at p. 1193).

Ms. Reidelberger's son was one of Ms. Frey's students. Ms. Reidelberger testified about the impact that Ms. Frey's death had on her son. She testified that she could not explained to her son why the murder happened. (Id. at p. 1213). She explained that her son will never "get over" the murder because Ms. Frey "inspired him to do whatever he could." (Id. at pp. 1214).

The Missouri Supreme Court addressed these claims and held:

> "As a general rule, the trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." Storey, 40 S.W.3d at 908 (internal citations omitted). The Freys did not offer this testimony as a medical opinion of causation, but only as their perception of the continuing impact of this crime on their family during three retrials, three appeals, and a post-conviction hearing.
>
> Storey presented 10 mitigating witnesses, including seven close friends or family who testified all about Storey's life from the time he was a few months old up to the time of his imprisonment. Each told of horrible abuses suffered by Storey growing up in a terrible family. Storey was permitted to present mitigating evidence to help the jury assess punishment. The evidence Ms. Frey's friends and family presented "is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." Payne v. Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). "Counsel is not deemed ineffective for declining to make a non-meritorious objection." Six, 805 S.W.2d at 167.

Storey IV, 175 S.W.3d at 133-34.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. Here, counsel was not ineffective because the evidence was admissible. See Hopkins, 92

F.3d at 671. Gladys Frey and Tim Frey both testified about the effect of Ms. Frey's murder on their family. Neither expressed an opinion about whether Petitioner deserved to die, meaning their testimony was admissible. See Basile, 1 Fed. Appx. at 570 (holding evidence describing impact of death on victim's family, but not characterizing the defendant or crime or suggesting an appropriate sentence, was admissible). Similarly, Ms. Reidelberger's testimony about Ms. Frey's impact on the lives of children is allowable because the "[v]ictim's civic activities and involvement in the community are part of their lives, part of what has been lost on account of their death." Gray, 281 F.3d at 756. This claim is denied.

### 5. Religious Testimony

In this claim, Petitioner alleges trial counsel was ineffective for failing to object to portions of Harrison's and Ms. Reidelberger's testimony. (Pet. at p. 136). Specifically, Petitioner alleges that his counsel should have objected to Harrison's and Ms. Reidelberger's testimony about the religious impact Ms. Frey's murder had on them.

The State asked Harrison how the murder affected her emotionally, personally, and spiritually. (Resp. at Ex. Y-3 p. 1198). Harrison stated:

> Spiritually, Jill's death brought me closer to God. As you will probably hear later when I read what I wrote for her eulogy, it is not my style to volunteer to say that I will write and talk in front of a group of people and do a eulogy. I knew that that came from God.
>
> Jill has definitely been a spiritual being for me and has helped me down that avenue definitely.

(Id. at pp. 1198-99). Harrison later reiterated that her eulogy for Ms. Frey "came spiritually."(Id. at p. 1200).

Ms. Reidelberger implied that the poem she wrote about Ms. Frey was divinely inspired. Ms. Reidelberger testified that one night she could not sleep and "kept praying to God to help Jill's family

get through this and that and at midnight all of these words starting coming to me and I wrote them down." (Id. at p. 1214). The poem, which she read to the jury, stated that Ms. Frey "worked so hard for God's special child," and ended "God bless her and guide her on her way. We all love her and she'll be deeply missed, may God guide you all." (Id. at pp. 1218-19).

> The Missouri Supreme Court addressed this claim and held:
>
> In State v. Debler, this Court stated: "The decision between life and death should not turn on the most compelling Scriptural parallel or the best historical analogy . . . . [B]oth sides should avoid excessive Biblical and historical references." 856 S.W.2d 641, 656 (Mo. banc 1993). While an objection is proper to any attempt to compel a jury to impose a death sentence based on religion, id., there is no general prohibition to religious references in a sentencing.
>
> These comments were not made in reference to reasons why Storey should be sentenced to death. Ms. Frey's friends and family felt that Ms. Frey's death brought them closer to God. This is victim impact evidence, and counsel is justified in not further highlighting the statement by making a meritless objection. These witnesses were entitled to tell the jury about the impact of Storey's crime, and the jury was entitled to hear about it. Storey has not shown that these statements were an "attempt to compel a jury to impose a death sentence." Id. Nor has he shown that the references were excessive. Id. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." Six, 805 S.W.2d at 1.

Storey IV, 175 S.W.3d at 135.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. The Fifth Circuit held that statements about the victim's family relying on their religious beliefs for comfort is admissible under Payne. See United States v. Bernard, 299 F.3d 467, 479 (5th Cir. 2002); see also United States v. Mitchell, 502 F.3d 931, 989-90 (9th Cir. 2007) (holding that the government could introduce evidence about Navajo religious tradition to show that the victim's family no longer had access to its primary source of religious knowledge); United States v. Nelson, 347 F.3d 701, 714 (8th Cir. 2001) (noting that religious references can be included in admissible victim impact evidence). Because religious references similar to the ones made here are admissible

under Payne, counsel's performance was not deficient. See Hopkins, 92 F.3d at 671 Thus, this claim is denied.

### 6. Picture of Ms. Frey at Age Three

Petitioner alleges that he received ineffective assistance of trial counsel when the State was allowed to introduce a picture of Ms. Frey at age three. (Pet. at p. 138). The trial court asked if the defense objected, and Kenyon said no. (Resp. at Ex. Y-3 p. 1160). Petitioner alleges that allowing the jury to see a picture of Ms. Frey, who was thirty-seven at the time of her death, as a small child was improper victim impact evidence meant to influence the jury's emotions. (Pet. at p. 138).

The Missouri Supreme Court addressed this claim and held:

> "As a general rule, the trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." Storey, 40 S.W.3d at 908 (internal quotations omitted). "The photographs of Frey . . . serve to illustrate Frey's value to the community and the impact of her death upon her friends and co-workers. In other words, the exhibits help the jury to see the victim as something other than a 'faceless stranger.' " Id. at 909. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." Six, 805 S.W.2d at 167.

Storey IV, 175 S.W.3d at 136.

Upon consideration, the Court finds that the Missouri Supreme Court's application of Strickland was reasonable because the picture was admissible. The Fourth Circuit held that the admission of multiple childhood photographs of an adult victim did not violate Payne. See United States v. Barnette, 390 F.3d 775, 799 (4th Cir. 2004); contra United States v. Sampson, 335 F. Supp. 2d 166, 191 (D. Mass. 2004) (refusing to admit a video montage of victim that was set to music and contained 200 still photos). Because no Payne violation occurred, there was no need for counsel to object. See Hopkins, 92 F.3d at 671. As such, this claim is denied.

### 7. Entire Community Closing Argument

Here, Petitioner alleges that he received ineffective assistance of trial counsel when his counsel failed to object to the State's closing argument. (Pet. at p. 139). In his closing argument, the prosecutor stated:

> The real tragedy here when you come right down to it, is not that the defendant made a bad choice for himself, but that that bad choice involved ending the life of Jill Frey. Like throwing a rock into a pond, there are ripples that go in all directions and those ripples in this case from that murder have washed over this family and this community like a tidal wave.

(Resp. at Ex. Y-4 p. 1695). Defense counsel did not object. At the 2001 Motion Court hearing, Beimdiek testified that her decision not to object was "a close call." (Id. at Ex FF-2 p. 357). She further stated: "I see that at least an argument, that he expands the victims in this case. I don't know that that ever would have resulted in any appellate relief. We probably should have posed the objection anyway." (Id.).

The Missouri Supreme Court addressed this claim and held:

> Counsel contemplated making this objection, but decided against it. While the prosecutor's statement is flowery, an objection to it would have great propensity to upset the jury because it would be saying that, no, this murder did not wash all over the family or the community. It is easy to see why counsel reasonably decided not to make this objection and risk alienating the jury. "Trial strategy is not a ground for ineffective assistance of counsel." State v. Chambers, 891 S.W.2d 93, 109 (Mo. banc 1994).

Storey IV, 175 S.W.3d at 136.

Upon consideration, the Court finds that the Missouri Supreme Court's application of Strickland was reasonable because the admission of this evidence did not violate federal law. The Eighth Circuit has held similar statements were not prejudicial. See White v. Luebbers, 307 F.3d 722, 730 (8th Cir. 2002) (holding that counsel was not ineffective for failing to object to prosecutor's argument that society deserved retribution). The statement was isolated and did not suggest that the jury should rely on its community conscience to sentence him to death. See Weaver v. Bowersox, 438

F.3d 832, 841 (8th Cir. 2006) (using community conscience as a guiding principle unfairly burdens the defendant). As such, Claim Thirty-Four is denied.

### L.   Claim Thirty-Five

In this claim, Petitioner alleges that he received ineffective assistance of counsel when his counsel failed to call "non-family" and "family" witnesses to testify on his behalf. (Pet. at p. 140). Petitioner alleges that counsel's inadequate investigation of possible mitigation evidence caused this failure. (Id.). He further alleges that this error was prejudicial because the jury would have found non-family witnesses more credible that family witnesses.

#### 1.   Non-Family Witnesses

Petitioner claims that twelve non-family witnesses should have been called. First, he alleges that a member of either the Hughes family or the Watson family should have been called. (Id. at p. 142). Albert and Mary Hughes were Basler's landlord in Nashville, Georgia and their granddaughter Donna Watson, with her husband Bobby, were Basler's neighbors. (Id.). If called, they would have testified that Petitioner was a typical boy who was never problematic, violent, or aggressive. (Id. at pp. 142-43). They also would have testified that Keith Corbett beat Basler. (Id.).

Nancy Summer was a family friend. (Id. at pp. 143-44). She would have testified that Petitioner was a "typical little boy," "respectful," and "not violent." (Id. at p. 144). She would have testified that Basler had a series of abusive relationships. (Id.). Carroll Whitney ("Whitney"), Keith Storey's ("Keith") biological father, would have testified that he began having contact with Keith when Keith was approximately ten years old. (Id. at p. 145). Keith stayed with him every other weekend and eventually moved in with him when he was fifteen. (Id.). Whitney would have testified that there were no drug or alcohol problems at his home. (Id.).

Louis Chester ("Chester"), Billy Hansen ("Hansen"), and Janice Raver ("Raver") were Petitioner's former teachers. (Id. at p. 146). Chester, who taught Petitioner in eighth grade, would have testified that Petitioner was "quiet," "respectful of authority," and "a model student in terms of behavior." (Id. at p. 147). Hansen, Petitioner's tenth grade math teacher, would have testified that he was a "sweet kid," "pleasant and respectful," and "reserved and quiet." (Id.). Petitioner tried in his class, but received a poor grade due to missing class. (Id.). Raver, Petitioner's eighth grade history teacher, would have testified that he was "well behaved," "cooperative" and "never a problem." (Id.). She described his character as "one of sensitivity and compassion." (Id.).

Two football coaches would have testified on his behalf. (Id.). James Marshall ("Marshall") would have testified that Petitioner had a poor home life, and he frequently took Petitioner home with him. (Id.). Marshall thought Petitioner hung around because he needed a friend. (Id. at p. 148). Marshall remembers Petitioner as being a "good kid around me" and never giving him "any trouble." (Id.). Buddy Pafford ("Pafford"), another coach, lived next door to Petitioner and knew about his problems at home because he would often come to his house crying over events at his home. (Id.). Petitioner played with Pafford's children and would even help Pafford with chores. (Id.). Pafford tried to include Petitioner in his family's activities. (Id.). Pafford also considered him a polite and respectful child. (Id.).

Finally, former employers would have testified for Petitioner. (Id. at p. 149). Willie and Mary McGee would have testified that Petitioner worked for them for a few summers and was a good worker. (Id.). Greg Wetherington and Lee Kinchen would have testified that Petitioner worked for them as a chopper gun operator, led a team of two to five workers, never caused any problems, and worked hard. (Id.). Robert Trowell, one of Petitioner's co-workers, would have corroborated this assessment. (Id.).

The Missouri Supreme Court addressed this claim and held:

> Counsel testified that the overall strategy was to use family members as witnesses who knew Storey very well. The affidavits and depositions that Storey complains about reiterate the same stories already presented by witnesses who testified at trial. Storey has not shown that any of these other witnesses, who had limited contact with him, "would have presented a viable defense" to the sickening photographs and evidence of Storey's crime. State v. Harris, 870 S.W.2d 798, 817 (Mo. banc 1994). Counsel was not "ineffective for not putting on cumulative evidence" from these other witnesses. Skillicorn v. State, 22 S.W.3d 678, 683 (Mo. banc 2000), cert. denied, 531 U.S. 1039, 121 S.Ct. 630, 148 L.Ed.2d 538 (2000).

Storey IV, 175 S.W.3d at 137-38.

Upon consideration, the Missouri Supreme Court reasonably applied Strickland. The Eighth Circuit has consistently held that counsel is not ineffective for failing to adduce additional cumulative evidence. See Winfield, 460 F.3d at 1033-34; Bucklew v. Luebbers, 436 F.3d 1010, 1020 (8th Cir. 2006); Hall, 296 F.3d at 694. As such, this claim is denied.

## 2. Family Members

Petitioner claims that three family members should have been called. Susie Storey ("S. Storey"), his step-grandmother, would have testified that she saw signs of abuse and that she was the only one who paid attention to Petitioner. (Pet. at pp. 150-51). Johnny Dees ("Dees"), Petitioner's uncle, would have testified that he knew Carroll Storey abused Basler, Petitioner, and Keith. (Id. at p. 153). He considered Petitioner a "happy go-lucky person. I never saw him get into fights. He was not a bully." (Id.). Patricia Dees Heath ("Heath"), Petitioner's cousin, would have testified that Petitioner was always very nice to her, helped her parents do chores, and talked her parents into letting her get a cat. (Id.).

Petitioner alleges that his counsel should have questioned two family members more thoroughly. First, counsel should have questioned Basler about her efforts to help him find a job shortly before Ms. Frey's murder. (Id. at p. 151). Secondly, counsel should have questioned Sharon

Stacey ("Stacey"), Petitioner's cousin, about babysitting Petitioner and Keith. She would have testified that Carroll Storey tried to sexually assault her and when she told Basler, Carroll Storey attacked her and threatened to rape her. (Id. at p. 152).

> The Missouri Supreme Court addressed these claims and held:

> Counsel introduced this type of mitigation evidence through other family members. Storey has not shown that additional testimony from these witnesses, "would have presented a viable defense" to the sickening photographs and evidence of Storey's crime. Harris, 870 S.W.2d at 817. . . .

> This additional testimony of Sharon Stacey and Pat Basler is all sideshow. Even had the court allowed the evidence, and had the jury believed it, the evidence is not particularly helpful to Storey. Counsel had already established that Storey claimed a head injury and that his stepfather was abusive. These witnesses would have reiterated the same thing. Counsel was not "ineffective for not putting on cumulative evidence." Skillicorn, 22 S.W.3d at 683.

Storey IV, 175 S.W.3d at 138-39.

Upon consideration, the Missouri Supreme Court reasonably applied Strickland. The testimony of Dees, Heath, Basler, and S. Storey would have been cumulative, meaning counsel was not ineffective for failing to introduce it. See Winfield, 460 F.3d at 1033-34. Additionally, it was a reasonable trial strategy to not introduce Stacey's testimony about her confrontation with Carroll Storey. The testimony was irrelevant, cumulative, and prejudicial. As such, this claim is denied.

### 3. Employment records

Finally, Petitioner claims that his council should have introduced his employment records. (Pet. at p. 140). The Missouri Supreme Court addressed this claim and held:

> At Chaparral Boats, Storey built boat decks and hulls. The evidence from that job was that he was a hard worker with a good attitude, but that he quit without giving notice. Storey claims that he left because of an injury. The medical records indicate that his own drunk driving caused his injury. As employment mitigation, counsel presented the testimony of Storey's supervisor at the prison library. She testified that he was a good worker who did not cause trouble. The records from Chaparral indicate the same thing. Counsel was not "ineffective for not putting on cumulative evidence." Skillicorn, 22 S.W.3d at 683.

<u>Storey IV</u>, 175 S.W.3d at 139.

Upon consideration, the Missouri Supreme Court reasonably applied <u>Strickland</u> because this evidence would have been cumulative. Counsel is not ineffective for failing to adduce cumulative evidence. <u>See</u> <u>Winfield</u>, 460 F.3d at 1033-34. As such, Claim Thirty-Five is denied.

### M.    Claim Thirty-Six

In this claim, Petitioner alleges that his 1999 trial counsel was ineffective for failing to investigate multiple expert witnesses that would have testified on his behalf. (Pet. at p. 154). Petitioner alleges that his Biemdiek's investigation into this evidence was deficient because she relied on the opinion of his prior counsel. (<u>Id.</u> at 154-55).

Petitioner first alleges that his counsel should have called Dr. Cowan, a neuropsychologist, that interviewed and tested Petitioner in 1992. (Resp. at Ex. N-2 pp. 211-17). He also reviewed his employment records, medical records, social history records, and educational records when forming his opinion. (<u>Id.</u> at p. 217). Dr. Cowan found that Petitioner has an IQ of 87, which is considered a "little low, dull." (<u>Id.</u> at p. 240). Dr. Cowan concluded that Petitioner is "classified within the brain damaged range of neuropsychological functioning at approximately a mild degree of impairment." (<u>Id.</u> at p. 250). During cross-examination, Dr. Cowan admitted that some tests found that Petitioner was normal and others found that he had brain damage. (<u>Id.</u> at pp. 265-67). Dr. Cowan admitted that he only testifies for the defense, and when testifying, has found that a brain defect exists almost seventy percent of the time. (<u>Id.</u> at pp. 267, 270). Biemdiek testified that she decided not to call Dr. Cowan because he found that Petitioner was "just outside the normal limits," and that his conclusions would not "be compelling testimony."(<u>Id.</u> at Ex. FF-2 p. 229).

Petitioner believes that his counsel should have called Dr. Alice Vliestra ("Dr. Vliestra"), a child psychologist specializing in child development. (Pet at p. 157). She would have testified that

Keith and Petitioner turned out differently due to the positive influence of Whitney. (Id. at p. 158). She would have explained that Petitioner was genetically predisposed to alcoholism, and his childhood abuse, as well as poor parental role models, caused to him to turn to drugs and alcohol. (Id. at p. 157-58). Counsel decided not to use Dr. Vliestra because she "could alienate the jury because the prosecutor would point out that Ms. Frey's entire life had been dedicated to helping this same group of children." Storey IV, 175 S.W.3d at 144.

Dr. Straub, a psychologist, testified that Petitioner suffered from posttraumatic stress disorder and had an antisocial personality due to his abuse as a child. (Resp. at Ex. N-3 p. 377, 380). Dr. Straub testified that Petitioner was acting under extreme emotional distress at the time of the murder because receiving the divorce papers, and his heavy drinking, released his pent-up stress. (Id. at p. 406). On cross-examination, Dr. Straub had trouble explaining how Petitioner went from an everyday person that follows the law to a murderer so filled with rage that he knew of, but could not control, his actions. (Id. at pp. 428-34). Counsel could not remember why she failed to call Dr. Straub, but presumed that it was because he was not persuasive. (Id. at Ex. FF-2 pp. 235-36). She also noted that Dr. Vandenberg testified about the same topics as Dr. Straub. (Id.).

Dr. Robert Smith ("Dr. Smith"), a clincal psychologist and addiction specialist, would have testified that Petitioner was dependent on alcohol and cannabis, had posttraumatic stress disorder, and had miminal brain dysfunction. (Pet. at pp. 159-60). Dr. Smith attributed these problems to Petitioner's childhood. (Id. at p. 160). He would have testified that Petitioner's brain defect caused him to have an additional impairment when making decisions while drinking. (Id. at p. 161). Finally, he would have testified about why Keith and Petitioner had turned out differently. (Id.).

Dr. Eric Jolly ("Dr. Jolly"), a psychologist and university administrator, testified that his testing was consistent with Dr. Cowan's testing. (Resp. at Ex. N-4 p. 672). His testing showed that

Petitioner's emotional responses were consistent with an individual suffering from frontal lobe damage, and that alcohol would exacerbate the effects of this brain injury. (Id. at pp. 672, 675-76). He agreed that Petitioner's extreme emotional distress led him to commit an "extreme act of rage." (Id. at p. 679). Counsel decided not to call Dr. Jolly because his work as an university administrator left him vulnerable to being percieved as a "bureaucrat and not a scientist." (Id. at Ex. FF-2 p. 239). Counsel also believed he was vulnerable on cross-examination because Petitioner had not told him he acted with rage when killing Ms. Frey and he did not have any medical evidence to back up his diagnosis. (Id. at p. 240).

Jill Miller ("Miller"), a forensic social worker, would have testified that Petitioner's behavior resulted from his poor home environment, which began with Basler drinking while pregnant with him. (Pet. at pp. 163-65). She believed that his behavioral problems were caused by the extreme abuse he suffered as a child. (Id.). Counsel stated that she had "a little bit of concern" about using Miller because Miller was trying to tell her how to orchestrate Petitioner's defense. (Id. at Ex. FF-2 pp. 247-48). Finally, Dr. Lois Pierce would have explained the field of forensic social work and stated that Miller's investigation into Petitioner's background was similar to, but more extensive than, a normal social work report. (Id. at Ex. FF-1 pp. 15-30).

The Missouri Supreme Court addressed this claim and held:

Trial counsel is not ineffective for failing to shop for experts who will testify in a certain way. State v. Mease, 842 S.W.2d 98, 114 (Mo. banc 1992). Counsel's strategy was to rely on lay witnesses with a solid expert to tie everything together. Storey's counsel, Ms. Beimdiek, was responsible for the experts used during this trial. She testified that she does:

> not like to use experts as a general rule. . . . I think my experience and my observations have been that there are just a very limited number of experts ... who can be persuasive to a jury . . ., and I think that many times they do appear to be hired guns. . . . My preference, when possible is to rely on lay witnesses to identify [anecdotal] evidence. That is, in my mind, more persuasive to a jury than an expert . . . .

The motion court found that counsel "contacted movant's original (and current) PCR counsel about the numerous experts who testified in movant's 199[3] PCR proceeding. Trial counsel was made aware of the reservations that PCR counsel had about the various experts. Additionally, the motion court . . . in 1993 specifically found that those experts were not credible. . . ." The motion court continued: "with regard to witnesses O'Donnell, Straub, and Jolly, the 1993 motions court's findings lead to the conclusion that that court did not find them to be persuasive." The motion court further held:

> Calling all of the witnesses would be redundant and would likely alienate the jury by repeatedly seeking sympathy for [Storey's] upbringing. Trial counsel was clearly not ineffective in failing to call all of these experts. . . . Nor was counsel ineffective for failing to call any of his identified experts in addition to, or in lieu of Dr. Vandenberg. Drs. Cowan, Straub, Smith, Vliestra, in addition to Jill Miller, each failed to provide any testimony significantly different from Dr. Vandenberg.

Storey's family presented a vivid and often repeated history of child abuse from infancy. These witnesses testified that in spite of all this abuse, Storey really was a good person. Dr. Vandenberg then testified that this abuse to Storey caused him to be unstable, and to suffer from borderline personality disorder, alcohol dependency, and posttraumatic stress disorder. Dr. Vandenberg explained that Storey's personality disorder has emolliated over time, he is well-adapted to prison, and poses no threat to inmates or corrections employees. Finally, Dr. Vandenberg explained to the jury that Storey could not conform his actions to the requirements of the law because of an extreme mental or emotional disturbance. All of the other experts listed above would have testified to variations on this instability due to his childhood and familial influences. Storey has not shown that any of these experts, in any combination, "would have produced a viable defense." State v. Harris, 870 S.W.2d 798, 817 (Mo. banc 1994).

Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by not calling all of these experts to testify. Williams v. Taylor, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations omitted). Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." State v. Tokar, 918 S.W.2d 753, 761 (Mo. banc 1996). "Trial strategy is not a ground for ineffective assistance of counsel." State v. Chambers, 891 S.W.2d 93, 109 (Mo. banc 1994). Storey has not shown prejudice because he has not shown a reasonable probability that had these experts testified, "the result of the proceeding would have been different." Williams, 529 U.S. at 391, 120 S.Ct. 1495.

Storey IV, 175 S.W.3d at 144-47.

Intially, the Court must determine whether counsel satisfied her duty to make a reasonable investigation or to make a reasonable determination that an investigation was unnecessary. Link, 469 F.3d at 1203. The Court finds that this duty was satisfied. Biemdiek reviewed the prior testimony of all of these witnesses as well as their reports. (Resp. at Ex. FF-2 p. 209). She also contacted the 1992 Motion Court counsel to discuss whether these expert opinions were helpful and took notes on her impressions. (Id. at pp. 210-20, 228-59). After making these inquiries, she determined that the testimony of these experts was not helpful, which is a trial strategy decision. See Tunstall, 306 F.3d at 606.

Moreover, the Missouri Supreme Court's decision was a reasonable application of Strickland. The expert testimony was cumulative because Dr. Vandenberg's testimony, as well as the testimony of Petitioner's family, informed the jury that he had been physical and sexually abused when growing up, had a personality disorder, had an alcohol dependency, and had post-traumatic stress syndrome. Skillcorn v. Luebbers, 475 F.3d 965, 974-75 (8th Cir. 2007) (holding counsel was not ineffective for failing to put on expert to provide mitigating evidence where similar evidence was introduced through other witnesses); Bucklew, 436 F.3d 1010, 1019 (8th Cir. 2006) (holding counsel was not ineffective by failing to present testimony of neuropsychologist where a psychiatrist, which counsel considered more persuasive, testified). As such, Claim Thirty-Six is denied.

**N.    Claim Thirty-Seven**

In Claim Thirty-Seven, Petitioner alleges that he received ineffective assistance of counsel when his 1999 trial counsel failed to investigate evidence impeaching Smith and failed to obtained independent hair testing that would have supported a motion to recall the guilty verdict.[14] Petitioner

---

[14] The Court previously discussed these factual circumstances in Claim Sixteen and Claim Twenty-Four.

alleges that counsel should have introduced testimony impeaching Smith's testing of the pubic hairs found on Ms. Frey because it would have made the jury more receptive to a life sentence and would have supported a motion to recall the judgment. (Pet. at p. 173). Additionally, Petitioner alleges that independent testing of the pubic hair should have been introduced that showed the hair did not come from Petitioner. (Id. at p. 174).

The Missouri Supreme Court addressed this claim and held:

> Before addressing this claim directly, it is important to recognize the overriding trial strategy that precluded further investigation into this evidence. Ms. Frey's body was found naked below the waist. However, there was no conclusive evidence of sexual assault. Two pubic hairs were found on Ms. Frey's body, but they could not be conclusively linked to Storey. The hairs also could not eliminate Storey as a suspect. During the 1999 trial, Storey's counsel excluded any argument or evidence that Storey sexually assaulted Ms. Frey. The motion court held that "the record reflects that counsel was effective in obtaining an order excluding the State from arguing sexual assault."

> Storey now claims that trial counsel was ineffective for not obtaining additional testing of the pubic hairs. In this 29.15 proceeding, mitochondrial DNA found in the two pubic hairs was compared with Storey's mitochondrial DNA. The new results do not positively identify Storey, but he still cannot be excluded as a suspect based on the hairs because he matches them. The motion court held that this "investigation actually reveals the wisdom and prudence of trial counsel in deciding not to engage in such additional testing . . . . In this case movant sought DNA testing of the hairs. That DNA testing found a 'match.' 'Therefore, Walter Timothy Storey is not excluded as the contributor of the two questioned hairs.' " As to Storey's claim, that counsel failed to find impeachment evidence against the hair experts, counsel made a much wiser choice when she eliminated all reference to the evidence and the entire testimony of those experts.

> Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by eliminating all reference to sexual assault rather than conduct further testing or by impeaching the experts. Williams v. Taylor, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Storey has not overcome the "strong presumption . . . that trial counsel was effective . . . ." Tokar, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy" by not further testing this evidence. Id. at 766. "Trial strategy is not a ground for ineffective assistance of counsel." State v. Chambers, 891 S.W.2d 93, 109 (Mo. banc 1994). Storey has not shown prejudice because he has not shown a reasonable probability that had counsel pursued further

testing, "the result of the proceeding would have been different." <u>Williams</u>, 529 U.S. at 391, 120 S.Ct. 1495.

Regardless of the two hairs and all of the tests done on them, Storey is linked to this murder because he left a bloody handprint in Ms. Frey's room and his blood on a t-shirt. He also confessed to the crime. Trial counsel was effective enough to have all references to sexual assault excluded from the 1999 trial even though Ms. Frey was found naked from the waist down. Storey has not shown that "the result of the proceeding would have been different" had the sexual assault evidence been allowed and impeached at trial or had the mitochondrial DNA tests been conducted earlier. <u>Id.</u>

<u>Storey IV</u>, 175 S.W.3d at 143-44.

Upon consideration, the Court finds that the Missouri Supreme Court's application of <u>Strickland</u> was reasonable because the exclusion of the sexual assault evidence was a sound trial strategy decision. The Court further agrees that any testing of the hairs was unnecessary. Even if the testing proved the hair came from somewhere else, overwhelming evidence of guilt still existed. Similarly, counsel was not ineffective for keeping testimony about the pubic hair sample out of the 1999 penalty phase trial. Introducing evidence about the hairs could have opened the door to evidence about the possible sexual assault of Ms. Frey. As such, this claim is denied.

### O.     <u>Claim Thirty-Eight</u>

In this claim, Petitioner alleges that he received ineffective assistance of counsel when his trial counsel failed to object to numerous statements made by the prosecutor. (Pet. at p. 175). The Court will address each instance in turn.

#### 1.     <u>Voir Dire Comment</u>

During voir dire, the prosecutor asked one of the venirepersons, "[d]o you have a preference or leaning toward either punishment as the best punishment for people who go around committing murder first?" (Resp. at Ex. Y-1 p. 355). Defense counsel did not object. (<u>Id.</u>). Petitioner alleges that this comment led the jury to believe that he had committed more than one murder. (Pet. at p. 175).

The Missouri Supreme Court addressed this claim and held:

When asked why she did not object, counsel responded: "No strategy reason. We should have. I think that's an improper comment to make . . . . I think it suggests evidence of other crimes, that he has committed other homicides." The motion court held: "The comment requires a broad inference to be drawn from the State's comment in voir dire. Counsel was not ineffective in this regard." This Court agrees with the motion court. It would not be reasonable to think that the jury was misled by this comment into thinking that Storey had a history of murders. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to this comment, "the result of the proceeding would have been different." Williams, 529 U.S. at 391, 120 S.Ct. 1495.

Storey IV, 175 S.W.3d at 152.

Upon consideration, the Court finds that the Missouri Supreme Court's application of Strickland was reasonable. It is unreasonable to think that this comment led the jury to believe that Petitioner was guilty of multiple murders. The reasonable interpretation of this question is that the phrase "committing murder first" was an abbreviated way of saying "committing murder in the first degree." As such, any objection would have been meritless.

### 2. Plummer's Testimony

Here, Petitioner alleges that he received ineffective assistance of counsel when his trial counsel failed to object to portions of Plummer's testimony. (Pet. at pp. 176-77). Plummer testified about Petitioner's interrogation and his statements made to the police . (Resp. at Ex. Y-2 pp. 1085-87). Plummer testified that Petitioner said "he used to believe in the death penalty. He said he didn't believe in it anymore. He didn't think he should get off free." (Id. at p. 1087). The prosecutor told Plummer, "[l]et's not get into all that." (Id.). Petitioner alleges that counsel should have objected to this testimony because his views on the death penalty were irrelevant and would prejudice the jury against him. (Pet. at p. 177). At the 2001 Motion Court hearing, Kenyon admitted that he should have filed a motion in limine or objected to the testimony. (Resp. at Ex. HH pp. 100-01).

The Missouri Supreme Court addressed this claim and held:

Counsel, Kenyon, testified that he should have objected. "Actually, what I should have done was I should have filed a motion in limine requesting that that statement be excluded and that the prosecutor be instructed to instruct his witness to not bring that up." The 29.15 motion court held: "Movant's statement to Detective Plummer that he no longer believed in the death penalty can reasonably be interpreted as evidence of guilt, particularly when he followed it with the comment that movant did not feel 'he should get off free.' " Storey's comment can be interpreted as evidence of guilt. It was relevant to the penalty phase, and an objection to it would have been baseless. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." State v. Six, 805 S.W.2d 159, 167 (Mo. banc 1991).

Storey IV, 175 S.W.3d at 150-51.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland because no prejudice occurred from counsel's failure to object to this statement. The comment was isolated and not highlighted by either the trial court, the State, or his own counsel. As such, the Court will deny this claim.

### 3.     Cross-Examination of James Aiken

In this claim, Petitioner alleges that his trial counsel was ineffective for failing to object to the prosecutor's cross-examination of Aiken. (Pet. at p. 178). Aiken testified that Petitioner could be safely housed and incarcerated for the rest of his life without posing a risk of harm to the staff, inmates, or the community. (Resp. at Ex. Y-3 pp. 1236-38). During cross-examination, the State asked Aiken if he knew about various inmate murders that had occurred in Missouri prisons. (Id. at pp. 1267-71). Defense counsel made multiple objections. (Id. at pp. 1269-71). After a bench conference, the trial court sustained the objection. (Id. at p. 1272). Due to the objections, Aiken only answered one of the questions about an inmate murder and stated, "I do not have the particulars on that particular case." (Id. at p. 1270). Petitioner alleges that his counsel was ineffective because he failed to object when these other prison killings were first mentioned and failed to point out that the prosecutor had misrepresented the facts of these killings. (Pet. at p. 179).

The Missouri Supreme court addressed this claim and held:

A question is not evidence and no prejudice results from questions that are not answered. State v. Williams, 652 S.W.2d 102, 110 (Mo. banc 1983). Counsel objected to the prosecutor's question and was overruled. This is a confusing line of questioning, but two objections were not necessary. The prosecutor asked the question, which was not factually accurate, and the witness did not answer. There was nothing left for counsel to object to. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." Six, 805 S.W.2d at 167.

Storey IV, 175 S.W.3d at 153.

Upon consideration, the Court finds that the Missouri Supreme Court's decision was a reasonable application of Strickland. The record reflects that Aiken never answered the questions. See United States v. Givens, 712 F.3d 1298, 1301 (8th Cir. 1983) (holding that unanswered improper question is not a prejudicial error). Additionally, Kenyon objected five times to this line of questioning. (Resp. at Ex. Y-3 pp. 1269-72). Counsel was not under a duty to know the facts of every death row inmate's behavior while in prison. Thus, counsel's representation was not deficient, and this claim is denied.

### 4. Dr. Givon's Testimony Regarding Personality Disorder

Petitioner claims that his counsel was ineffective by not objecting to a comment made by Dr. Max Givon ("Dr. Givon"), an expert for the State. (Pet. at p. 180). After being asked about whether Petitioner's antisocial personality disorder still exists, Dr. Givons testified:

Well, I changed the diagnosis to just a personality disorder not otherwise specified because he seemed to have mellowed some over the years. And I'm not certain that this disorder is completely gone and may not be reactive once he is in a free community. I felt I should give him the benefit of the doubt and since he has not displayed any severe antisocial behaviors in prison in a number of years, I figure that the personality disorder, as I said is usually life long and so it is still there, but the antisocial aspect of it has diminished perhaps to some extent.

(Resp. at Ex. Y-4 pp. 1637-38) (emphasis added). Petitioner alleges that the highlighted portion of the testimony was prejudicial because it suggested to the jury that he would be freed from prison.

- 105 -

(Pet. at p. 180). He alleges that counsel should have objected to it and discredited it during cross-examination.

The Missouri Supreme Court addressed this claim and held:

> This comment was not repeated and there is no evidence that the witness intended to suggest that Storey could be paroled. When compared with the evidence of guilt in this case, it is not reasonable to think that this comment was what made the jury give the death penalty. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to this comment, "the result of the proceeding would have been different." Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted).

Storey IV, 175 S.W.3d at 151.

Upon consideration, the Court finds that the Missouri Supreme Court reasonably applied Strickland because Petitioner cannot show prejudice. The record shows that the jury could not have reasonably believed that Petitioner would ever be freed from jail. The jury instructions repeatedly informed them that the only possible punishments were death or imprisonment for life without eligibility for probation or parole. (Resp. at Ex. Z-2 pp. 178-86). As such, this claim is denied.

### 5.      Dr. Givon's Testimony Regarding Competence

Petitioner alleges that he received ineffective assistance of counsel when his counsel failed to object to Dr. Givon's testimony about his competence to stand trial. Dr. Givons, in pertinent part, testified that he interviewed Petitioner and found that he understood the proceedings and could cooperate with this counsel. (Resp. at Ex. Y-4 pp. 1614-15). Counsel objected to this testimony because Petitioner had not raised the issue of competence. (Id. at p. 1614). Petitioner alleges that counsel should have objected on relevancy grounds. (Pet. at p. 181).

The Missouri Supreme Court addressed this claim and held:

> When asked in the hearing why she did not object for relevancy, counsel testified: "I should have. That is the proper objection. Competency, once it's been determined that a defendant is competent [it] is not relevant, shouldn't really be mentioned in front of the jury." The motion court held: "The questions were not so improper or prejudicial

as to mislead the jury. Trial counsel did object, but the objection was overruled. There is no merit to this claim." "As a general rule, the trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." State v. Storey, 40 S.W.3d 898, 908 (Mo. banc 2001) (internal quotations omitted). It may be true that competency was not directly relevant to this part of the trial, but this testimony does not harm Storey, and the trial court had discretion to allow it. Counsel did not err by not objecting twice. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to this comment, "the result of the proceeding would have been different." Williams, 529 U.S. at 391, 120 S.Ct. 1495.

Storey IV, 175 S.W.3d at 152-53.

Upon consideration, the Court finds that this determination was a reasonable application of Strickland because Petitioner cannot show prejudice. The comment was isolated and not harmful to Petitioner's mitigation evidence. The fact that Petitioner could stand trial and aid his counsel did not undermine his mental health mitigation evidence. As such, Claim Thirty-Eight is denied.

### P.    Claim Thirty-Nine

Petitioner alleges that he received ineffective assistance of counsel when his trial counsel failed to properly object to portions of the prosecutor's closing arguments.

### 1.    Equating Mercy with Weakness

Petitioner alleges that he received ineffective assistance of counsel when his counsel failed to object to the prosecutor's argument that equated mercy with weakness. (Pet. at p. 182).[15] Counsel did file a motion in limine to exclude this argument, which the trial court denied. (Resp. at Ex. Y-1 pp. 38-40). The trial court told the State to refrain from suggestions that a life sentence equates to weakness. (Id. at p. 40). During his closing argument, however, the prosecutor equated mercy with weakness. (Id. at Ex. Y-4 p. 1698). Counsel objected to the statement as being an "improper

---

[15]The Court previously addressed this comment in Claim Twelve.

argument." (Id.). Petitioner alleges that the counsel should have objected to it for violating State v. Rousan, 961 S.W.2d 831, 850-51 (Mo. 1998).

The Missouri Supreme Court addressed this claim and held that "[t]his was raised as part of Storey's prior appeal and cannot be relitigated, even on a different theory, during a post-conviction proceeding." Storey IV, 175 S.W.3d at 154. Upon consideration, the Missouri Supreme Court reasonably applied Strickland. Here, Petitioner cannot show prejudice because the Court, in Claim Twelve, held that the comment did not result in a constitutional violation. Additionally, the Eighth Circuit has denied this exact argument. Rousan, 436 F.3d at 960. As such, this claim is denied.

### 2.      Comparing Petitioner's Life to Ms. Frey's Life

Petitioner alleges that he received ineffective assistance of counsel when his trial counsel failed to object to the prosecutor comparing his life with Ms. Frey's. (Pet. at p. 184). Specifically, the prosecutor stated:

> I don't want to get into the business of measuring the value of one life against another, but I don't think there is any debate that Jill Lynn Frey was a fine woman. You know most of us in this life go through our lives and don't do a great deal of harm and we don't do a great deal of good either, but this woman was doing a lot of good. And another part of the tragedy is, that that's been seized from us and taken from us.

(Resp. at Ex. Y-4 pp. 1700-01). Trial counsel did not object. At the post-trial hearing, Beimdiek stated that she was "not sure" that the remark was objectionable, but admitted that the remark could have been interpreted as comparing the value of Petitioner's life and Ms. Frey's life. (Id. at Ex. FF-3 p. 358).

The Missouri Supreme Court addressed this claim and held:

> The motion court held: "The state's closing argument did not attempt to weigh or compare the life of the victim against the movant's as occurred in the first trial. The state simply stated that Jill Frey was a fine person-a reasonable and fair comment on the evidence."

The prosecutor had argued in Storey's 1995 case:

> Why do we have a death penalty? The reason we have the death penalty is because the right of the innocent people to live outweighs-by huge leaps and bounds, outweighs the right of the guilty not to die. The right of the innocent completely outweighs the right of the guilty not to die, and, so, it comes down to one basic thing. Whose life is more important to you? Whose life has more value? The Defendant's or Jill Lynn Frey's?

State v. Storey, 901 S.W.2d 886, 902 (Mo. banc 1995). This Court granted post-conviction relief because of the 1995 statement and responded:

> [E]ven if the process could be distilled to "one thing," it would not be "Whose life is more important to you? Whose life has more value?" In truth, "There is one principle . . . : The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision."

Id. Even a cursory reading of these two arguments illustrates the profound difference between them. In this case, the prosecutor's statement did not mischaracterize the law, and "[c]ounsel is not deemed ineffective for declining to make a non-meritorious objection." State v. Six, 805 S.W.2d 159, 167 (Mo. banc 1991). Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by not objecting. Williams v. Taylor, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." State v. Tokar, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy." Id. at 766. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected, "the result of the proceeding would have been different." Williams, 529 U.S. at 391, 120 S.Ct. 1495.

Storey IV, 175 S.W.3d at 154-55.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland because any objection would have been without merit. The prosecutor's comments merely highlighted the victim impact evidence that Ms. Frey's death was costly to her family, friends, and the community. The prosecutor specifically stated that he was not comparing lives. As such, there was nothing to object to because he was merely discussing admissible evidence under Payne. See Carter, 92 F.3d at 671. Even assuming that counsel's performance was deficient, Petitioner cannot

show any prejudice. See Bucklew, 436 F.3d at 1022 (holding that no prejudice occurred where prosecutor referenced whether the victim's children will look back and believe that justice was served). As such, Claim Thirty-Nine is denied.

### Q.   **Claim Forty**

Petitioner alleges that he received ineffective assistance of trial counsel when his 1999 trial counsel did not file a motion to recall the mandate to challenge his guilt phase conviction due to a faulty instruction. (Pet. at p. 185). The Court has already explained the circumstances surrounding this instruction in Claim Twenty-Nine.

The Missouri Supreme Court addressed this claim and held:

> The 29.15 motion court held, in 2004, "The issue was raised in the 1993 PCR and movant was not successful. Trial counsel cannot be deemed ineffective for failing to raise an issue that was already raised without success." This issue has been litigated by Storey before and without success. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." State v. Six, 805 S.W.2d 159, 167 (Mo. banc 1991).

Storey IV, 175 S.W.3d at 157-58.

Upon consideration, the Court finds that the Missouri Supreme Court's decision was a reasonable application of Strickland. The Missouri Supreme Court limited the effect of Erwin to "cases tried in the future or on direct appeal where the issue was preserved." See State v. Chambers, 891 S.W.2d 93, 106 (Mo. 1994). Neither circumstance applies here, meaning Erwin has no effect on this case. As such, his trial counsel was not ineffective because any motion to recall the mandate would have been meritless. See Hopkins, 92 F.3d at 671. As such, Claim Forty is denied.

### R.   **Claim Forty-One**

In this claim, Petitioner alleges that he received ineffective assistance of counsel when his trial counsel failed to challenge the penalty phase instructions as being too confusing to jurors. (Pet. at p. 187). Petitioner alleges that counsel could have supported this objection with scientific evidence from

Dr. Richard Wiener ("Dr. Wiener"), a psychologist. (Id.). Dr. Wiener's research shows that jurors do not understand the model instructions, making them more likely to impose the death penalty. (Id.).

The Missouri Supreme Court addressed this claim and held:

> Storey points to nothing specific about the instructions that was confusing to the jury, but instead argues generally that all death penalty instructions are flawed, so naturally the instructions in his case must have been flawed. Storey cites no other case in his brief to support this claim. Free is the only case discussed, and in that case the Seventh Circuit specifically rejected a similar study. Id. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." State v. Six, 805 S.W.2d 159, 167 (Mo. banc 1991).
>
> Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by failing to object to the jury instructions based on Dr. Wiener's study. Williams v. Taylor, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." State v. Tokar, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy." Tokar, 918 S.W.2d at 766. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to the instructions, "the result of the proceeding would have been different." Williams, 529 U.S. at 391, 120 S.Ct. 1495.

Storey IV, 175 S.W.3d at 158-59.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. The Eighth Circuit recently rejected the exact same argument about Dr. Wiener's studies and the Missouri death penalty instructions. See Middleton v. Roper, 498 F.3d 812, 819 (8th Cir. 2007); see also Free v. Peters, 12 F.3d 700, 704-07 (7th Cir. 1993) (Posner, J.) (rejecting similar argument). As such, Claim Forty-One is denied.

## S.     Post-Trial Hearing Related to Juror Misconduct

Following the 1999 penalty phase trial, Judge Ellsworth Cundiff ("Judge Cundiff") went back and spoke to jury. (Resp. at Ex. Y-4 p. 1712). Because Petitioner's case was a death penalty case, the jury was visibly upset. (Id.). Judge Cundiff, in an attempt to make them feel better, told them that the ultimate decision rested with him. (Id. at p. 1713). He also informed the jurors that "this was

[Petitioner's] third time and the third sentence of death." (Id.). After Judge Cundiff made this statement he heard, "one of the jurors to [his] left and in the background said, male juror said, I knew it." (Id.). Judge Cundiff informed the parties of this comment almost two weeks after the trial ended. (Id. at p. 1712). The State argued that no inquiry was necessary because the statement was "ambiguous." (Id. at p. 1714). Judge Cundiff agreed with the State and stated, "I don't know what he meant whether he was responding to me or whether he was responding to one of the other jurors. There was a lot of talking going on. I heard it loud and clear so I don't have a feeling on it." (Id.).

Judge Cundiff was later recused and Judge Nancy L. Schneider ("Judge Schneider") held a hearing on November 22, 1999. (Resp. at Ex. Y-5 p. 1). The jurors were questioned alone and individually, and they were asked these four questions: (1) "[i]s it true, that you were a member of the jury panel in the case of State versus Walter Storey?"; (2) "[d]id you know before being sworn in as a juror that the defendant had previously been given the death penalty?"; (3) "[d]id you read any articles or see or hear any programs during the trial or during the deliberations indicating to you that the defendant had previously been sentenced to death?"; and (4) "[d]id any person, other than another juror, tell you during the trial or during the deliberations that the defendant had previously received the death sentence?". (Id. at pp. 16-34). Each juror answered "yes" to first question and "no" to the other questions. (Id.). Based on this hearing, Judge Schneider found that there was no juror misconduct. (Id. at pp. 35-36).

In 2003, Petitioner's post-conviction counsel deposed both Judge Cundiff and Jeffery Paulson ("Paulson"), the bailiff. (Pet. at p. 190). Judge Cundiff testified that he thought he heard a male voice say "I knew that" when he told the jury that Petitioner had previously received the death penalty. (Id.). He also testified that he did not hear any other statements from a juror that would have caused someone to say "I knew that." (Id.). He stated that everyone in the jury room was talking and that

he has a hearing problem, but does not wear a hearing aid. (<u>Id.</u>). Paulson testified that he did not hear

the statement, but did see a male juror nodding his head. (<u>Id.</u> at p. 193). He also admitted that he may

have told a post-conviction investigator that he heard the comment. (<u>Id.</u>).

1. <u>**Claim Forty-Two**</u>

In this claim, Petitioner alleges that he received ineffective assistance of counsel when his trial

counsel failed to call Judge Cundiff and Paulson at the November 22, 1999 hearing. (<u>Id.</u> at p. 189).

Petitioner believes that he was prejudiced by their absence because, without them, there was no

independent evidence of juror misconduct. (<u>Id.</u> at p. 194).

The Missouri Supreme Court addressed this claim and held:

> The questions asked of the jurors were carefully constructed to balance the need to make sure that no juror had gained extrinsic information with the rule prohibiting "testimony of a juror . . . for the purpose of impeaching the verdict of a jury." <u>Wingate</u>, 853 S.W.2d at 916. No juror misconduct was revealed at the special hearing. Judge Schneider already knew that Judge Cundiff had heard the statement and that the bailiff had not heard it. There was no reason to call the judge and bailiff at the special hearing.
>
> Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by not calling the judge and the bailiff. <u>Williams v. Taylor</u>, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." <u>State v. Tokar</u>, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy." <u>Id.</u> at 766. "Trial strategy is not a ground for ineffective assistance of counsel." <u>State v. Chambers</u>, 891 S.W.2d 93, 109 (Mo. banc 1994). Storey has not shown prejudice because he has not shown a reasonable probability that had the judge and the bailiff testified, "the result of the proceeding would have been different." <u>Williams</u>, 529 U.S. at 391, 120 S.Ct. 1495. Storey has not established the existence of any additional evidence that would have been admissible and the absence, of which, might have been prejudicial.

<u>Storey IV</u>, 175 S.W.3d at 130.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of

<u>Strickland</u>. There was no need for Judge Cundiff to testify because Judge Schneider already had

copies of the transcripts from the earlier hearing where Judge Cundiff first told the parties about the possible misconduct. (Resp. at Ex. Y-5 p. 5). There was no need to have Paulson testify because his testimony would have added little to the proceedings. At most Paulson "may" have heard the comment and saw a male juror shaking his head. (Pet. at p. 193). Moreover, Petitioner cannot show prejudice. Judge Schneider held a hearing and questioned each juror individually and each denied having any extrinsic information. There is no reasonable probability that Judge Cundiff and Paulson's testimony would have altered this result. As such, Claim Forty-Two is denied.

### 2.     <u>Claim Forty-Three</u>

Petitioner next alleges that the trial court erred by failing to inform defense counsel of the possible juror misconduct when it happened because this delay prejudiced him. (Pet. at p. 195). Additionally, he alleges that this passage of time caused the loss of valuable information. (<u>Id.</u> at pp. 195-96). Judge Cundiff testified that he waited two weeks before telling the parties because he needed to think about what to do and did not want to upset the jurors. (<u>Id.</u> at p. 193).

The Missouri Supreme Court addressed this claim and held:

> Storey's alternative argument, that he was prejudiced by the delay of the special hearing, cannot be construed as resulting from the ineffectiveness of counsel. Moreover, no prejudice to Storey has been shown for the same reasons explained above.

<u>Storey IV</u>, 175 S.W.3d at 130.

Upon consideration, The Missouri Supreme Court's decision did not result in a decision that was contrary to clearly established federal law or an unreasonable application of federal law to the facts. Petitioner's argument focuses on the delay amounting to a constitutional violation. The one case he cites, however, does not support the proposition that issues of juror misconduct must be immediately resolved. <u>See</u> <u>United States v. Boyd</u>, 610 f.2d 521, 524-26 (8th Cir. 1979). Moreover,

the Court does not see how a two-month delay in resolving this issue violated Petitioner's constitutional rights. As such, Claim Forty-Three is denied.

**T.      Claim Forty-Seven**

In this claim, Petitioner alleges that he received ineffective assistance of counsel when his appellate counsel failed to argue that Basler's testimony about Keith's ongoing relationship with Whitney was improperly excluded. (Pet. at p. 204). At trial, defense counsel attempted to introduce evidence that Keith and Petitioner had different upbringings. They tried to introduce this evidence through Basler, but the Court sustained the State's objection to this testimony on relevancy grounds. (Resp. at Ex. Y-4 pp. 1431-33).

Keith later testified that he met Whitney and went to live with him. (Id. at pp. 1567-68). He also testified that Petitioner once moved in with his real father in Alabama. (Id. at p. 1568). On cross-examination, Keith also testified about moving out of Basler's home when he was approximately fifteen. (Id. at pp. 1584-85).

The Missouri Supreme Court addressed this claim and held:

> Appellate counsel testified: "When I read the transcript I thought it was just minimal evidence about the kind of contact Keith had had with his father, and it really-it just didn't seem to me that it was a very strong point." The motion court held that counsel "made a reasonable decision of appellate strategy to not raise that issue on appeal." Because counsel's decision not to appeal the trial court's ruling was trial strategy, it "is not a ground for ineffective assistance of counsel." State v. Chambers, 891 S.W.2d 93, 109 (Mo. banc 1994).

Storey IV, 175 S.W.3d at 149.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. Counsel rightly determined that this claim was weak and chose to pursue stronger arguments on appeal.  See Link, 469 F.3d at 1205-06. Petitioner cannot demonstrate prejudice because the jury learned that Keith lived with his biological father during his teenage years while

Petitioner had very limited interaction with his biological father. See Winfield, 460 F.3d at 1033 (holding that counsel is not ineffective for failing to present cumulative evidence). As such, Claim Forty-Seven is denied.

### U.    Claim Forty-Eight

In this claim, Petitioner alleges that he received ineffective assistance of appellate counsel when his counsel failed to argue the he should have received a mistrial due to Plummer's statements. (Pet. at p. 206).

Plummer was the police detective that interviewed Petitioner after the murder. (Resp. at Ex. Y-2 pp. 1055-56). The prosecutor asked Plummer if Petitioner had indicated whether he was being truthful. (Id. at p. 1064). Plummer responded, "[w]hen we made — when I made that statement, he nodded his head in an affirmative way and said, okay, I'll tell you what really happened, but maybe I need to talk to a lawyer." (Id.). Beimdiek objected because the evidence about asking for a lawyer had been excluded in a motion in limine. (Id.). She also asked the Court to grant a mistrial. (Id. at p. 1065). The Court refused to grant a mistrial, but asked Beimdiek if she wanted any other relief. (Id. at p. 1066). Beimdiek declined any further relief to avoid highlighting the issue to the jury. (Id.).

The Missouri Supreme Court addressed this claim and held:

> Trial counsel objected to the testimony and raised it in a motion for new trial. Appellate counsel testified that it was an error for the officer to have mentioned the right, but was merely a quick reference and insignificant. Appellate counsel did not think it would require reversal. The motion court found that appellate counsel consciously decided not to raise it on appeal because it would not bring reversal. Because counsel's decision not to appeal the trial court's ruling was trial strategy, it "is not a ground for ineffective assistance of counsel." Chambers, 891 S.W.2d at 109.

Storey IV, 175 S.W.3d at 149.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. Generally, appellate counsel is not ineffective by raising some claims on appeal and

ignoring others because such a choice represents the sound strategy of focusing on stronger claims. Link, 469 F.3d at 1205-06. This presumption is only overcome when ignored issues appear stronger than those raised. Id. Here, this issue was not stronger than the ones raised. In Missouri, a mistrial is "a drastic remedy to be exercised only in those extraordinary circumstances in which prejudice to the defendant cannot otherwise be removed." State v. Goff, 129 S.W.3d 857, 866 (Mo. Ct. App. 2004) (quoting State v. Johnson, 901 S.W.2d 60, 62 (Mo. 1995)). The failure to request any other corrective action aside from a mistrial "dulls any inclination" that a mistrial was warranted. See State v. Webber, 982 S.W.2d 317, 323 (Mo. Ct. App. 1998). As such, this claim had no chance of success on appeal, meaning counsel's decision not to raise it was reasonable. Claim Forty-Eight is denied.

## V.      Claim Forty-Nine

In this claim, Petitioner alleges that he received ineffective assistance of appellate counsel when his counsel failed to argue that the trial court erred by denying his request for the 1999 penalty-phase trial to be a bench trial. (Pet. at p. 207). At his 1999 penalty-phase trial, Petitioner filed a motion to waive his right to a jury and have a bench trial. (Resp. at Y-1 p. 106). The State objected on the basis of Mo. Rev. Stat. § 565.006.3 and stated that it did not consent. (Id. at p. 109). The trial court denied Petitioner's motion on the basis of the State's objection. (Id.). Petitioner alleges that his appellate counsel should have argued that this ruling was erroneous because it conflicts with Mo. Const. Art. I, § 22. (Pet. at p. 208).

The Missouri Supreme Court addressed this claim and held:

Punishment is different than guilt. A "defendant has no constitutional right to have a jury assess punishment." State v. Taylor, 929 S.W.2d 209, 219 (Mo. banc 1996). Section 565.006.3, RSMo 1993, provides: "If a defendant is found guilty of murder in the first degree after a jury trial . . ., the defendant may not waive a jury trial of the issue of the punishment to be imposed, except by agreement with the state and the court." Storey exercised his right to a jury at the guilt phase of his trial and received a jury for his guilt phase. He did not have a right to waive a jury for punishment,

- 117 -

<u>Taylor</u>, 929 S.W.2d at 219, and the State did not grant him the privilege. Appellate counsel did not err in deciding not to appeal this jury waiver claim.

<u>Storey IV</u>, 175 S.W.3d at 149-50.

Upon consideration, the Court finds that no violation of <u>Strickland</u> occurred here because Petitioner cannot show prejudice. The Missouri Supreme Court has determined that Mo. Const. Art. I, § 22 has no impact on Mo. Rev. Stat. § 565.006.3. <u>See id.</u> This determination of state law is binding on this Court. <u>See</u> <u>Wainwright v. Goode</u>, 464 U.S. 78, 84 (1983). Because the Missouri Supreme Court rejected Petitioner's argument that § 565.006.3 does not violate the Missouri Constitution, Petitioner cannot show prejudice because there is no reasonable probability that this argument would have been successful on appeal. As such, Claim Forty-Nine is denied.

### W.  **Claim Fifty**

In this claim, Petitioner alleges that he received ineffective assistance of appellate counsel when his counsel failed to argue on appeal that the denial of his motion for a new guilt-phase trial was erroneously denied. (Pet. at p. 209). The motion was based on the contention that the 1991 trial court had erred by allowing evidence of a prior conviction because that conviction had been overturned on appeal. (<u>Id.</u>). <u>Storey II</u>, however, held that although the admission of this evidence was erroneous, it was a harmless error. 986 S.W.2d at 466. The motion asked the court to reconsider the Missouri Supreme Court's ruling. (Pet. at p. 210).

The Missouri Supreme Court addressed this claim and held:

Storey claims that appellate counsel was ineffective for failing to appeal the trial court's decision "denying a new guilt phase because evidence of Tim's vacated Georgia conviction was highly prejudicial." At trial, Storey was impeached with evidence of a vacated prior conviction in Georgia. This was discussed by this Court in Storey's second appeal, and was held to have been harmless. <u>State v. Storey</u>, 986 S.W.2d 462, 465-66 (Mo. banc 1999). Appellate counsel testified that she "thought the issue had previously been presented to the Missouri Supreme Court and ruled on, and I didn't see any reason to raise it again." The motion court denied the ineffective

assistance claim. It was not error for counsel not to raise this issue again before this Court.

Storey IV, 175 S.W.3d at 150.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of Strickland. This claim was a weak and had little chance of success on the merits. Appellate counsel's decision to ignore it represented sound appellate strategy. Link, 469 F.3d at 1205-06. As such, Claim Fifty is denied.

## V. Claim Addressed on the Merits--2001 Motion Court

### A. Claim Seventeen

In this claim, Petitioner alleges that 2001 Motion Court erred by denying his claim that the decision to seek the death penalty was the result of prosecutorial misconduct committed by Kenny Hulshof ("Hulshof"), the prosecutor in the 1991 guilt phase trial. (Pet. at p. 70).

In 1995, while Hulshof was running for a seat in the United States House of Representatives, the Missouri Supreme Court reversed Petitioner's sentence due to Hulshof's prosecutorial misconduct. Storey I, 901 S.W.2d at 900-02. One of the main attacks against Hulshof while he was running for Congress was that he had mishandled a murder case by accidently letting the speedy trial time lapse. (Pet. at p. 71). In 1995, while running for Congress and after he left the Missouri Attorney General's office, Hulshof entered his appearance for the State in the retrial of the penalty phase. (Id.). Prior to the 1997 penalty-phase trial, Hulshof was removed from the case on defense counsel's motion. (Id. at p. 74). Hulshof testified that he was close to the Frey family and wanted to see the case through to the end. (Id. at p. 75). He also testified that he wanted the appointment to earn some money because he did not have a job while running for Congress. (Id.). Petitioner believes that the decision to seek the death penalty was based on Hulshof's improper motives and the demands of the

Frey family to "retry the case, in whole or in part, as often as necessary, to seek and secure the death penalty." (Id.).

The Missouri Supreme Court addressed this claim and held: "Three different prosecutors sought the death penalty against Storey and three different juries assessed the death penalty against Storey. Storey's claim is not a recognized 29.15 claim. This point is frivolous and is denied." <u>Storey IV</u>, 175 S.W.3d at 148.

A state many not impose the death penalty in an arbitrary and capricious manner. <u>Battle v. Delo</u>, 19 F.3d 1547, 1562 (8th Cir. 1994). Additionally, due process requires that "vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." <u>Sexton v. Kemna</u>, 278 F.3d 808, 811 (8th Cir. 2002) (quoting <u>North Carolina v. Pearce</u>, 395 U.S. 711, 725 (1969)). There is no presumption of vindictiveness if the same sentence is imposed following a successful appeal. <u>Id.</u> at 812.

Upon consideration, the Missouri Supreme Court's decision was a reasonable application of federal law. Hulshof was removed from the case before trial began. The brutal manner of Ms. Frey's murder provided the State with a valid reason for pursuing the death penalty. In each of Petitioner's three penalty-phase trials, the State chose to seek the death penalty. As such, Claim Seventeen is denied.

## REQUEST FOR EVIDENTIARY HEARING

Petitioner requests that the Court grant him an evidentiary hearing. (Pet. at p. 211). The AEDPA has limited the circumstances in which a federal habeas court may order an evidentiary hearing. Section 2254(e)(2) states:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–

(A) the claim relies on–

    (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Id. Furthermore, an evidentiary hearing is unnecessary when the issues raised in the petition can be resolved on the basis of the state court records, see Reynolds v. Caspari, 974 F.2d 946, 948 (8th Cir. 1992), or when the record clearly indicates that the claims are either barred from review or without merit. See Wilson v. Kemna, 12 F.3d 145, 146 (8th Cir. 1984) (citations omitted).

Upon consideration, the Court will deny Petitioner's request for an evidentiary hearing, because the state court records are sufficient, and because Petitioner's claims are without merit.

## CERTIFICATE OF APPEALABILITY

Section 102 of the AEDPA requires the Court to issue a certificate of appealability in order for a § 2254 petitioner to appeal a dismissal of a Petition for a Writ of Habeas Corpus to the Court of Appeals. See 28 U.S.C. § 2253. This Court possesses the authority to issue certificates of appealability under 28 U.S.C. §2253(c)(1) and Rule 22(b) of the Federal Rules of Appellate Procedure. See Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997). The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(1); Tiedeman, 122 F.3d at 521. "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997), cert. denied, 525 U.S. 834 (1998). Finally, section 2253(c)(3) requires that the certificate of

appealability "specify [the] issue or issues with respect to which the applicant has made a substantial showing of the denial of a constitutional right." Tiedeman, 122 F.3d at 522 (citing 28 U.S.C. § 2253(c)).

Upon consideration, the Court finds that Petitioner has made the requisite showing with respect to the following grounds in his petition: Claim Nine, Claim Fourteen, Claim Twenty-Seven, and Claim Thirty-Nine.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Walter T. Storey's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 17) is **DENIED** and his claims are **DISMISSED** with prejudice. An Order of Dismissal shall accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that a partial Certificate of Appealability shall issue herewith and accompany the same.

Dated this 16th day of June, 2008.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE